# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

JAMES DAVID BECK and GERALD DEAN CRUZ,
Defendants and Appellants.

S029843

Alameda County Superior Court
110467-A and 110467-B

December 2, 2019

Justice Liu authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Chin, Corrigan, Cuéllar, Kruger, and Groban concurred.

PEOPLE v. BECK and CRUZ

S029843


Opinion of the Court by Liu, J.


Defendants James David Beck and Gerald Dean Cruz were convicted of the first degree murders of Dennis Ian Colwell, Emmie Darlene Paris, Franklin Delano Raper, and Richard Talmadge Ritchey, and of conspiracy to commit murder. (Pen. Code, §§ 182, subd. (a)(1), 187, subd. (a), former § 189 (all further undesignated statutory references are to the Penal Code).) The jury also found true, as to both Beck and Cruz, a multiple-murder special-circumstance allegation and allegations of personal use of a deadly weapon (baseball bats, knives, and a baton). (§ 190.2, subd. (a)(3), former § 12022, subd. (b).) After separate penalty phases before the same jury, the jury returned death verdicts — first for Cruz and then for Beck — and the trial court entered judgments of death. This appeal is automatic. (Cal. Const., art. VI, § 11, subd. (a); § 1239, subd. (b).)

We vacate as unauthorized the multiple-murder special-circumstance true findings as to Count V (conspiracy to commit murder) for Beck and Cruz, as well as the death sentences imposed for that count. (See *post*, pt. II.C.5.) As so modified, we affirm the judgments, including the judgments of death based on the murders.

## I. FACTS

### A. Guilt Phase

Shortly after midnight on the night of May 20, 1990 and early morning hours of May 21, 1990, Beck, Cruz, Jason LaMarsh, Ronald Willey, Richard Vieira, and Michelle "Missy" Evans, entered a house located at 5223 Elm Street in Salida and killed Colwell, Paris, Raper, and Ritchey. A fifth resident, Donna Alvarez, escaped the house during the attack and subsequently identified LaMarsh as one of the perpetrators.

The original complaint charged all six perpetrators, but the cases of Vieira and Evans were severed. Following a change of venue from Stanislaus County to Alameda County, Beck and Cruz were tried with LaMarsh and Willey, but the jury was unable to reach a verdict on the charges against the latter two men.

Evans entered a plea agreement under which, as relevant here, she would plead guilty to being an accessory and the district attorney would recommend a sentence of one year (less six months for time served, and further reduced by conduct and work credits) in exchange for her truthful testimony at trial against Beck, Cruz, LaMarsh, and Willey. The crime of accessory carried a maximum term of three years of imprisonment and a fine not exceeding $5,000.

#### 1. Prosecutor's evidence

##### a. Events before May 20

In late 1989, Cruz, his girlfriend Jennifer S., and his two small children moved into a studio apartment in a residential area of Salida known as the "Camp." Around the same time, Beck and Vieira moved into a large trailer in front of the studio. At some point, LaMarsh began to date Evans and

frequently stayed in a smaller trailer located behind Beck and Vieira. Cruz, Beck, and Vieira often wore camouflage clothing.

In January 1990, Raper, who was about 50 years old, moved his trailer into the Camp. Raper had several friends who frequently visited, including Debbie "Little Debbie" Smelser and James "Fat Cat" Smith. Raper had an acrimonious relationship with Beck, Cruz, and LaMarsh. Cruz told an acquaintance before the May 20, 1990 murders that he would "like to get his hands on" Raper.

At least six weeks before the murders, Beck, Cruz, and LaMarsh hooked Raper's trailer to Beck's van and moved it to nearby 5223 Elm Street. A group of men, including Beck, Cruz, Vieira, and LaMarsh, then pushed Raper's car off the property. The car was then set on fire.

Tanya Miller, Michelle Evans's younger half-sister, had previously lived with Evans at 5223 Elm Street. In April 1990, while Miller was still living at 5223 Elm Street, she received a 30-day eviction notice. She left her furniture in the house and moved in with Evans at their grandmother's house. She received a three-day notice shortly before the murders, became anxious to move her furniture, and asked Evans to help her move.

On Friday, May 18, 1990, about 9:00 p.m., Evans, Cruz, Beck, LaMarsh, Willey, and Vieira went to 5223 Elm Street to move out furniture. Cruz brought a 12-pack of beer and shared it with everyone there, including victims Colwell, Ritchey, Raper, and Paris. Raper and LaMarsh spoke for about 10 minutes and then briefly engaged in a fistfight. Beck and Willey then started wrestling with Vieira. No furniture was moved. After 45 minutes to an hour, Evans and the others

returned to the Camp. Later that night, Colwell visited the Camp and was beaten by Beck, Cruz, LaMarsh, Willey, and Vieira before being permitted to leave.

### b. *Events on May 20 and May 21, 1990*

Around noon on May 20, Smith visited Raper at 5223 Elm Street. Victims Ritchey and Colwell were also there. Sometime between 1:00 p.m. and 3:00 p.m., Smith observed LaMarsh visit the neighbor next door to Raper.

Sometime on the evening of May 20, Vieira visited Cruz's next-door neighbor, Dee Ann Messinger; Vieira was dressed in camouflage clothes, a dark ski cap that resembled a cap found at the murder scene, and black boots. He was carrying a silver or gray bat that resembled the color and length of a bat found at the murder scene and asked to borrow spray paint.

Around 6:00 p.m. on May 20, Evans visited the Camp. Cruz asked Evans to draw a floor plan of the house at 5223 Elm Street. As she did so, Cruz sharpened a Ka-Bar knife, a fixed blade about 10 inches long with serrations on one side. Cruz also told Evans to call her half-sister Miller and "tell her not to go home tonight."

Late at night on May 20, Patricia Badgett was visiting her boyfriend Willey when he received a telephone call from a person who sounded like Cruz. Willey lived in Ceres and had shoulder-length hair. Willey asked Cruz, "Can we move a different day?" and explained he did not feel well. Willey left a few minutes later.

Later that evening, Evans, Cruz, Beck, LaMarsh, Willey (whose hair was in a ponytail), and Vieira gathered in LaMarsh's trailer and were given assignments of what to do at 5223 Elm Street. Everyone but Evans and LaMarsh was

wearing camouflage clothing. Cruz pointed to Evans's floor plan, gave each person a specific entrance and time to enter, and said they should "go and do them all and leave no witnesses." Evans understood "do them all" to mean kill them but did not believe Cruz was serious. Evans was to "count the people and get them in the living room," and then open the back bedroom window for Beck and Vieira. Cruz said if "anyone didn't do their job right, they would join the people in the house." Cruz also said that if Little Debbie was there, "she's his," and that he hoped Fat Cat was there. Cruz handed out four paintball or camouflage masks to Beck, Willey, Vieira, and himself. Cruz said that handguns would not be used because they were "too noisy." There was no discussion of moving furniture.

Around midnight, Evans, Beck, Cruz, LaMarsh, Willey, and Vieira, who were carrying weapons, drove to 5223 Elm Street. Evans and LaMarsh were dropped off, and the others parked the car. Evans entered the home and then from a window observed Beck, Cruz, Willey, and Vieira running toward the house wearing masks. Vieira also wore a dark ski cap. Beck and Vieira entered the house through the window where Evans was standing. Beck and Vieira ran toward the living room, and about 30 seconds later Evans heard Paris screaming, "Oh, God, oh, God," and "I didn't do it, I didn't do it," and pleading for her life. Evans left the house and went to the car. On the way, she saw Willey sitting on the back of a person lying facedown in the street; Willey and Cruz, who had a baton, did something to this individual.

Donna Alvarez, who was homeless and had been offered a place to stay at 5223 Elm Street on May 20 by victim Ritchey, fell asleep in a back bedroom around 8:00 p.m.

Alvarez was awakened around midnight by a woman she now knew as Evans, who said Evans's sister needed the bedroom and Alvarez had to get up. Alvarez went into the living room and asked Raper if there was anywhere else she could sleep. He said she could sleep wherever she liked, so Alvarez, joined by Ritchey, went into the other bedroom. A man, whom Alvarez later identified as LaMarsh, was holding a silver gun and said, "Everyone into the living room." Alvarez ran and hid under clothes in the garage. She heard people "wrestling" and a woman scream. She managed to push up the garage door and escape, and sought help from a neighbor who called the police.

Around midnight, Earl Creekmore, who lived near 5223 Elm Street, heard someone running next to his house and then a loud bang on his air conditioner. Creekmore went outside to investigate. He saw two men "beating up on one guy" on his knees in the street; the victim was screaming, "Oh, God, help me." The victim also said, "No, stop, please don't." The assailants were kicking the victim in the ribs and punching him in the back of the head. One assailant, whom Creekmore identified at trial as Willey, had a ponytail that reached the middle of his back. The other, whom Creekmore identified at trial as Cruz, was heavyset and wore a red baseball cap.

Creekmore asked the men what was going on, but they did not respond. Cruz went into the house at 5223 Elm Street and then immediately returned to the street. By this time, the beating victim had fallen over and was lying motionless on his back in the street. Cruz straddled the victim, picked him up by his shirt, and "made a cutting motion on his throat." The victim made a gurgling sound. Creekmore started to leave,

looked back, and saw Willey swinging what appeared to be a two-by-four over his head. Creekmore returned home, and his roommate called 911.

Also around midnight, Kathy Moyers arrived at a friend's home, located across the street from 5223 Elm Street. She saw three people "scuffling" on the shoulder of the street. One person appeared drunk because he was falling down. When she exited her car, she heard the man on the ground saying, "Please don't, no, please," and "please, no, help me, stop." He was on his knees, and the other two were standing over him. The other two persons were reaching for the fallen man to pick him up. One of the assailants had broad shoulders, weighed about 260 pounds, and was about five feet eight inches tall. He had on a ski cap and resembled Cruz in size and shape. The other assailant was smaller, about five feet five inches tall, 145 to 160 pounds, with a light-colored ponytail, and resembled Willey in size and shape. Moyers called the police. She then saw the body lying in the street and the assailants entering the house at 5223 Elm Street.

About four minutes later, Moyers observed four persons leave the house, including the two assailants and two men similar in build to Beck and LaMarsh. They were all dressed alike in heavy, dark clothing, and they wore ski caps similar to one found at the crime scene. They looked at the body in the street and walked toward the tracks.

Around 12:45 a.m. on May 21, William Duval, the rental manager for 5223 Elm Street who lived nearby the home, was awakened when something hit his bedroom window. He saw a woman crawling on her hands and knees across his lawn. He went outside and a few minutes later observed four men

7

leaving 5223 Elm Street in single file, going east "double-time" or "trotting." They all appeared to be dressed the same. The two men at the front of the line were six feet to six feet two inches, and weighed about 165 pounds. Beck's and Willey's physical builds were consistent with these men. The third man was five feet ten inches to six feet tall and heavyset, weighing about 350 pounds. Cruz's physical appearance was consistent with this man. The last man was much shorter and had a darker complexion than the other men. LaMarsh's general physical build was consistent with the last man. LaMarsh and Vieira had the same complexion, but Vieira was a bit shorter. The men held their hands at "port arms position," or one hand on the chest, and the other toward the shoulder; Duval could not tell if they were carrying anything.

When Beck, Cruz, LaMarsh, Willey, and Vieira returned to the car where Evans was waiting, Beck was covered in blood and carrying a bloody knife, Cruz had blood on his hands, and LaMarsh's bat was bloody. The group drove to Willey's home in Ceres. On the way, LaMarsh said he did not think Raper was dead, and Beck replied, "He's dead. I saw his face crumble as I was walking out the door." Beck also said it was a "waste that they only got three dudes and a chick." Willey said, "Someone watched us do" or kill "the guy in the front yard," and Cruz became angry because they did not kill the person watching. Vieira said he had thrown away the Ka-Bar knife, his bat, and the baton. LaMarsh wanted to throw his bat out the window, but Cruz said he should keep it. Cruz was disappointed Little Debbie and Fat Cat had not been there because he would have liked to kill them.

When the group arrived at Willey's house, everyone but Evans and LaMarsh laundered their clothes. Vieira said he

left his hat at the crime scene, and Vieira and Willey said they had left their masks. Cruz directed Vieira to clean the blood off Cruz's shoes and from the car. The remaining masks and weapons were put under Willey's house. Willey later moved the weapons from this location.

Evans subsequently asked LaMarsh what he saw inside the house, and he appeared frightened and said, "Missy, it was the worst thing you ever want to see." LaMarsh described Raper raising his arm and LaMarsh then hitting Raper with the bat and breaking his arm. LaMarsh also said he had knocked down with the bat three individuals who were attempting to flee the home.

About 1:00 am on May 21, 1990, Stanislaus County Deputy Sheriff Charley Corle received a call regarding an assault in the area of Elm and Mason in Salida. He arrived about four minutes later, saw an ambulance next to a body lying in the street, and was directed by Alvarez to 5223 Elm Street. A blood-stained camouflage mask was found between Ritchey's legs, and a dark knit cap and a second camouflage mask were found on the front lawn of 5223 Elm Street. Shoe prints in the gutter area in front of the house were the same size and type as shoes belonging to Evans.

Found nearby in a field and in the same general area were a metal baton, a bloody aluminum bat, and a Ka-Bar knife. About 15 feet from the knife was a knife sheath.

### c. Additional evidence linking Beck and Cruz to the murders

Shortly after the murders, Beck told an acquaintance, Phillip Wallace, that "we" or "I" "slit some throats." Wallace

was shocked and said something like, "You're not serious." Beck smirked.

Sylvia Zavala worked at Crescent Supply Company, an Army surplus store in Modesto that Beck and Cruz had previously visited. On February 27, 1990, Zavala showed Cruz camouflage masks that were similar to one found at the murder scene. A store receipt for the purchase on that date of four masks and camouflage clothing was found in Cruz's home. Sometime after February 27 and before March 13, Cruz purchased 16-by-16-foot camouflage netting. On March 13, 1990, Cruz purchased a Ka-Bar knife similar to one found at the murder scene; a receipt for the purchase on that date of two knives was found in Cruz's home.

Steve Miller worked at Gun Country, a retail gun shop in Modesto. Cruz and the prosecutor stipulated that several weeks before the murders, Cruz purchased the police baton found at the murder scene. Cruz was accompanied by Beck. The parties also stipulated that Exhibit No. 87, a .380-caliber weapon that resembled the gun Alvarez saw LaMarsh holding on the night of the murders, was purchased on July 25, 1989 and registered to Beck.

Dr. William Ernoehazy, a pathologist, performed autopsies on Raper, Colwell, Paris, and Ritchey. Raper had suffered extensive and fatal head injuries by a blunt force instrument, most likely a baseball bat but possibly a baton. The outline of his head and his facial features were distorted, and bone fragments had been driven deep into his brain. He had also been stabbed in the neck, with his right carotid artery and larynx cut, and his left arm was broken.

Colwell had suffered a skull fracture, cut and stab wounds to his face, multiple stab wounds to his skull, stabbing and slicing wounds to his neck that cut his jugular vein, carotid artery, and larynx, a slicing wound to his liver, stab wounds to his chest, and defensive wounds to his left hand. The cause of death was stab wounds to the neck and abdomen.

Paris had suffered multiple contusions and lacerations of her scalp from a blunt force instrument, stab wounds to her neck and chest, and defensive hand wounds. The cause of death was a severed throat, a wound that cut her carotid vessels, jugular vein, and larynx, and extended down to her spine.

Ritchey had suffered stab wounds to his neck, back, abdomen, and liver, and multiple defensive wounds on his hands. There were slicing wounds of his heart and pulmonary artery that caused extensive hemorrhaging in his chest cavity. His jugular vein, windpipe, and carotid artery were cut; these wounds extended down to the cervical vertebrae. Either the stab wound to his chest or his severed neck would have caused death.

Department of Justice Crime Laboratory Criminalist Marianne Vick testified that blood on the baton was consistent with Colwell's blood, blood on the bat and the Ka-Bar knife was consistent with Paris's blood, and blood on one of the camouflage masks was consistent with Ritchey's blood.

### 2. *Defense evidence*

Cruz, Beck, LaMarsh, and Willey each testified in their own defense.

### a.  Cruz

#### 1.  Cruz's testimony

Cruz denied killing anyone on the night of May 20, 1990, or conspiring to kill anyone on May 20 or in the preceding days.  On cross-examination, Cruz testified that in January 1990, Raper's trailer appeared at the Camp about 50 feet from Cruz's home.  Fat Cat, Little Debbie, and Colwell frequently visited Raper.  Raper was verbally abusive and uncooperative, and Cruz was disturbed by the frequent fights and visible drug use.

Raper had been arrested for tearing down Cruz's fence.  Raper threatened Cruz by giving him an "evil eye" and saying, "Better not press charges."

Cruz, Beck, and others moved Raper's trailer out of the Camp after a child was seen playing with a discarded syringe.  After Raper left, his car was moved out of the Camp and burned, but Cruz denied involvement.

Sometime after Raper's car was burned, Raper — while on the other side of a fence from Cruz — pulled a knife on Cruz in front of Jennifer and Cruz's children and told Cruz "he was going to kill" him.  Cruz could not recall whether he had reported this incident to the police.  Raper returned to the Camp several times after making the threat.  On one occasion, he stood at the end of the driveway and yelled obscenities "towards" Cruz and said he would kill Cruz "pretty soon," "[m]aybe today," "[m]aybe tomorrow."  Raper then crossed the street, stood completely still, and watched Cruz for a long time.  Cruz did not recall reporting this incident to the police.

About a month before May 20, 1990, Cruz began to hear that the Camp might encounter problems with Raper's biker

friends. In response, Cruz, Beck, and Vieira performed armed patrols of the Camp perimeter. Cruz reported this information at some point to the Sheriff.

Before the murders, Cruz had been to 5223 Elm Street once. A week or some days before the murders, he went to the home with Beck, Evans, Willey, LaMarsh, and Vieira to help move a refrigerator and furniture; the group brought a 12-pack of beer as a goodwill gesture. At different points during the visit, Raper, Colwell, Ritchey, and Paris were there, as well as Little Debbie and a woman named Diane Kiernan. Cruz denied Colwell was beaten later that night.

On the evening on May 20, Evans told Cruz she needed to retrieve some clothes, including a bridal gown that was an heirloom, from 5223 Elm Street, and wanted Cruz and others to accompany her for protection. Evans did not draw a diagram of the house. Also that evening, Evans told Cruz that Raper had threatened to kill Cruz and her, and said that "Raper was sharpening knives." Evans used "crank" (i.e., methamphetamine) and greatly disliked Raper and Paris.

Around midnight, Cruz, Beck, LaMarsh, Willey, Vieira, and Evans, some of whom were armed, drove to 5223 Elm Street. Cruz saw no one with a gun, black watch cap, or mask.

Cruz dropped off Evans and LaMarsh near 5223 Elm Street and then parked where his car would not be noticed by Raper's friends. Beck, Willey, and Vieira got out of the car and suddenly started running toward the victims' house. Cruz heard someone say something like "what's up" and "he's gone crazy." He assumed at the time of his testimony this had been Earl Creekmore. Cruz exited the vehicle and started walking with a cane toward the house. He saw Willey and a person he

later learned was Ritchey fighting in the middle of the street. They were "rolling around, socking each other." Cruz told Willey, "Let's go," but Willey and Ritchey continued fighting.

Cruz entered the house and saw Raper sitting in a chair "look[ing] like what's on the film"; he did not move and did not look to be in "good shape." Cruz's attention was diverted by Beck pulling Colwell off Vieira and throwing him. Cruz told Beck that somebody was "out there by Ron," and Beck ran out the front door. Vieira and Colwell continued fighting. Cruz yelled, "Let's go now," and Evans "pop[ped] up" from behind the counter. Vieira pulled out his Ka-Bar knife, and Cruz turned away. Cruz asserted he was not physically capable of fighting another individual on the night of the murders and denied stabbing any of the victims, hitting Raper on the head, or directing Vieira to cut Paris's throat.

Cruz left the house, and later the entire group returned to the car and drove off; Willey asked to be taken home. There was no conversation. At Willey's house, Cruz saw blood on Evans's face, and her hair was matted. Cruz denied he "order[ed] anyone about" and specifically denied ordering Vieira to clean blood off Cruz's shoes or to clean the blood out of the car on the night of the murders.

Cruz called Jennifer and told her to get out of town and to meet him at an Oakdale hotel. Cruz, Beck, and Vieira left Willey's house and joined Jennifer at the Oakdale Motel. Cruz did not call the police to report what had happened because he would then "be involved."

Cruz met with Stanislaus County Sheriff's Detective Gary Deckard on May 21, 1990 and denied being at 5223 Elm Street on the night of the murders. Cruz asserted he did not

believe in the use of deadly force except in self-defense. He did not like violence and did not want to see anybody get hurt.

### 2. *Physical evidence*

Detective Deckard testified he had seized Cruz's cane from him, visually inspected it, and saw no evidence of the presence of blood.

Apparently in an effort to demonstrate that Cruz did not match witness descriptions of the perpetrator, Stanislaus County Sheriff's Detective Darrel Freitas testified that at the time of his arrest, Cruz weighed 350 pounds.

Stanislaus County Deputy Sheriff Michael Dulaney testified he arrived at 5223 Elm Street at about 2:30 a.m. on the morning of May 21, 1990. He did not bag the hands of Raper, Paris, or Colwell because the coroner said that it was unnecessary to do so. He did not collect into evidence a knife with food particles found in the kitchen because it appeared unrelated to the murders. Deputy Dulaney also attended the autopsies of the four victims and did not observe the pathologist taking fingernail scrapings.

### 3. *Prior witness statements*

Detective Freitas testified that when he spoke to Kathy Moyers on May 21, 1990, she told him that all of the individuals she observed were large and wearing dark clothing. Moyers was with another person and appeared hesitant to speak with Detective Freitas. Earl Creekmore said that he saw two individuals, and one was larger than the other. One had a long ponytail, was about six feet one inch tall, and weighed about 170 pounds, and was beating someone on the ground. The other was about six feet three inches tall,

weighed about 250 pounds, had short hair, and was wearing a baseball cap.

### 4.   Evans impeachment

Detective Deckard testified he had interviewed Evans four times.  On October 12, 1990, after Evans reached a plea agreement with the district attorney's office, she made a complete statement to Detective Deckard.  After testifying at the preliminary hearing, Evans called Detective Deckard to say that she now recalled she had been carrying a small survival knife on the night of the murders.  Evans appeared concerned this information might affect her plea bargain.

Michelle Mercer, who was 18 years old, testified that she had known Evans for 10 to 15 years, and that Evans was "not well liked in the community" and had a reputation for violence and dishonesty.  About a week before the murders, Mercer had observed Evans and Paris partially undressed and kissing.  In June 1991, Evans told Mercer she had been involved in killing Paris and described in detail to Mercer "how they sliced [Paris's] throat and she loved every minute of what Raper got." Evans said she had "watched Franklin die, and . . . it was kind of neat."   Evans was concerned that Mercer was going to assault Evans's little sister and threatened Mercer, saying that she "still had friends out there that could take care of [her] too."

James Richardson testified that Evans had been a friend since childhood.  In May 1990, Evans told Richardson that she had watched the murders the night before and had laughed as she did so.   She also said she had planned the murders. Richardson said Evans had a reputation for being untruthful and "exaggerated a lot."

Stanislaus County Sheriff's Detective Mark Ottoboni interviewed Evans on May 22, 1990, and she appeared to be under the influence of Valium or alcohol. Evans said on the night of the murders she had seen Paris hiding under the kitchen table. Someone approached Paris who was of small stature, was of Mexican descent, and was wearing camouflage clothing and a mask. Evans also said that Colwell was beaten up outside and that Beck was not at 5223 Elm Street during the murders. Evans made several conflicting statements during this interview. At some point Detective Ottoboni caused Evans and Beck to be placed in a room together and surreptitiously observed they had a whispered discussion about the murders.

### 5. *Raper*

Cruz introduced certain testimony regarding alleged illegal activity by Raper, apparently to demonstrate that Raper could be violent. On April 16, 1990, at about 9:45 a.m., Stanislaus County Deputy Sheriff Bryan Grimm met with Cruz at 4510 Finney Road and took an initial report of a disturbance. Deputy Grimm returned later that day in response to a call, and Cruz showed him a damaged fence. Cruz made a citizen's arrest of Raper, and Deputy Grimm accepted the arrest and took Raper to jail. Deputy Grimm was required to accept a citizen arrest regardless of its validity. Raper told Deputy Grimm he had the money to post bail, and he could then "be back on the street to harass" Cruz. Raper was not hostile or violent in any way to Deputy Grimm.

In about February 1990, Robert Bowers, who had rented Cruz the studio apartment at the Camp, hired Cruz to manage the Camp. Cruz did not collect rent and was not authorized to

evict Raper. Raper did not have a lease agreement with Bowers. Bowers received complaints about an unauthorized trailer at the Camp, but did not know the occupant, and took no steps to remove it. On cross-examination, he testified he did not know Beck, Vieira, and LaMarsh were living there, and their trailers would have also been illegal.

Greg Boynton had an automotive repair store in Salida. At some point Raper moved his trailer onto a vacant lot next to Boynton's business. Raper was about 50 years old, about five feet seven inches tall, and weighed about 100 pounds. Raper and Boynton had an altercation in which Raper spoke disrespectfully about Boynton's father, and Boynton pushed Raper down. Several days later, on October 13, 1989, Raper and another man, perhaps named Fat Cat, arrived in a vehicle and confronted Boynton, saying Fat Cat was going to kill Boynton. Raper and Fat Cat then spun donuts in the vacant lot until their car stalled, and they were beaten by Boynton and his father James Boynton. James Boynton then had Raper's trailer moved. Thereafter he saw Raper frequently in Salida. Raper said that "he was going to get" James Boynton and would "holler or cuss" at him, making insulting gestures.

On August 18, 1989, about 4:00 a.m., Stanislaus County Sergeant Jane Irwin encountered Raper sitting in his car in Salida. She observed a knife handle and, when backup arrived, she removed Raper from the car and searched it. Raper was belligerent, refused to put his hands up, and told officers to "[g]o ahead and shoot me." He was carrying an ice pick, and a razor and knives were found in his car. He did not resist arrest.

### b. *Beck*

Beck testified he was close friends with Cruz and Vieira and had lived with Rosemary M. in Oakdale. On May 20, 1990, Beck was 34 years old and weighed about 260 pounds.

That evening at the Camp, Evans told Beck and Cruz that she had gone to 5223 Elm Street earlier to retrieve certain items. Raper refused to let her take the items and said he and his friends were going to go to the Camp and kill Evans and those with whom she associated there. "A little later" Beck drove to Ceres and picked up Willey to "help us protect ourselves." They returned to the Camp about 11:30 p.m. and found Cruz, Evans, LaMarsh, and Vieira there. Evans said it was urgent she retrieve a wedding gown and other clothes from 5223 Elm Street and asked that someone accompany her so that Raper would not again interfere. There was no discussion of "leaving no witnesses," and no weapons were distributed. No map of 5223 Elm Street was drawn, nor did Evans orally describe the house layout.

The entire group went "in case something happened, so they wouldn't be caught so then they couldn't get out." Although Beck was concerned for his life, he was not armed when he and the others went to the Elm Street house.

Evans and LaMarsh were dropped off at the Elm Street house and left the car carrying bats. After the car was parked in a different location, Beck, Vieira, and Willey got out and began walking toward the house. They heard a girl scream, and the three men ran toward the house. When Willey, who was ahead of Beck, reached the yard, he was confronted by a man and they began to fight. Beck followed Vieira into the house and observed LaMarsh holding a baseball bat and

standing in front of Raper. Raper was sitting down and Beck watched his body "slump[] down." Beck was "shock[ed]," stood there briefly, and then moved toward noises in the house. He saw Vieira and Colwell struggling. Vieira's back was on the floor, and Colwell was on top of Vieira. Beck hit Colwell "pretty good" a "few times" on his back and then threw him several feet into the cupboards. Beck observed Evans on top of victim Paris, punching her.

Cruz said someone was "out there by" Willey, so Beck ran outside. He observed Willey "standing over there by a guy laying down there on the ground," and "some guy walking off." Beck told Willey, "Let's go," and Willey started running to the car. Cruz exited the house, and he and Beck walked back to the car. Evans and Vieira ran past them. No one walked in single file. Beck and Cruz were the last members of the group to return to the car. They drove to Willey's house. Beck denied saying, "[O]nly three guys and a chick, what a waste," having a bloody arm, or waving around a knife. He saw no weapons, other than the bats, and no blood on anyone. Beck had never seen Cruz run, and he did not run the night of the murders. Beck did not know anyone had died on Sunday night until late Monday morning or early afternoon.

Beck denied killing anyone, cutting anyone's throat, or doing anything wrong on the night of May 20. Beck was present, but denied fighting with victim Colwell when Colwell visited the Camp two nights before the murders. He denied telling Phillip Wallace he had cut someone's throat. He identified a mask found at the crime scene as the type of mask he had seen in Cruz's home.

Beck was arrested the night after the murders. He was untruthful in his statement to police because he did not want to "get [his] friends in trouble."

### c. *LaMarsh*

LaMarsh testified that he met Beck, Cruz, and Vieira about two months before the murders. Soon after, while at the Camp, LaMarsh heard someone yelling and saw Beck standing at attention with Vieira standing at attention behind him, and Cruz next to Beck. Cruz yelled at Vieira that he was "going to have to learn more responsibility." Cruz then said, "Okay, Dave," and Beck "socked" Vieira. Vieira "doubled over and fell on the ground," and Beck said, "Get up." Vieira stood up and was crying.

Cruz, Beck, and Vieira appeared to be a survivalist group. During LaMarsh's first conversation with Cruz, Cruz showed him about 30 weapons. Cruz, Beck, Vieira, and Willey invited LaMarsh to their group by having LaMarsh cut himself and leave a bloody print on a piece of paper. About the time Cruz had Raper arrested for pulling up a fence signpost, Cruz told LaMarsh, "[I]t would be a lot easier if they had just went in the trailer and did him" or killed Raper "than going through all this hassle."

On the night of May 20, LaMarsh returned to his trailer about 11:30 p.m. Cruz, Evans, and Vieira visited, and Evans said they were going to 5223 Elm Street so that Evans could retrieve some of her clothes and items that belonged to her half-sister Miller. Evans asked LaMarsh to accompany her into the house. LaMarsh brought a bat in case "there was any problems," along with a gun Cruz had lent him two weeks earlier. LaMarsh did not agree to beat anyone up. He was told

"nothing about murder" or that "they were going to kill anybody."

Once at 5223 Elm Street, LaMarsh encountered Raper and broke his arm in self-defense. Cruz then hit Raper several times on the head with his baton. LaMarsh saw Beck stab Colwell in the stomach. LaMarsh fled out a window because "all hell had broken loose and these guys were in there doing serious shit."

After the murders, in the car on the way to Willey's house, Cruz asked Evans how many people were in the house, and she said there were five. Cruz asked Beck, "Well, how many did we get?" Beck said, "Four," and Cruz said, "Fuck," and was angry that one person had escaped. Cruz then asked Beck, "[W]ho all did we get?" Beck replied, "Dennis [Colwell], some dude, a chick, and Frank [Raper]." Cruz said, "[T]hey're all dead, aren't they?" Beck replied, "Yeah." LaMarsh said, "Well, Frank [Raper] ain't dead." Beck laughed and said: "He's dead. I seen his face crumble on the way out the door."

At Willey's house, Cruz ordered Vieira to clean the blood off Cruz's shoes and to clean the car; Vieira did so. Beck had fresh scratches on his stomach. Cruz told Beck, "We're going to have to get an alibi."

Rosemary testified she had known Beck and Cruz for about seven years and Vieira for about five years, and she had lived with them for about two years. Rosemary and Beck had been romantically involved. Beck and Cruz told Vieira what to do, and Vieira would do it "on command" and be "very obedient," including standing at attention for long periods of time. Cruz was the leader, even when Beck, Cruz, and Rosemary lived in Beck's home, and Beck and Rosemary

obeyed him. Beck and Jennifer were allowed to object, but Rosemary had never seen Beck refuse to do something Cruz wanted him to do. Beck and Cruz would not "physically hurt anybody" but would "tell them that's the way it was going to be." Rosemary, Beck, Vieira, and a man named Steven Perkins were the ones in the household who were employed, but Beck and Cruz received all of their earnings. Beck, Cruz, and Vieira were nice to LaMarsh to get him to join their group, and Rosemary had observed them attempt to similarly recruit other members.

On the evening of May 20, 1990, Cruz called Rosemary and asked that she and her boyfriend, Phillip Wallace, come over, and that Rosemary stay with Jennifer. He said, "[T]he guys were going to go even a score, get in a fight" at a house "on the other side of the park there" in Salida. Cruz said he wanted to settle a score with Fat Cat.

The following evening, Beck visited Rosemary. Beck was wearing brand new sneakers. When asked by the prosecutor whether Beck had mentioned doing anything to the people who were killed, Rosemary testified that Beck said, "[T]hey had to do them." Beck also said Vieira had been ordered to clean the blood off "everybody's shoes at Ron Wi[l]ley's house." He smiled and said he had purchased new shoes because his were covered in blood and he could not get them clean.

### d. Willey

Willey testified he had known Beck and Cruz since 1985. In 1986 he attended a one-year trade school in Phoenix, and when he returned to California in 1987, his relationship with Beck and Cruz had changed. Beck and Cruz were "best friends," Cruz "was the one that was running the show," and

Beck "always did whatever [Cruz] said." Cruz told Vieira how to act, when he could go to bed, and what he could do when he was awake. Beck, to a lesser extent, also gave orders to Vieira. If Vieira did not act as expected, Beck would slap him on the back of his head or punch him in the stomach. Sometimes Cruz told Beck to inflict pain on Vieira.

In the beginning of May 1990, Cruz called Willey and invited him over to the Camp. Willey had not had any contact with Cruz for about eight months and did not know where he lived. At some point after Willey arrived, a group including Willey, LaMarsh (whom Willey met that night), Beck, and Cruz, gathered in a small trailer. Cruz had LaMarsh sign a piece of paper, cut his hand and place a bloody fingerprint on the paper, and said that he was joining their group. Willey had engaged in a similar ritual in 1985.

On May 20, about 11:15 p.m., Cruz called Willey and asked him to help move furniture from 5223 Elm Street. After they arrived at the home, Willey had a fistfight with Ritchey outside. Beck suddenly knocked Willey off Ritchey, fell on Ritchey, and slit Ritchey's throat. Later at Willey's house, Evans and LaMarsh appeared nervous and frightened. Willey did not kill anyone and did not know anyone was going to be killed that night.

### 3. *Rebuttal*

Stanislaus County Sheriff's Lieutenant Myron Larson testified he searched Cruz's home on May 21, 1990 after the murders but did not find a Ka-Bar knife or camouflage masks. Detective Deckard similarly testified that he had examined all the evidence found in Cruz's home, and there were no masks.

### 4. *Cruz surrebuttal*

Pete Rarick testified he had previously been married to Rosemary. Rosemary had lied to Rarick, and he did not trust her.

## B. Penalty Phase

Many of the testifying individuals shared the same surname, so for clarity, we use first names to identify certain witnesses.

### 1. *Prosecutor's case against Cruz*

Jennifer, Cruz's former girlfriend and the mother of his three children, testified. Jennifer met and moved in with Cruz in 1987 when she was about 16 years old and he was 25 years old. Jennifer had known Vieira and Steven Perkins, another person who had lived with Jennifer and Cruz, for about the same amount of time she had known Cruz. On about 25 occasions between 1987 and 1990, Cruz made Vieira stand in the middle of the room and punched him in the stomach as hard as he could. Cruz told Vieira to "stand still and take it." Cruz performed a similar ritual about 50 times against Perkins, at least once causing injuries that sent Perkins to the hospital.

Cruz also on several occasions and without warning used a Scorpion stun gun on Vieira; Vieira would scream and jump. Cruz twice used the stun gun on Jennifer. Cruz once placed a loaded long-barreled rifle in Rosemary's mouth and threatened to kill her. On that same occasion Cruz also placed the rifle in Jennifer's mouth and asked, "Are you going to get your shit together or are you going to die?"

On January 6, 1990, when Jennifer was about two months pregnant, Cruz pushed her to the ground. He then

kicked her in the stomach and between her legs, causing bleeding. Jennifer fled barefoot and without a jacket to a woman's shelter for four days. Cruz asked Jennifer to return and was kind to her, so she moved back in with him.

During their relationship, Cruz struck Jennifer about 100 times with a cane or other object. Whenever Cruz thought Jennifer had "got[ten] out of line" or the couple fought, Cruz would threaten to kill her. Cruz also told Jennifer the "only way out of this relationship is when one of us dies."

Cruz hit their infant daughter A. on her legs or bottom with a fly swatter or a ruler. When A. was less than six months old, Cruz punished A. by placing her in a dark room and allowing Jennifer to feed, hold, or change her only every six hours. When Jennifer objected to this treatment, Cruz beat her. When A. was less than a year old, Cruz would suspend her in a halter in the middle of a device he called the "rack," and attach to her legs Mason jars filled with water. He would then make her cry so that her legs would go up and down. Cruz also gave their daughter "clappings" in which he would slap the back or side of her head with his open hand leaving bruises on the inside of her ears. When A. was learning to walk, Cruz found it humorous to ask A. if she wanted a clapping, and watch her respond by falling to the ground and hiding her head between her hands.

On cross-examination, Jennifer testified that at some point after Raper had been moved out of the Camp, he had returned and threatened to kill Cruz. On the night of May 20, Evans told Cruz something similar to that "Raper was coming over that night with some people to wipe everybody out."

The parties stipulated that an agreement had been made between Jennifer and the district attorney's office that if Jennifer testified truthfully in various proceedings, including the Cruz penalty phase, two felony cases pending against her would be dismissed.

### 2. Cruz defense case

#### a. Family and friends

Cruz and several of his relatives testified on his behalf, and their recollections of his childhood and identification of who was in which familial role were at times inconsistent. Cruz presented evidence that he had been confused while growing up as to who his biological parents were and that he had experienced several situations in which he was disappointed by the response of medical or law enforcement personnel.

Cruz was born in Modesto in March 1962. Hortencia Cruz, Cruz's mother, testified that his father was Ausencio Cruz. Because Ausencio had gone to Mexico and had not returned, Hortencia put the name of a friend — Lawrence Jimmy Cox — on Cruz's birth certificate. At that time, the family lived on a ranch in Oakdale owned by Drummond Augustus Sproul and performed chores for him, apparently in exchange for housing.

When Cruz was a young boy, he was told by Jesus Hernandez, Hortencia's former husband, that Ausencio was not his father and that his father was a "drunk." Cruz then confirmed with Hortencia that she was his mother, and said, "Well, as long as I know who my mother is, I don't care who my father is."

Hortencia worked hard to provide for her children, and Cruz never went without food or clothing. Hortencia and Ausencio raised Cruz to tell the truth and to know right from wrong. He rarely misbehaved or was physically disciplined. He enjoyed playing with the many sheepdogs on the ranch and running through the fields. He and Ausencio played together and would "come home happy and laughing." Cruz enjoyed reading throughout his childhood.

Ausencio Cruz testified that he married Hortencia in 1961. Cruz was Ausencio's only child. He learned he had a son when Cruz was two years old. When Ausencio returned from Mexico, Cruz had a different last name, so Ausencio was advised to adopt him. He was not advised to get an amended birth certificate.

Ausencio and Cruz were very close, and Ausencio watched him play Little League Baseball, took him to Oakland Athletics' baseball games and to the movies, and taught him how to drive. Ausencio did not believe Cruz had "anything to do with all of that," apparently referring to the capital crimes, and if he did, Ausencio would "love him more." If Cruz received the death penalty, Ausencio would "feel like dying."

Esperanza Hope Castillo Cruz (Hope), Cruz's half-sister, also testified that Hortencia was Cruz's biological mother and Ausencio was his biological father. When Cruz was born, Hope was about 21 years old and a partner in a restaurant. The family ran the restaurant for five or six months from 1961 to 1962 and during the day kept baby Cruz in a bun drawer. After they left the restaurant, the family worked picking fruit in Fresno from 1962 to 1964 and slept on a mattress placed next to their car.

Ausencio returned from Mexico and was surprised to learn he had a two-year-old son (Cruz). When Cruz was about three years old, the family settled in Oakdale on Sproul's ranch. They worked on the ranch and it was a "beautiful time" for the family. Sproul loved Cruz and spent significant time with him. In 1970, the family purchased a large trailer to live in on the ranch and, in 1976, purchased a house in Oakdale.

When Cruz was about six months old, Hope dropped him and he hit his head on a concrete porch. He cried, had a bump, and was uncomfortable that day. They could not afford to take him to a doctor. Hope did not observe any lasting effects other than that Cruz was not interested in taking a bottle for an unspecified period of time. When Cruz was about four years old, he went through a windshield when the car in which he was riding stopped suddenly. He was stunned and weak after the accident. The family thought he was "okay" and did not consider the injury serious.

Hope had seen Jennifer frequently slap A. and once throw her outside. Hope had never seen Cruz mistreat A.

Hope did not believe Cruz had done "these terrible acts," but even if he had, she would still love him.

Marlene Hernandez, Cruz's half-sister, testified she was 14 years old when Cruz was born. Hope had been gone for a period of time before she came home with baby Cruz, and said someone had given her Cruz to care for. Marlene recalled battles between her mother and Hope as to who would care for Cruz, and the two women were "screaming at him all the time." Marlene saw Cruz disciplined with a switch, rope, iron cord, and a hanger.

Marlene left her mother's home when she was about 14 years old to live with her father in Los Angeles County, but occasionally visited her mother. When Cruz was about 14 years old, he visited Marlene. He was well-mannered and did not seem disturbed in any way. Marlene told him that his mother was Hope, and his father was a man named Jim Cox.

At some point Hortencia's pet canary was eaten by a cat, and Hortencia slit open a cat's stomach to see if the bird was inside. When Cruz was about 17 years old, Hortencia was angry that a neighbor's dog had wandered into her yard, and she cut off its back legs with an axe.

Marlene loved Cruz but believed the death penalty would be fair.

Hope testified that Ausencio did not know that Hope and her siblings were Hortencia's children; they were referred to as her nieces and nephews so that Ausencio would not learn Hortencia had previously been married. Similarly, Armando Hernandez, who was Cruz's half-brother and who was about 24 years older than Cruz, testified that Hortencia told Armando not to call her "Mom" because Ausencio did not know she had been previously married. Ausencio thought that Armando was a "friend." Marlene similarly testified that in 1979 or 1981, Hortencia told her not to call her "[M]om" or "mother" when Ausencio was around because he believed Hortencia was Marlene's aunt and that Marlene's mother had died. Marlene was never permitted to discuss her father.

Sharon Dennis, Cruz's fourth grade teacher, knew him as Gerald Cox and described him as "pretty bright" and a "good reader," but an unambitious student who preferred to engage in activities other than schoolwork. It frustrated Dennis that

Cruz did not apply himself. He was not a troublemaker, and she did not recall him as unkempt or dirty. In testimony from an evidentiary hearing that was read into the record, Dennis described being told by a school faculty member that Cruz lived with his mother and sister but did not know that his mother was actually his grandmother and his sister was his mother. The information was not "idle gossip" but given in confidence to Dennis to assist her in evaluating any problems with Cruz in class or any emotional problems. She did not believe this information was common knowledge, and she never heard it discussed by other teachers or children.

Cruz testified that he first learned that his last name might be Cox when he was in the first grade and his teacher referred to him by that name. Until then he had thought his last name was Cruz. Cruz was teased in school about not having a father and about his hair and clothes. In the third or fourth grade, he returned to the classroom during recess and overhead his teacher and another person "saying . . . it was a question . . . who [his] mom was." Cruz immediately left. Ausencio told Cruz that Hortencia had had a sister who died and that all the other children in the home were Hortencia's nieces and nephews.

Cruz rarely completed a full elementary school year because his family traveled and he neglected assignments to be performed while he was away from school. He had no friends in elementary school until the fourth grade.

Cruz believed he had been treated unfairly in elementary school. On one occasion, his teacher left his class unsupervised for an extended period of time and then spanked him in front of the class because he went to the restroom while she was

gone. On another occasion, he was disciplined for throwing sawdust at children who had beaten and bullied him, but the other children received no discipline. On cross-examination, Cruz agreed with the prosecutor that it was common for children to be teased at school but that in his view he was teased excessively. At some point Cruz was hit in the head with a rubber mallet by an acquaintance, and shortly after this incident, he took up karate. Cruz dropped out of high school in the tenth grade.

Cruz's mother was strict and his parents disciplined him by hitting him with objects such as a stick, umbrella, coat hanger, or iron cord. Cruz was of the view that his mother raised him properly and that he was not abused. His parents did not socialize, and Cruz was not allowed to date or to have girls over to the house.

Sproul was a father figure and best friend to Cruz, and the two spent a significant amount of time together. Sproul expressed disdain for "stool pigeons" or persons who contacted the police when they observed a crime or socially unacceptable behavior, or who participated in an activity but then blamed someone else.

Cruz asked Beck to make the rack for his daughter A. to help her stand and to strengthen her legs. He did not use large Mason jars but baby food jars. Cruz wanted A. to be strong physically, emotionally, and mentally. He hit her with a fly swatter to assist her efforts to crawl. He denied he ever "clapped" her or slapped her. Jennifer resented the attention Cruz gave A.

Cruz denied ever hitting Vieira and said he hit Perkins only when the two "sparred." The stun gun was a first aid

treatment for snake bites. He had used the gun on Jennifer but "[n]ot the way she says," and claimed the gun made a "wicked sound, . . . but it doesn't do anything."

Cruz felt "bad" that Paris was killed because she had been "exploited" and apparently "wasn't there because she wanted to be." Cruz also felt bad that Raper was killed, was sure that Raper's relatives loved him, and felt bad that "his relatives are suffering." Cruz also felt bad because of what he and his parents were going through.

Several witnesses testified to Cruz's negative experiences with Sproul and with medical and law enforcement personnel. Hope and Hortencia testified that Sproul had said Cruz would inherit some of Sproul's land when he died. After Sproul's death, his will could not be located.

Hope and Hortencia also testified that when Cruz was about eight, the family went back into the restaurant business in Hughson. Cruz and other family members worked in the restaurant, and it was a happy period for the family. They took business from a pool hall next door, and one night the pool hall owners bombed the restaurant. Police responded an hour and a half later. Cruz's family fled the restaurant, leaving behind all their possessions. It was a traumatic experience for Cruz "because he was so young."

Hope once observed a man siphoning gas from her car and followed him home. At some point Cruz, who was about 17 years old, joined her. The police came but said they could not do anything about it and suggested she make a citizen's arrest. She did so, and the police handcuffed the man and another man hiding in the back of a car. The second man told Hope and Cruz they would be sorry. Hope filed a complaint,

but the district attorney said the case was not worth prosecuting. The second man was released the next day and threatened Cruz.

Cruz was close to one of his half-brothers, Fred Hernandez, who died from an aneurysm in 1976, after being kicked or struck in the head by his wife. The wife was not prosecuted.

Emanuel Furtado, Jr., met Cruz in the fifth or sixth grade. Furtado and Cruz had a mutual friend, Alan Lutz, who was killed when the pickup truck in which he and others were riding crashed. Furtado and Cruz understood that if the responding ambulance had been able to locate Lutz in the weeds he might have been saved.

Hartley Bush, a lawyer, initiated a stepparent adoption for Ausencio Cruz in about 1972. He obtained a 1965 divorce decree between Hortencia and Hernandez and a 1968 marriage certificate for Hortencia and Ausencio. The adoption proceedings were later abandoned. About this time in 1972, Cruz was charged in a juvenile proceeding with spray painting an automobile and given probation.

### b. *Expert testimony*

Dr. Hugh Ridelhuber, a psychiatrist, interviewed Cruz twice, each time for three to four hours. He also interviewed Dennis and Cruz's sister Hope, reviewed "voluminous records" from counsel, spoke to the defense investigator, and performed testing on Cruz.

Dr. Ridelhuber believed that Cruz had a reluctance to rely on authoritarian figures to protect his family when he perceived they were in danger. Cruz was unsure who his parents were, and that had "a very disturbing effect on him."

He began a search for an identity that "compensated for his not knowing and . . . his insecurity." Cruz formed an "oddball" belief about who he was "that gave him some sort of satisfaction of feeling important."

Cruz recounted several instances in which he had experienced law enforcement or medical personnel not being responsive or capable of dealing with the situation, such as when his family's restaurant was bombed, when someone siphoned gas out of a car, and when Lutz was not immediately discovered after the truck accident. Cruz told Dr. Ridelhuber that he had called the police regarding Raper's threats and that Raper had been arrested and taken in, but was then released and continued to harass Cruz. These circumstances "really undermined his trust in authority." Cruz also told Dr. Ridelhuber he understood Sproul was going to leave the ranch to him when Sproul died, and when that did not occur, Cruz believed that a "shyster attorney" and other individuals "had cheated them out of it" and that the court system did not prevent this result.

In addition, Dr. Ridelhuber testified, teachers and other school officials are "part of the authoritarian system that a child adjusts to" and "needs to respect." Dr. Ridelhuber believed it was a "fairly common experience" for children to be punished by a teacher when they are in fact the victims. For a child who already has questions about authority, "that would be an additional wedge in breaking . . . the sort of needed trust that children have in authority."

Cruz had great difficulty succeeding in society, so he had withdrawn and collected around himself a band of people "almost like a Neanderthal clan." Dr. Ridelhuber believed the

punitive behavior Cruz had inflicted "towards his own clan and family . . . [was] consistent with the way he was treated as a child growing up." Cruz was not a sadist but had a false belief that his behavior would make people stronger and that similar treatment had made him stronger.

Cruz's loss of his half-brother Fred and friend Lutz caused him to have a tendency to overreact to protect remaining friends and family. Cruz had also suffered a major loss when the identity of his biological parents was called into question and when his purported parents did not give him a sense of security or a feeling of being valuable and lovable. As a result of his experiences, Cruz would have perceived Raper's behavior as a "mounting kind of catastrophic threat" because Raper did not cease his behavior when confronted, because Cruz did not perceive "police[] as being able to protect him," and because of Cruz's own sense of fear or vulnerability.

Although Cruz had some of the traits of a borderline personality and "some characteristics of a paranoid" person, he did "not fit clearly into a definable disorder." During Dr. Ridelhuber's interview of Cruz, he was "struck by how normal he can be."

Dr. Ridelhuber had spoken to some of Cruz's jailers and understood that he was a model prisoner. Dr. Ridelhuber opined that Cruz would adapt well to prison because he was 30 years old and had an IQ of 130 that would allow him to manage his affairs when a clear structure was provided. Moreover, Cruz was "not a sociopathic or antisocial character," had "no history of violence outside of this crime," and had no "history of rebelling against authority." In Dr. Ridelhuber's

view, Cruz could "use the intellect that he has to . . . learn a trade . . . in the prison system and be productive."

The parties stipulated that "prison life is very structured and authoritarian in nature for a person sentenced to life in prison without the possibility of parole."

### 3. *Prosecutor's case against Beck*

Cynthia S., Jennifer's younger sister, testified that she met Beck in about 1987 when she was 16 years old. At the time, Cruz and Jennifer were living together in Modesto. From 1987 to 1989, Cynthia worked with Beck, Vieira, and Perkins installing vinyl and hardwood flooring. Once, when Cynthia was working with Perkins, he accidentally cut an orange extension cord with an electric saw and received an electric shock. Several months later when Cynthia visited Jennifer's home, she observed Perkins on his hands and knees on the floor feverously sanding a gun cabinet. An orange extension cord was also on the floor. Beck and Cruz were seated to her right, and Cruz asked Cynthia to flip on the light switch that was adjacent to the door she entered. When she did so, Perkins "started flopping around and screaming in the middle of the living room like a fish out of water." Cynthia shut off the switch. Beck and Cruz were laughing, and Perkins started moaning from the pain. Cynthia saw that the exposed wires of the extension cord were wrapped around Perkins's toes and secured with duct tape, and the other end of the cord was plugged into a wall outlet activated by the light switch. The last time Cynthia had seen Perkins's feet, they were "burnt from shock, . . . still very infected, . . . like open wounds."

Cruz appeared to be in control of the household, and Beck and Perkins did what he requested. Cynthia frequently

witnessed Beck punch and kick Perkins and Vieira after being ordered to do so by Cruz; neither Perkins nor Vieira fought back. Cruz once put a rifle in Cynthia's mouth and threatened to pull the trigger because he believed she had stolen one of his guns. Beck was present but did not intercede on her behalf.

Cynthia lost contact with Beck and Cruz for a time, and she reestablished contact about two months before the murders when she visited their home at the Camp. Cruz appeared to still have the same control over individuals in the household.

Steven Perkins (Steven), the father of Perkins, testified that in about 1987, when Perkins was about 20 years old, he left home to live with Beck and Cruz and Cruz's family for about 17 months. During this period, his father saw him two or three times. When Perkins left home, he was six feet five inches tall and weighed about 370 pounds, and was happy-go-lucky and outgoing.

When Perkins came home at the end of September 1989, he had lost about 125 pounds since his parents had last seen him at Christmas. His personality had also dramatically changed. He was withdrawn and moody and would not speak to anyone or answer the telephone, would not go outside, and was intensely claustrophobic. Perkins refused to discuss what happened when he lived with Beck and Cruz.

A few days after Perkins arrived home, he was hospitalized. There Steven learned Perkins's feet were severely infected, he had shackle marks above his ankles, and he had a large bruise covering his chest. Perkins subsequently admitted himself to a psychiatric unit because he was afraid he would hurt his parents or others. Steven observed Perkins had begun to have mental lapses, and at the time of Steven's

testimony, Perkins had trouble remembering what day of the week or what month it was.

Perkins testified that the Becks were family friends and that he had known David Beck, who was about 10 years older than Perkins, since Perkins was about four years old. Perkins had also grown up with Cruz. Perkins once told Cruz he had observed Jennifer and her sister Cynthia engaging in oral sex. Apparently in retaliation, Jennifer took Perkins to a house where he was repeatedly kicked in his naked groin and electrocuted through his legs and toes. After this attack, Perkins tried to kill himself by having a motorcycle accident. About a month later, shortly after moving back in with his father, he was admitted to the hospital because he had severe athlete's foot and "chest problems," and learned he had broken his ribs, shattered his breast bone, and hurt his spleen in the motorcycle accident. Once he was released, he tried to kill himself again by attempting to overdose on prescription medication. He was referred for psychiatric counseling because he had hit his head in the accident and was having cognitive difficulties.

Perkins was still friends with Cruz and spoke with him on the telephone. He denied ever being hit, tortured, or assaulted with a stun gun by Beck or seeing Beck beat Vieira.

Jennifer met Beck in 1986 about the same time she met Cruz. In July 1987, Beck, Cruz, and Jennifer shared an apartment. Jennifer had witnessed Beck beat Perkins about 30 times. Beck's beatings of Perkins were sometimes on his own and not at the direction of Cruz. Beck and Cruz used an "orange line treatment" against Perkins and Vieira, where they would attach an orange extension cord to the toes of one of

these individuals and turn on the electricity. Jennifer had also seen Beck use a Scorpion stun gun on Vieira; Vieira would jump and yell and try to escape.

Cruz was the leader of "The Cause," which was "supposed to be the advancement of mankind." In Cruz's journal were signatures and fingerprints of individuals, such as Beck, who had agreed to be in The Cause. The Cause became "sick, distorted, [and] perverted," Cruz's "idea of some type of twisted control over people." Perkins "was beaten until he could hardly move and then he had to go to the hospital." Jennifer denied arranging for Perkins to be beaten and electrocuted. Cruz told Perkins to tell anyone who asked about his injuries that he had been in a motorcycle accident.

Jennifer was beaten by Cruz several times while Beck was present. She did not leave Cruz because she was afraid he would kill her. Beck was devoted to Cruz. Jennifer never saw Cruz beat Beck or put a gun in his mouth.

Rosemary testified that she met Beck in 1982 and, eight months to a year later, began dating him. About two years later, they moved in together, were happy, and frequently discussed marriage. But at some point, Beck told Rosemary he had to give her to Cruz because "that was the thing to do." Cruz told her that marrying her was the only way he could ever control her and prevent her from leaving.

Rosemary and Beck eventually lived for six to eight months on Claret Court in Modesto with Cruz, Jennifer, their infant daughter A., Vieira, and Perkins. At one point, Rosemary's hand was cut and her bloody fingerprint placed in a book "[s]o that you would . . . belong to them." "[A]fter you did that, they owned you."

Cruz and Beck were the leaders of the group, but Cruz was in charge. Cruz's word was "[e]verybody's law," he declared punishments, and Beck's role was to administer punishment to other members. Beck might be reprimanded, but he was not punished in the same way as "everyone else." In Rosemary's view, Cruz and his group were members of a strange religious cult. They discussed Satanism and astrology.

Beck tied filled Gatorade bottles to A.'s ankles when she was learning to crawl. If A. cried, Beck would give her ice-cold water until she found it difficult to breathe.

While living with Beck, Rosemary was subjected to physical violence by him. Once when she tried to leave, Beck and Perkins drove after her, threw her into a van face first, and took her back to the house. Beck then kicked her in the back as she walked up the stairs.

Once, because someone lost an envelope containing several postage stamps, Rosemary was forced to open her mouth in the presence of Beck, Cruz, Vieira, Jennifer, and Perkins, and someone placed a loaded rifle in her mouth. On another occasion, Cruz told Rosemary in front of Beck that he was going to take Rosemary's "head off and keep it for a trophy." Beck seemed to agree with Cruz, but Rosemary noted, "not all the time did we tell [Cruz] what . . . we really felt." In December 1988, Rosemary went to visit her parents for Christmas and never returned to Claret Court, leaving behind everything she owned.

### 4. Beck defense case

#### a. Beck's family and friends

Several of Beck's family members and friends testified. Beck had grown up in Oakdale. His mother was strict but

caring and was respected in the community. When Beck was about 17 years old, his father was sent to Atascadero State Hospital for molesting his two younger sisters. His parents divorced, and his mother married his father's brother. They were still married at the time of Beck's penalty phase trial. Beck got along well with his stepfather.

Beck presented evidence that he had regularly attended Bethel Assembly of God church in Oakdale. He sang in the choir for at least three or four years, and he was faithful in attending church and choir rehearsals. The choir recorded an album, and Beck's photograph was on the back of the album cover. Beck also played the trumpet at church, participated in youth group activities, and his brother Steven observed he knew the Bible "from front to back." Beck and his close friend David John Sondeno had built a six-foot kite together for a church outing that featured a cross and the number one to symbolize "[t]here's only one way, and that's through Christ." Sondeno described Beck as outgoing, pleasant, and generous with his time and money even though he came from a family of limited resources.

G.W. Wingo testified that he had been Beck's wrestling coach at Oakdale Union High School for four years. He saw Beck every day for about three months of each year. Beck was a quiet person who did everything that was asked of him, did not cause any problems, and "got along well with everybody." Wingo could not have "asked for a better person during the wrestling program." Wingo had not had contact with Beck since he graduated from high school about 20 years before Wingo's testimony.

In 1978, Beck married a woman named Barbara; they had three children. He and his young family lived in Coalinga in a three- or four-bedroom house with a swimming pool. Beck attended oil well drilling school and worked in the oil business. He got along well with his coworkers and supervisors, and did not miss work. Beck later worked as a floor installer from daylight to dark efficiently performing quality work. Beck continued to attend church, and the preacher at times visited Beck's home. Beck was easygoing and not violent.

After the marriage ended, Barbara did not have custody, and Beck and his children moved in with his mother and stepfather so they could provide child care. Christy Shulze, Beck's stepsister and former cousin, testified that Beck was gentle with his children and took care of them, and they loved Beck "very much." He was also good at interacting with Shulze's children, and they thought of him like a big brother. She had never observed Beck to be violent or mean, or to mistreat children. His half-sister Linda Willis testified that he was a "[v]ery concerned and caring father" and his children were happy. He did not physically discipline his children. Beck was generous to others, and he once left food and Christmas presents for one of Willis's needy neighbors.

After Beck's divorce from Barbara, he began to spend time with Cruz and his friends. Beck spent little time with his children or his family, and his sister Angela Morgan testified he "just wanted to be with" Cruz. She agreed with defense counsel that he was "the opposite person" and "seem[ed] like somebody [she] didn't know." Although she would drive Beck home when he lived with Cruz, she was never allowed inside their home.

Beck's brother Steven agreed with the prosecutor that after Beck started associating with Cruz, he "didn't care about anything or about anybody," and "when you were talking to him," it would "be like talking to a wall." At one point Beck told Steven, "I'll take your soul." Beck also told Steven he was going to kill their sister Debbie apparently over a monetary dispute, and Beck also threatened Steven's infant son.

Raymond Greer met Beck in church about 18 years before his testimony and recalled that Beck had attended prayer meetings, carried a Bible with him everywhere, and counseled youth group members. Greer last saw Beck about five years earlier during Beck's divorce. Beck was not his usual "bubbly self," but rather was disillusioned and did not believe God could help him.

Willis met Cruz on several occasions and described him as controlling and manipulative. Beck would only speak when Cruz allowed. Cruz called himself a high priest and told Willis he had powers and could place curses on individuals. Beck appeared to believe Cruz's claims and began to act like Cruz. They spoke to Willis about Satanism and the occult, and at some point tried to get Willis to join a Satanic church. It appeared to Willis that Beck's entire belief system had changed.

About two weeks before the murders, Beck, Cruz, and several other men visited Willis. Beck and the others appeared to be controlled by Cruz. Cruz spoke to Willis in front of the others about taking care of or taking out a person named Raper, who lived in a trailer park, apparently because he was dealing drugs to children in the trailer park. Willis understood this to mean killing Raper. Cruz said, "I can do anything and

if I don't like somebody, I'll take them out." He said that he had powers and that "nobody could stop him or get in his way." Willis grew uncomfortable with the discussion and asked them to leave. Everyone left but Beck, who tried to calm Willis by saying that "nothing was going to happen and everything was going to be all right." Beck said that he believed in Cruz and that Cruz was Beck's friend. Willis told Beck he "better think about what he was doing and get away from what was going on." She said he was headed for trouble and should disassociate from Cruz. Beck said he was "involved, he couldn't get out." Willis asked about others who would be affected by Beck's and Cruz's actions. Beck said he knew what he was doing, and the "only ones who are going to get hurt are the ones who deserve it."

Willis visited Beck in jail after the murders. Beck said, "Don't worry. I'm going to get out of this." He said that Cruz was "going to make sure" by using contacts on the outside and that things were going to happen to people. Beck appeared to feel remorse for the murders because he kept his eyes down and would not look at Willis. When Beck's brother Steven visited Beck in jail after the murders, Beck laughed and said, "If I had a chance to do it all over, I would."

The parties stipulated that Beck had not been housed in the general population in Alameda County and had not been a disciplinary problem while incarcerated there. They further stipulated that Beck had been in custody in Stanislaus County from May 1990 to February 1992.

b. *Expert witnesses*

Jerry Enomoto, a former Director of the Department of Corrections, testified that that he had reviewed Beck's

Stanislaus County custodial records. After being informed of evidence concerning Beck's lack of custody and court disciplinary problems in Alameda County, Enomoto agreed with counsel that Beck would be an appropriate candidate for housing in the California Department of Corrections and Rehabilitation system.

Randy Cerny, president of Central Valley Consultants, Inc., a consulting firm that trained law enforcement officers in the investigation of ritualistic activity, testified as a cult expert. From 1979 to 1991, he was a Stanislaus County Sheriff's deputy and studied groups that exhibited cult-like behavior.

Cerny defined a cult as group of individuals bound together by a philosophy usually espoused by a central leader. The leader usually has total control of the group and will use various techniques to control the group members. Cults were like gangs, except cults had an underlying religious philosophy. Cults were also much more cohesive and the level of control was more important than in a gang. Members had little sense of individuality, lived at the whim of the leader, and were subject to various types of mind control techniques including torture. Members generally became mirror images of their leader.

In September 1985, then Deputy Cerny learned of the "Cruz Group" from Rosemary. Cerny had since performed additional investigation by reading diaries, court transcripts of cases involving the Cruz "situation," and speaking to law enforcement personnel. In his view, the Cruz Group was a cult that continued at the time of Cerny's testimony. Cruz was a charismatic leader who demanded total allegiance from group

members and was very skilled in emotional manipulation. The Camp had the characteristics of a cult compound.

The diaries Cerny read described ritualistic practices at some of the homes in which Beck and Cruz had lived. They also described Perkins's torture with an orange cord and by forced acts of sodomy and bestiality. Cerny read no accounts of Beck being tortured or mistreated; rather, Beck was the one who administered punishment at Cruz's direction. Cruz was the leader, and Beck was "second in command and everybody else fell in underneath him." Beck was Cruz's enforcer and was controlled by Cruz.

James Moyers, a psychotherapist who had published an article on the religious psychotherapy issues of former fundamentalists, testified he had interviewed Beck to assess how his religious background might be involved in the case. Beck had a Pentecostal background, and members of this fundamentalist religious group tended to rely on spiritual leaders to determine how to live their lives. When a Pentecostal follower finds he can no longer believe in the church's teachings and breaks from the church, he or she can experience "shattered faith syndrome." This involves confusion, often deep depression, and a sense of emptiness. "There also can almost be a compulsive search for something to give one's life meaning and to explain one's experiences . . . some real desperate need to fill up a spiritual vacuum."

Moyers opined that Beck had suffered from shattered faith syndrome. Beck had described his growing disillusionment with and departure from the church. His marriage to a woman he had recently met was characteristic of someone with the syndrome. In addition, a few weeks after the

marriage ended, Beck met Cruz and became "intensely involved with him." Cruz's teachings seemed to have provided Beck "with an explanation and meaning in his life that he really hadn't felt like he had had before."

Shattered faith syndrome was common, and Moyers agreed with defense counsel that "most of these people don't run out and kill four people." Beck "had the misfortune of being in a very vulnerable place and coming across something in . . . Cruz that led him to the killings." Had the timing been different, or if he had come across someone with similar teachings that did not lead to a violent episode, "things would be far different." Beck's abandonment of his fundamentalist background made him "particularly vulnerable to anybody who had something that seemed to be true, that seemed to give him some direction and meaning. . . . [I]t was unfortunate that it happened to be [this] particular person and . . . set of teachings."

Dr. Lowell Cooper, a clinical psychologist, testified he had administered psychological tests to Beck to gather descriptive information about his functioning. These tests included the Rorschach inkblot test, the Wechsler Adult Intelligence Scale, the Thematic Apperception test, the Draw-a-Person test, and the Babcock Story Recall test. Dr. Cooper concluded based on these tests that Beck had an "empty hole in him" that consisted of "not having any emotions, not knowing where they are, not knowing what they should be." Much of his functioning was driven by trying to manage this empty hole. Beck was also unusual in the way he thought about "what goes on around him" and was "definitely off the mark relative to the way most people see these test materials and

respond to them." Dr. Cooper believed Beck would do well or would at least appear normal in a structured situation.

Beck was not violent, as his "feelings of aggression are as absent as any other feeling." He was "always on the search for people who will fill up the emptiness, provide direction, provide routine, provide structure." His "loyalty is intense to the point where he really loses the distinction between himself and the other person" because if he loses the other person, "he will be thrown . . . back into the emptiness." Beck's "social judgment" was "the worst area of his intellectual functioning." Dr. Cooper agreed with defense counsel that when "Beck looks for somebody or something, he's looking [for] . . . something that fulfills spiritual needs, his ideas of betterment for self and mankind."

On cross-examination, Dr. Cooper testified Beck did not suffer from any mental disease, he had found no mental defect, and there were no indications of brain damage. Beck had a full-scale IQ of 102. Beck displayed no remorse about the crimes. Nothing in the evaluation indicated that Beck was in a dark hole and "functioning in some absurd manner" on the day of the murders.

Richard Ofshe, a sociology professor at the University of California, Berkeley, specialized in issues of influence and control. He had interviewed Beck, read Beck's diaries and his penalty phase testimony, reviewed documents relating to Vieira's prosecution, and interviewed Vieira, his sister, and his brother-in-law. Cruz's group included "an ideology of belief in magic, in the occult, that was to result in benefits to people." In Professor Ofshe's view, the group was a "high control group," although Cruz's techniques "were substantially more

brutal" than most groups he had studied. The fact that Beck did not need to be tortured in order for Beck to accept orders from Cruz "suggests that Mr. Cruz's control over Mr. Beck was at least as great, if not greater," than for the other group members.

Beck refused to tell Professor Ofshe how the Cruz group developed or operated. Beck said that he had taken an oath and that if he broke his oath, "people would be hurt." When Professor Ofshe told Beck, "[Y]ou're afraid someone will kill your children or your family," Beck became visibly upset and started to cry. Professor Ofshe subsequently said to Beck, "Gerald Cruz is threatening to have your children killed if you talk." Beck did not affirm or deny the statement. In Professor Ofshe's view, on the night of the murders, Beck was "under very substantial pressure to conform to the directives" of Cruz, and he was experiencing duress because "Cruz's control involved . . . a general threat of death, should he not follow . . . Cruz's orders and break with the group."

Dr. Daniel Goldstine, a psychologist, interviewed Beck for 12 to 15 hours and relied on other information, including listening to Cruz testify in his penalty phase and reading the diaries of Beck, Cruz, Vieira, Perkins, Jennifer, and Rosemary, Beck's autobiographical sketch, notes from the defense investigator, and trial transcripts.

Beck had no significant history of aggression but "was simply a victim of a very despicable cult led by" Cruz. Beck had suffered significant disappointments that made him vulnerable, such as moving frequently during his childhood, his father's arrest for molesting his sister[s], the breakup with his longtime girlfriend Sheryl for whom he had purchased an

engagement ring and whose father was more of a father to Beck than his own father, and Barbara's abuse of his trust and the breakup of their marriage.

In Dr. Goldstine's view, Cruz made Beck feel like a lieutenant when he "was at best like a sergeant." In the interviews, Beck "simply defend[ed] Mr. Cruz all the time and basically stuck with that loyalty." "Never once did [Beck] say, 'I was a victim myself of Mr. Cruz, I was manipulated.'" Rather, Beck believed "he was a co-equal partner, that he [had] joined in freely." Beck denied punishing Vieira or Perkins, or that Cruz had been cruel to the group members. When Dr. Goldstine "would confront him with obvious evidence of some of the monstrous acts that went on in this group, he simply denied it" and was "clearly lying." Dr. Goldstine believed that Beck was still under Cruz's control and that Beck had lied in his guilt phase testimony.

Beck was not suffering from any mental illness and had no brain damage. There was no history of head injuries or fetal alcohol syndrome. Dr. Goldstine opined that Beck's "flat affect" and "his guardedness" were "directly attributable to being part of this cult and what [had] happened to him." In Dr. Goldstine's view, Beck had exhibited remorse.

### 5. *Prosecutor's Beck rebuttal*

Jennifer testified that her daughter A. was born in July 1988. Sometime later that year, Beck, Cruz, and Vieira placed a tape recorder next to A. in her crib. As she was falling asleep, they snuck up on her and screamed at her. A. woke up and started to scream and cry. The tape recording of this incident was played for the jury.

Jennifer received numerous threatening phone calls from Cruz while he was in jail after the murders. They stopped just before Cruz's penalty phase when he learned Jennifer would be a witness. Jennifer also received threatening phone calls from Perkins. Jennifer had been afraid of Beck because "he would do what [Cruz] told him to do."

## II. DISCUSSION

As to many claims, Beck and Cruz "allege for the first time that the error complained of violated their federal constitutional rights. To the extent that in doing so defendants have raised only a new constitutional 'gloss' on claims preserved below, that new aspect of the claims is not forfeited. However, '[n]o separate constitutional discussion is required, or provided, when rejection of a claim on the merits necessarily leads to rejection of [the] constitutional theory.' " (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 364 (*Bryant, Smith and Wheeler*).)

### A. Pretrial Issues

#### 1. *Motion to suppress*

Cruz contends the trial court erred in denying his motion to suppress items seized during the May 21, 1990 search of his studio apartment located at 4510 Finney Road, No. 7 in Salida. (Former § 1538.5.) He contends the affidavit submitted by Detective Deckard to obtain a search warrant failed to establish probable cause to search his home. He further contends that even if the affidavit did demonstrate probable cause to search the studio, Detective Deckard improperly withheld material information from the affidavit that would have undercut this showing. He also contends that information obtained before the search warrant was executed

— that the suspect "Jason" stayed in one of trailers — vitiated probable cause to search the studio. We conclude there was no error.

### a. Factual background

The murders occurred shortly after midnight on May 21, 1990. At 10:19 a.m. that day, Detective Deckard obtained a warrant to search the studio apartment and any trailers. (The original search warrant and supporting affidavit were apparently destroyed. The parties rely on a copy of the affidavit that was attached to the suppression motion and made part of the settled record.)

Detective Deckard's supporting affidavit and attached statement of probable cause (the affidavit) stated that around 2:00 a.m. on May 21, he arrived at the quadruple murder scene. Surviving victim Donna Alvarez described her assailant, who was holding a handgun, as "a white male adult, 20 to 25 years of age, 6–0, medium build with brown afro type hair." Around 3:00 a.m., Detective Deckard spoke with Kenneth Tumelson outside the victims' house. Tumelson said that a person he knew as "Jason" was "approximately 21 years of age, ha[d] brown afro-type hair," and frequented the victims' residence. Jason was "staying in a group of apartments located across the street from the Laundromat on Finney Road." Around 4:00 a.m., Detective Deckard spoke with Frank Raper, Jr. (Frank), the son of victim Franklin Raper. Frank stated that his father had experienced problems with someone named "Jason" and had asked to borrow a gun because he "feared for his life." Jason had set fire to and destroyed Raper's car about a month earlier. Frank understood that Jason was "supposed to be staying in a[n] apartment across from the Laundromat,"

and Frank described the residence "as having a large amount of camo type material draped in front of the residence" and said it was "located in the back or the rear of those . . . apartments."

The affidavit further recounted that around 5:00 a.m., Detective Deckard and other law enforcement officers went to 4510 Finney Road, No. 7. It appeared no one was home. A "large camo type of material [was] in front of the residence." Around 5:30 a.m., Detective Deckard spoke with Kevin Brasuell, who said that someone named "Jerald" lived in No. 7, which was the manager's apartment. Brasuell said a "white male with a brown afro type hair . . . frequents that residence," but Brasuell did not know his name. Brasuell had seen "several people coming and going out of the manager's apartment."

At the suppression motion hearing, Detective Deckard testified that when he arrived at 4510 Finney Road on May 21, he spoke with Brasuell, who lived in front of the studio. Brasuell said that a person fitting the suspect's description frequented the studio and the small trailer, and that Gerald and his wife lived in the studio. The studio was a freestanding building. Deckard observed an extension cord running from the studio to the small trailer. A SWAT team officer entered the large trailer to see whether any perpetrators were inside. The small trailer was not entered apparently because officers were able to see all of the interior simply by looking through a window. Before Detective Deckard left to obtain the warrant, he was of the view that the two trailers were "part and parcel of" the studio.

Brasuell testified that on May 21, he told Detective Deckard that Jason lived or "frequently stayed" in the small trailer and "frequently stayed" at the studio. Detective Deckard asked him "who all stayed back there," which Brasuell took to mean the studio and trailers. The studio and the two trailers were "all one unit close together." He told Detective Deckard that Cruz, Jennifer, Beck, Jason, and Vieira "all lived there together." Brasuell testified it appeared to him that these individuals "all had access to each and every other thing." Brasuell had several conversations with Detective Deckard on May 21 and could not recall when during the day he made each particular statement.

Detective Deckard further testified that when he returned with a search warrant, he had information that at least four individuals had committed the murders and that "Jason" was in a group that frequented the studio and the trailers. Jennifer was standing outside the studio. Detective Deckard asked Jennifer whether LaMarsh lived in the studio or in either trailer. Jennifer said that Jason slept in the small trailer. Detective Deckard at this point came to the view that there were separate living accommodations in the trailers or that Jason "stay[ed] in the small trailer" while Beck and Vieira "stay[ed] in the large trailer." After Detective Deckard read the warrant to Jennifer, officers searched the studio.

Jennifer testified that on May 21, 1990, she lived with Cruz and her two infants in a studio apartment located at 4510 Finney Road, No. 7. There were two trailers on wheels at that location. They did not have separate unit numbers. The small trailer in which LaMarsh lived was about 20 feet away. It lacked toilet facilities and obtained electricity from the studio through an extension cord.

55

The trial court granted the suppression motion, as relevant here, as to items seized from the large trailer where Beck and Vieira resided. It denied the motion as to Cruz's studio "only" on the ground of good faith (see *United States v. Leon* (1984) 468 U.S. 897), implicitly finding that the search warrant was not supported by probable cause. The court stated: "Of the three pieces of property searched, the actual Apartment No. 7 [the studio] has caused the Court the most difficulty. As I previously commented, Mr. Deckard, in the Court's opinion, had probable cause to obtain a search warrant for Apartment 7 and he properly did so. However, by the time he returned with the search warrant to search Apartment 7, he knew now or by then that it was a separate residential accommodation and he knew that Mr. LaMarsh actually lived in the small trailer. However, he also knew that Mr. LaMarsh frequented Apartment No. 7 and may in fact have stayed in it at times, and he did have a search warrant authorizing its search. Here the court did not say that Mr. Deckard was not acting in good faith and reasonably believing that if he had returned to the magistrate with the additional information that Mr. LaMarsh actually lived in the trailer right next to the apartment and connected to that apartment with an extension cord, that the magistrate would also have authorized a search of the trailer in addition to the apartment rather than just substituting the trailer for the apartment. Thus on the *Leon* good faith doctrine and on that doctrine only, the search of Apartment 7 is ruled valid and what is adequately described in the search warrant is not suppressed."

### b. *Analysis*

"In reviewing a trial court's ruling on a motion to suppress evidence, we defer to that court's factual findings,

express or implied, if they are supported by substantial evidence. [Citation.] We exercise our independent judgment in determining whether, on the facts presented, the search or seizure was reasonable under the Fourth Amendment . . .” (*People v. Lenart* (2004) 32 Cal.4th 1107, 1119.)

Here, it appears that the trial court implicitly found as to the studio that although the search warrant was supported by probable cause when it was issued, Detective Deckard's subsequent discovery that LaMarsh actually lived in the smaller trailer vitiated that probable cause. We reach a different conclusion.

In determining whether a search warrant is supported by probable cause, we consider “whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.” (*Illinois v. Gates* (1983) 462 U.S. 213, 238; *People v. Camarella* (1991) 54 Cal.3d 592, 601.) “ ‘[S]ufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment.’ ” (*Maryland v. Garrison* (1987) 480 U.S. 79, 87.)

We agree with the trial court that the search warrant affidavit, which referred to an individual matching the description of one of the murder suspects living in the same residential area as the studio and “frequent[ing]” the studio, set forth sufficient facts to demonstrate a fair probability that evidence of the murders would be found in the studio. (See *Illinois v. Gates, supra,* 462 U.S. at p. 238; *People v. Farley* (2009) 46 Cal.4th 1053, 1099–1100.) Detective Deckard's subsequently acquired information that LaMarsh actually lived in the small trailer while frequenting and at times

staying in the studio does not vitiate the fair probability that evidence of the murders would be found in the place LaMarsh frequented, i.e., the studio. There was also evidence that the small trailer was dependent on the studio for electricity; it was so small as to be able to be thoroughly visually inspected for suspects from a window, and it was "part and parcel of" the studio.

To the extent Cruz's claim that the affidavit's reference to firearms, blood spatters and clothing tending to establish the identity of the perpetrator, documents or videotapes of the victim or others tending to show motive, and documents identifying who controlled the premises failed to describe evidence relating to the four murders and thus establish probable cause, is preserved, we reject it. Cruz does not claim the warrant lacked particularity in its description of the items sought, and given that Alvarez had described her assailant as displaying a firearm and there were four slain victims, these items related to the circumstances surrounding the murders. Moreover, it was "necessary to establish" who had "control over any evidence seized." (*Bryant, Smith, and Wheeler*, *supra*, 60 Cal.4th at p. 370.)

Cruz contends the warrant was invalid because Deckard omitted material information from his affidavit, rendering it deliberately or recklessly false and misleading. (*Franks v. Delaware* (1978) 438 U.S. 154, 155–156, 171–172.) A "warrant is presumed valid," and a "defendant claiming that the warrant or supporting affidavit is inaccurate or incomplete bears the burden of alleging and then proving the errors or omissions." (*People v. Amador* (2000) 24 Cal.4th 387, 393.)

"This court has applied the rule in *Franks* to deliberate omissions of material facts from an affidavit for a search warrant. . . ." (*People v. Sandoval* (2015) 62 Cal.4th 394, 409 (*Sandoval*).) At the same time, we have recognized "that a claim that material facts were omitted from an affidavit differs from a claim that the affidavit contains falsehoods: 'Though similar for many purposes, omissions and misstatements analytically are distinct in important ways. Every falsehood makes an affidavit inaccurate, but not all omissions do so. An affidavit need not disclose every imaginable fact however irrelevant'. . . . '[A]n affiant's duty of disclosure extends only to "material" or "relevant" adverse facts.' [Citation.] '[F]acts are "material" and hence must be disclosed if their omission would make the affidavit *substantially misleading*. On review under section 1538.5, facts must be deemed material for this purpose if, because of their inherent probative force, there is a substantial possibility they would have altered a reasonable magistrate's probable cause determination.' " (*Sandoval*, at pp. 409–410.)

Cruz contends Detective Deckard should have included information in his affidavit that the trailers were used as residences and that Cruz, Jennifer, and their two infants lived in the studio. We have concluded that the search warrant affidavit set forth sufficient facts to demonstrate a fair probability that evidence of the murders would be found in the studio. Information that the trailers were also used as residences would not lessen that probability. Thus, the affidavit was not substantially misleading in this respect.

As for the number of studio occupants, although Deckard testified that Brasuell told him that "Jerald" and his wife lived in the studio, his affidavit stated that he spoke to Brasuell,

who said that someone named "Jerald" lived in the studio. Cruz fails to demonstrate how omitting mention of "Jerald's" wife in the affidavit constituted a "deliberate falsehood" or "reckless disregard for the truth." (*Franks v. Delaware, supra,* 438 U.S. at p. 171.) Nor is it clear that Detective Deckard knew that the couple's two infants also lived in the studio before the warrant was issued or how such a circumstance " 'would have altered a reasonable magistrate's probable cause determination.' " (*Sandoval, supra,* 62 Cal.4th at p. 410.) Cruz fails to persuasively demonstrate that these omissions from Detective Deckard's affidavit rendered the search warrant invalid.

Cruz also challenges the execution of the warrant, relying on *Maryland v. Garrison, supra,* 480 U.S. 79. In *Garrison*, an officer obtained a warrant to search the third floor apartment of a suspect named McWebb; the officer reasonably believed McWebb's apartment was the only one on the third floor. (*Id.* at p. 81.) When officers arrived, they encountered McWebb, who used his key to give the officers access to the third floor vestibule. There, the officers encountered the defendant, Garrison, and saw two open doors. They entered one of the doors and observed heroin, cash, and drug paraphernalia. At that point, the officers realized there were two apartments on the third floor and that they had entered Garrison's, not McWebb's. The officers immediately discontinued the search of Garrison's apartment. (*Ibid.*) The high court concluded that execution of the warrant in Garrison's apartment was objectively reasonable based on the information available to the officers. (*Id.* at pp. 88−89.)

Cruz contends that here, unlike in *Garrison*, Detective Deckard wrongly executed the search warrant and searched

the studio after learning from Jennifer that LaMarsh did not live there, and that Cruz and Jennifer lived there with two children. In fact, Detective Deckard's affidavit stated that "Jerald" lived in the studio and Jason "frequent[ed]" the studio. Deckard's interview of Jennifer merely confirmed those circumstances, and the presence of two infants would not reasonably have led Detective Deckard to believe Jason did not frequent the studio.

In sum, we conclude Cruz's suppression motion was properly denied.

### 2. Severance

Beck and Cruz contend the trial court erred in denying their severance motions. There was no error.

#### a. Factual background

Before trial, Beck moved for severance on the ground that items seized from his trailer had been suppressed as to him, but each of his codefendants planned to introduce the evidence in their defense. Cruz moved for severance on the grounds that certain evidence had been suppressed as to some defendants but not others, that some of the defendants had made statements that would be damaging to other defendants, and that he was entitled to a separate penalty phase from the other defendants. At the hearing, Cruz asserted severance was also warranted because the defendants would present inconsistent defenses.

As to Beck's motion, at the severance motion hearing, the prosecutor said he would not introduce at trial any evidence found in Beck's trailer or Willey's home that was later suppressed. The trial court stated that the purpose behind the exclusionary rule was to prevent police misconduct and ordered

the prosecutor not to use the evidence found in Beck's trailer at trial. It further stated that the other defendants were not precluded from using this evidence, and defense counsel would have a "full and through opportunity to cross-examine any of the witnesses" presenting that evidence. On that basis, it denied Beck's severance motion.

As to Cruz's motion, Detective Deckard testified that none of the defendants had implicated any other defendant in his statements to law enforcement. LaMarsh had made incriminating statements to his friend Karen Spratling but had not incriminated any other defendant. The prosecutor said it appeared Spratling was not "going to be able to testify."

The trial court denied Cruz's severance motion. It said it was aware of no authority holding that defendants were entitled to separate trials simply because there were inconsistent defenses. Although the court was concerned about LaMarsh's statement to Evans that Cruz had "helped him beat Raper," it found that this statement, in light of other statements by LaMarsh made in Cruz's presence, did not warrant severance. The court incorporated that portion of its ruling on Beck's severance motion stating that defendants were not precluded from using evidence suppressed as to some but not all defendants, and that defense counsel would have a "full and through opportunity to cross-examine any of the witnesses" presenting that evidence. It also ruled there would be separate and sequential penalty phases for each defendant, with Cruz going first, then Beck, LaMarsh, and Willey.

Beck unsuccessfully filed a motion to reconsider the denial of his severance motion and the order of the penalty trials and a writ challenging that denial. At the end of trial,

the court instructed the jury, "You must decide separately whether each of the defendants is guilty or not guilty."

### b. *Analysis*

Section 1098 states in relevant part: "When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court order [*sic*] separate trials." This provision indicates the Legislature's "strong preference for joint trials." (*People v. Winbush* (2017) 2 Cal.5th 402, 455 (*Winbush*).) "Joint trials 'play a vital role in the criminal justice system' " because they "promote efficiency and 'serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.' " (*Zafiro v. United States* (1993) 506 U.S. 534, 537.) "Joint proceedings are not only permissible but are often preferable when the joined defendants' criminal conduct arises out of a single chain of events. Joint trial may enable a jury 'to arrive more reliably at its conclusions regarding the guilt or innocence of a particular defendant. . . .' " (*Kansas v. Carr* (2016) 577 U.S. __, __ [136 S.Ct. 633, 645]; see *People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 819 (*Daveggio and Michaud*).) We have found persuasive the high court's statement that when defendants are properly joined, severance should be granted "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." (*Zafiro v. United States*, at p. 539 [addressing severance under Fed. Rules Crim. Proc., rule 14]; see *People v. Lewis* (2008) 43 Cal.4th 415, 452 (*Lewis*).)

"We review a trial court's denial of a severance motion for abuse of discretion based on the facts as they appeared at the time the court ruled on the motion." (*People v. Avila* (2006) 38 Cal.4th 491, 575.) As can be seen, the concerns raised by Beck and Cruz in their severance motions were ameliorated by the prosecutor's representations and the trial court's rulings. None of the four defendants had implicated any other defendant in his statement to police; the prosecutor was precluded from introducing against any defendant evidence suppressed as to some defendants; the prosecutor said Spratling was unable to testify; and the defendants were granted separate penalty phases.

Cruz contends that the trial court made a blanket rejection of the argument that inconsistent defenses warranted severance without considering the potential prejudice in this case. But throughout the motion hearing the court actively sought to clarify what evidence was expected to be introduced and noted in its ruling that although it was concerned about a statement LaMarsh had made to Evans about Cruz, that statement alone did not warrant severance given other statements LaMarsh had made in Cruz's presence.

Cruz further contends that the trial court ignored relevant information "crucial to an informed evaluation" of the potential "undue prejudice from a joint trial." In particular, he contends LaMarsh offered to provide "specific information about documents and evidence regarding prior acts of LaMarsh's codefendants which he intended to introduce" and that he anticipated would elicit vigorous objection from the codefendants, but the trial court "failed to hold the requested in camera hearing, without comment."

In the colloquy to which Cruz refers, however, it appears LaMarsh was discussing evidence he intended to introduce at the penalty phase, not at the guilt phase. LaMarsh stated, "[E]ven though the guilt phase is not severed, the Court [should] seriously consider a separate penalty phase" because of prior acts evidence LaMarsh would seek to introduce and to which his codefendants would "object vigorously." Because the court then ordered separate penalty trials for each defendant, the court had no need to hold an in camera hearing to evaluate the evidence of any codefendant's prior acts that LaMarsh would seek to introduce at the penalty phase.

"[E]ven if a trial court acted within its discretion in denying severance, ' "the reviewing court may nevertheless reverse a conviction where, because of the consolidation, a gross unfairness has occurred such as to deprive the defendant of a fair trial or due process of law." ' " (*People v. Thompson* (2016) 1 Cal.5th 1043, 1079 (*Thompson*).) "Defendants bear the burden of establishing that the trial was grossly unfair and denied them due process of law, and 'a judgment will be reversed on this ground only if it is "reasonably probable that the jury was influenced [by the joinder] in its verdict of guilt." ' " (*Daveggio and Michaud, supra*, 4 Cal.5th at p. 821.) Beck and Cruz contend that such gross unfairness arose here because "the four defendants presented differing defenses."

"Mutually antagonistic defenses are not prejudicial *per se*." (*Zafiro v. United States, supra*, 506 U.S. at p. 538.) Although Beck, Cruz, LaMarsh, and Willey "each may have sought to cast blame on [each] other, it was undisputed that [all] had been involved in some manner" in the murders. (*Daveggio and Michaud, supra*, 4 Cal.5th at p. 820.) "The only material inconsistency concerned the degree to which each

participated in the murderous acts." (*Winbush*, *supra*, 2 Cal.5th at p. 457.) "Moreover, when there is sufficient independent evidence of the defendants' guilt, the actual presentation of conflicting defenses at trial does not reduce the prosecution's burden or otherwise result in gross unfairness." (*Bryant, Smith and Wheeler*, *supra*, 60 Cal.4th at p. 380.)

Here there was sufficient evidence of Beck's and Cruz's guilt for the charged crimes that was independent of their codefendants' testimony. Shortly before the May 1990 murders, Cruz, accompanied by Beck, purchased the police baton that, according to a stipulation by Cruz and the prosecutor, was found near the crime scene. Also, on February 27, 1990, a store clerk had shown Cruz camouflage masks similar to one found at the crime scene. A receipt for four masks purchased on that date was found in Cruz's home after the murder, but no masks were found during that search. Beck and Cruz testified at trial that on the night of the murders they traveled to 5223 Elm Street with Evans, LaMarsh and Vieira, and went into the home. Evans testified Beck and Cruz had participated in the planning and commission of the murders, and that when they returned to the car, Beck was covered in blood and carrying a bloody knife, and Cruz had blood on his hands. Cruz was identified by a witness as one of the assailants who attacked Ritchey. Shortly after the murders, Beck told acquaintance Wallace that "we" or "I" "slit some throats." The jury could reasonably infer Beck was referring to the murder of the victims in this case, the throats of three of whom were slit and the fourth stabbed. Rosemary testified that Beck visited her on the evening of May 21, 1990. When the prosecutor asked whether Beck had mentioned doing anything to the people who were killed,

Rosemary testified that Beck said, "[T]hey had to do them," and that he had purchased new shoes because his were covered in blood and he could not get them clean.

Cruz contends that severance was compelled because the evidence of conspiracy was weak and provided only by Evans; hence, in his view, it is reasonably probable a different verdict would have resulted absent "the antagonistic tactics of LaMarsh and Willey." We conclude more fully below, in rejecting Beck's claim, joined by Cruz, that no substantial evidence supports his conspiracy conviction, that even aside from Evans's testimony, there was substantial evidence of a conspiracy. (See *post*, pt. II.B.1.a.)

Cruz further contends that evidence that he, Beck, and Vieira were a "close-knit group and secretive" had no probative value against him, and therefore the guilty verdicts for Cruz and Beck and hung jury for LaMarsh and Willey must have resulted from LaMarsh's and Willey's "prejudicial and inflammatory character evidence." But evidence that Cruz, Beck, and Vieira were close and secretive was relevant to the prosecutor's theory that the three had conspired with LaMarsh and Willey to commit murder. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1135 (*Rodrigues*) [" 'The existence of a conspiracy may be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy.' "].) We also reject below Cruz's claim that evidence of the relationship between Cruz, Beck, and Vieira was prejudicial character evidence. (See *post*, pt. II.B.2.)

Cruz asserts that LaMarsh and Willey acted as additional prosecutors because "[t]heir testimony, and the

evidence they presented through other witnesses, clearly constituted far more evidence of [Cruz's] guilt than anything the prosecution presented or would have been able to present at a separate trial." Beck makes a similar argument but identifies Cruz, LaMarsh, and Willey as additional prosecutors.

Specifically, Cruz contends that LaMarsh's claim that Cruz, not LaMarsh, "committed the fatal assault on Raper," LaMarsh's defense expert's opinion that a baton rather than a bat had caused Raper's wounds, and Rosemary's emotional testimony against Cruz would not have occurred in a separate trial, thus avoiding prejudicial character evidence against Cruz. But evidence regarding the instrument likely used to inflict Raper's wound would have been admissible in a separate trial, and the trial court sustained objections to questions by LaMarsh asking Rosemary if she was afraid of Cruz. Nor is it obvious how LaMarsh's assignment of blame was unduly prejudicial. Beck similarly contends that evidence regarding the "cult-like" nature of the group was introduced by his codefendants and could not have been admitted in a separate trial, but the trial court sustained objections to testimony about cults, white supremacy, and the occult. Nor was LaMarsh's single statement that Beck, Cruz, and Vieira appeared to be a "survivalist" group so grossly prejudicial that severance was required. Moreover, as discussed below in rejecting Cruz's character evidence claim, evidence that Beck possessed firearms was not unduly prejudicial since none of the firearms was illegal or used to shoot any victim.

Beck also contends that a Ka-Bar knife box from his trailer that had been suppressed was introduced by LaMarsh. During LaMarsh's cross-examination of Beck, Beck denied

having seen a Ka-Bar knife box on May 20, 1990. After marking a box as an exhibit, counsel asked why the box had been found in Beck's trailer, and Beck's foundation objection was sustained. Beck was then asked whether any police officer had asked him about "any Ka-Bar box that was found in your trailer after May 20, 1990," and Beck said "Yes." Even assuming this evidence was improperly introduced, it was not prejudicial in light of other evidence of Beck's guilt and did not render the joint trial grossly unfair. (*Ante*, at pp. 67–68.)

Beck further contends that he was prejudiced by the denial of his severance motion when considered with the order of the separate penalty trials. In particular, he asserts that the prosecutor "exploited the jury's knowledge of the Cruz evidence during Beck's penalty trial by calling many of the same witnesses to testify that Beck was present or had knowledge of Cruz's bad acts."

In *Kansas v. Carr, supra*, 577 U.S. __ [136 S.Ct. 633], the high court rejected a similar claim. *Carr* involved two defendants who were brothers. (*Id.* at p. __ [136 S.Ct. at p. 637].) The older brother claimed he was prejudiced at their joint penalty trial "by his brother's portrayal of him as the corrupting older brother," and by his brother's cross-examination of their sister, who equivocated about whether the older brother had admitted to her he was the shooter. (*Id.* at p. __ [136 S.Ct. at p. 644].) The younger brother claimed that "he was prejudiced by evidence associating him with his dangerous older brother, which caused the jury to perceive him as an incurable sociopath," and by the jury's observation of his older brother in handcuffs. (*Id.* at p. __ [136 S.Ct. at p. 644]; see *id.* at p. __, fn. 4 [136 S.Ct. at p. 644, fn. 4].)

The high court held that joint capital sentencing proceedings do not violate the Eighth Amendment right to an individualized sentencing determination. (*Kansas v. Carr, supra,* 577 U.S. at p. __ [136 S.Ct. at p. 644].) Although the due process clause protects defendants against unduly prejudicial evidence that would render a trial fundamentally unfair, that standard was not met by the "mere admission of evidence that might not otherwise have been admitted in a severed proceeding." (*Id.* at p. __ [136 S.Ct. at p. 645]; see *id.* at p. __ [136 S.Ct. at p. 644].) The high court observed that the trial court had instructed the jury that it must give " 'separate consideration to each defendant' " and that evidence admitted as to one defendant should not be considered as to the other defendant. (*Id.* at p. __ [136 S.Ct. at p. 645].) The high court presumed that the jury followed these instructions, while observing such limiting instructions " 'often will suffice to cure any risk of prejudice.' " (*Ibid.*) Moreover, the high court concluded that the penalty verdicts were not a result of the challenged penalty evidence against one brother or the other, but of the guilt phase evidence of "acts of almost inconceivable cruelty and depravity." (*Id.* at p. __ [136 S.Ct. at p. 646.].)

Likewise here, the court instructed the jury that it must "[d]isregard any . . . evidence that you heard during Mr. Cruz's penalty phase" and "determine what the facts are from the evidence received during the guilt phase of the trial and this penalty phase." We presume it followed this instruction. Moreover, no evidence of Beck's unadjudicated criminal acts was introduced at Cruz's penalty trial. Thus, as in *Carr,* the Beck penalty verdict was not based on "guilt by association" with Cruz, as Beck contends, but on penalty evidence that Beck had tortured Perkins, physically assaulted Vieira and

70

Rosemary, and physically abused Cruz's infant daughter, and on the guilt phase evidence that Beck had participated in planning and committing four murders.

### 3. *Reopening of jury selection*

Beck, joined by Cruz, contends that the trial court erred in finding there was good cause to reopen jury selection to allow the prosecutor to exercise a peremptory challenge against Prospective Juror M.L. We reject the claim.

Code of Civil Procedure section 226, subdivision (a) provides: "A challenge to an individual juror may only be made before the jury is sworn." "Subdivision (d) of [Code of Civil Procedure] section 231 then explains: 'Peremptory challenges shall be taken or passed by the sides alternately, commencing with the plaintiff or people; and each party shall be entitled to have the panel full before exercising any peremptory challenge. When each side passes consecutively, the jury shall then be sworn, unless the court, for good cause, shall otherwise order.' " (*People v. Cottle* (2006) 39 Cal.4th 246, 255, italics omitted.) After the parties have passed on the jury but before the jury is sworn, the trial court may reopen jury selection and allow a peremptory challenge to be exercised if good cause is shown. (*Id.* at p. 256 [" '[T]he jury is sworn' when those 12 trial jurors have been sworn."].)

When Prospective Juror M.L. was asked on his juror questionnaire if his "religious views [would] in any way affect [his] service as a juror," and whether "[f]or religious or any other reason, do you feel you cannot sit in judgment on the conduct of a fellow human being," he responded "No" to each question but commented, "I'm not sure in certain cases." When asked his "general feelings regarding the death penalty," M.L.

answered, "Undecided." When asked which "entry . . . best describes your feeling about the death penalty," he chose "[w]ill consider" the death penalty. He was "[n]ot sure" how he would vote if the issue of whether California should have a death penalty law were on the ballot. When asked, "Under what circumstances, if any, do you believe that the death penalty is appropriate," he answered, "On extreme cases, when the public is or will be endangered and the criminal is beyond reform." In response to the question, "Could you set aside your own personal feelings regarding what you think the law should be regarding the death penalty, and follow the law as the Court instructs you," he replied, "Yes."

On voir dire, the trial court observed Prospective Juror M.L. had answered he was "[u]ndecided" about the death penalty and asked if he had heard anything in court that allowed him to further describe his feelings. M.L. replied "Yes," explaining: "Your explanation of the law. I would have to follow the law." The court asked, "Are you satisfied that you could follow the law regarding the death penalty as I've explained it to you?" M.L. answered, "Yes." M.L. answered "No" when asked if he had "feelings about the death penalty which are so strong that [he] would never impose the death penalty in any case whatsoever," or "feelings about the death penalty which [he] believe[d] would substantially interfere with [his] ability to function as a juror in this case." When asked if he had "any thoughts about [when] the death penalty . . . should be imposed," he replied, "I believe it should be applied to some cases." The court asked, "Do you have any preconceived ideas as to what cases it should be applied to?" M.L. replied, "No, I don't." M.L. was passed for cause by all parties.

The following day, after both sides had passed the jury and the trial court was preparing to have the jury sworn, the court inquired of the prospective jurors: "Ladies and gentlemen, do any of you feel there is any reason that you could not be a fair and impartial juror in this case? If so, please raise your hand. I see no one raising their hand." The court also inquired, "Are there any rules of law that I explained that you could not follow? I see no affirmative responses. Ladies and gentlemen, please stand and be sworn as the jurors of this case." As the clerk began to swear the jury, she observed Prospective Juror M.L. had raised his hand.

Outside the presence of the other prospective jurors, Prospective Juror M.L. told the court and counsel: "I am not really certain about the death penalty, sir, whether I can render [the] death penalty as a judgment. I would rather choose life in prison for the convicted person. I am not sure because of religio[us] reasons and other reasons that . . . I can render [the] death penalty. I believe that a man [who] has done something wrong, that he should be punished. I just am not absolutely certain right now, due to religious reasons, that I'm doing the right thing if I have to decide on the death penalty." After the court conferred with counsel about what questions to ask, Beck and Cruz then changed their position and unsuccessfully objected to any questioning. The court asked M.L., "[A]s you sit here right this minute, do you know for a fact that you could vote for the death penalty if you felt it was appropriate?" M.L. replied he could do so in "one case," explaining, "[i]f the persons are repeat offenders or the [c]ourt can prove that they will kill again." When the court asked if M.L. had "feelings about the death penalty which are so strong that [he] would never impose the death penalty in any case

whatever," he replied, "No, sir." The court asked whether M.L. had "feelings about the death penalty which [he] believe[d] would substantially interfere with [his] ability to function as a juror in this case?" M.L. responded, "I'm not sure whether that is substantial to your point of view or to the other people's point of view[,] but as I have stated . . . when I first answered my questionnaire, I am really not sure about the death penalty in the sentencing of a person to death. I know I can go through Phase 1 and find the person — you know, whether he's guilty or not. I'm just not absolutely sure whether I'm doing the right thing if I have to sentence a person to death." Beck and Cruz objected to any further questioning of M.L. The court nonetheless continued, subsequently asking M.L., "[H]ave your feelings about the death penalty changed in any manner since you answered the questions yesterday?" M.L. replied, "Sir, since you mentioned last week that this is a case regarding [the] death penalty, I have been asking myself . . . how to judge the case or what to do in case I get selected. To this point I'm not one hundred percent sure whether . . . I can do it or not . . . . [I]f I get selected as a juror, I don't want to be the last person to say or to be the only different person." After further colloquy, the court explained that M.L. was not "to concern [him]self . . . in any manner" with the possibility of a hung jury, noting, "That's allowed by the law, and it certainly happens. Do you understand that?" M.L. replied, "Yes, sir. And I just have this feeling inside that if it comes to the death penalty, it may end up that way, sir." The court asked, "Do you know whether it will end up that way?" M.L. replied, "No sir."

The prosecutor moved to reopen jury selection to exercise a peremptory challenge on the grounds that Prospective

Juror M.L.'s comments that day indicated "he would not follow the law and would only be able to impose the capital penalty in one limited situation." Beck and Cruz opposed the motion, and Beck asked the court to swear the jury. The trial court initially denied the prosecutor's request to reopen jury selection, but it delayed having the jury sworn to allow the prosecutor time to file a writ challenging the ruling. The prosecutor instead filed a motion for reconsideration, and the court ultimately granted the motion to reopen jury selection, ruling that although M.L. was not subject to a challenge for cause, "[i]n the instant case there were new facts, [M.L.'s] return to his questionnaire state of mind. . . . The Court finds that [M.L.'s] volunteered comments to the Court, along with his subsequent answers to questions put to him, establish the good cause for the district attorney to reopen to exercise peremptory challenges." The prosecutor subsequently exercised a peremptory challenge against M.L.

When originally questioned on voir dire, Prospective Juror M.L. expressed no hesitation about setting aside his feelings about the death penalty and applying the law as he was instructed by the court and stated he had no preconceived idea of the cases in which the death penalty would be appropriate. But the following day, M.L. so questioned his ability to impose the death penalty he believed it possible he would be the cause for a hung jury. He was now of the view that he could only impose the death penalty in "one case," which would be "if the persons are repeat offenders or the [c]ourt can prove that they will kill again." Under these circumstances the trial court properly found good cause and acted well within its discretion in reopening jury selection. (See *People v. DeFrance* (2008) 167 Cal.App.4th 486, 503−504

[the trial court properly found good cause to reopen jury selection when before the jury was sworn a juror "concluded it would be difficult for him to serve on the jury because it would require him to stay up all day and night for several days in a row"].) Contrary to Beck's assertion in his reply, nothing in Code of Civil Procedure former section 231, subdivision (d), required the trial court to immediately have the jury sworn once the court initially denied the motion to reopen jury selection. Rather, the court had authority to stay its ruling and allow the prosecutor time to file a writ or, as the prosecutor actually filed, a motion for reconsideration.

In sum, the trial court did not abuse its discretion in reopening jury selection and allowing the prosecutor to exercise a peremptory challenge.

### 4. Excusals for cause

#### a. Prospective Juror D.D.

Beck and Cruz contend that the trial court wrongfully excused Prospective Juror D.D. for cause based on her death penalty views. We reject the claim.

#### 1. Factual background

Prospective Juror D.D.'s juror questionnaire was lost after trial, but the court recounted without objection or correction by counsel many of her written responses in its ruling on the prosecutor's challenge for cause.

At voir dire, the trial court explained the general factual circumstances of the murders to the prospective jurors. It also described the guilt and penalty phases, defined mitigating and aggravating evidence, and explained "only if the jury decides the aggravating factors are so substantial in comparison with

the mitigating factors that death is warranted, can the jury impose the death penalty."

At voir dire, the trial court asked Prospective Juror D.D., "What are your feelings about the death penalty?" D.D. responded, "I am against the death penalty." The court asked, "If called upon as a juror in this case or if you are selected as a juror in this case and the jury got to the place where the penalty was to be decided, and that if after hearing all the law and the evidence you felt that the death penalty was the appropriate disposition, would you be able to vote for it?" She replied, "If I felt it was appropriate, yes. I guess the thing is whether or not I would believe it was appropriate." The court asked, "Do you believe there are any circumstances, any types of murders, where the death penalty could be appropriate?" D.D. replied, "Yes," explaining, "I think that somebody such as someone like Jeffrey Dahmer, if the death penalty had been appropriate in his case, I may be able to go with the death penalty. Severe human crimes, mass murders of numbers, lots of different people, and other, I guess, heinous circumstances involved would lead me to impose the death penalty; but it would have to be something very extreme and very severe. Otherwise, I really am not — I do not believe that the death penalty serves any purpose." The court asked, "Are your feelings about the death penalty so strong that you would never vote for first degree murder?" D.D. replied, "No." The court asked, "Are your feelings about the death penalty so strong that you would never find a special circumstance to be true?" D.D. replied, "Possibly." The court asked, "Are your feelings about the death penalty so strong that you would never impose a death penalty in any case whatsoever?" D.D. replied, "No."

The trial court asked, "Do you believe your feelings about the death penalty are so strong that they would substantially interfere with your ability to function as a juror in this case?" Prospective Juror D.D. replied, "Yes," explaining, "I would be fine during the guilt phase of the proceeding; but once we got to the penalty phase, I'm sure that it would . . . take a lot — it would take really a serious leap of some sort — and I'm not sure I'd be able to make it — to impose the death penalty." The court asked if D.D. understood that she would have to choose a sentence of life imprisonment if "the mitigating factors outweighed the aggravating factors" or if the factors "were essentially equal," and D.D. replied that she did. The court then asked, "Do you understand that if the aggravating factors were so bad in comparison with the mitigating factors that death was warranted, that you could impose the death penalty?" She replied, "I understand." The trial court asked, "If . . . the only evidence presented in the penalty phase were aggravating factors, bad things about the defendants, and they were very bad, would you be able to vote for the death penalty?" D.D. replied: "Well, when you say very bad, it would have to be very bad. I mean, it's a qualitative statement. What is very bad? You know, what's very bad to me is probably different from what's very bad to someone else . . . [W]e may have the same feelings about what is very bad, but I would still believe it was not right to have a part in the death of someone else in this manner." The court asked, "Is your belief such that you do not believe that you have the right to take part in a decision which would deprive a person of his life?" D.D. replied, "Yes." The court asked, "Do you believe that you could ever participate in a [courtroom] decision that would result in the taking of a person's life?" D.D. replied,

"Possibly, the case I mentioned before. It would have to be something very bad."

The prosecutor challenged Prospective Juror D.D. for cause. Beck and Cruz objected, and Cruz also objected to denial of their request for sequestered voir dire. Cruz requested the court present D.D. with "a hypothetical of the Dahmer case and see if she would consider that would be very bad where she would look for the death penalty." Beck asserted that D.D. was death qualified and that although she had "indicated that it would be very difficult for her to impose the death penalty," he was sure the prosecutor "doesn't want people who would find it easy to impose the death penalty."

The trial court sustained the challenge for cause. In its ruling, the court reviewed Prospective Juror D.D.'s answers on the written juror questionnaire. The court stated: "[I]n her questionnaire [D.D.] has stated that . . . she felt she could be fair to both parties, she was an unbiased person." She said that "she does not believe in the death penalty except in extreme Dahmer-type cases, where a death penalty should not be entirely ruled out." "[S]he strongly opposes the death penalty." When asked about "a situation where the death penalty could be appropriate," she responded, "multiple murders, if no remorse or promise of rehabilitation," and further stated she "could follow the law, although it would not be easy for her to sentence someone to death." She believed that the "death penalty should only rarely be imposed when there is absolutely no . . . hope of rehabilitation" and that "she would vote against the death penalty were it on a ballot." D.D. stated that "life without [the] possibility of parole is okay for the most heinous crimes imaginable." She "acknowledge[d] that the death penalty may be appropriate for only repeat

offenders" and stated "the death penalty is never appropriate for first-time offenders." When asked, "Is there anything about your present state of mind that you feel any of the attorneys would like to know," she responded, "I doubt seriously that I would impose a death penalty. My verdict would be affected if I was asked to vote guilty with a punishment of death as opposed to guilty with life imprisonment." Upon considering Prospective Juror D.D.'s written and oral responses, the court found that her "current state of mind is such that her feelings against the death penalty would substantially interfere with her ability to perform as a juror in a case in which the death penalty was a possible penalty."

### 2. Discussion

" The federal constitutional standard for dismissing a prospective juror for cause based on his or her views of capital punishment is ' "[w]hether the juror's views would prevent or substantially impair the performance of h[er] duties as a juror in accordance with h[er] instructions and h[er] oath." ' " (*People v. Friend* (2009) 47 Cal.4th 1, 56, quoting *Uttecht v. Brown* (2007) 551 U.S. 1, 7.) " ' "There is no requirement that a prospective juror's bias against the death penalty be proven with unmistakable clarity." ' " (*People v. Abilez* (2007) 41 Cal.4th 472, 497.) As the high court has observed, many prospective jurors "simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear'; these [prospective jurors] may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to

faithfully and impartially apply the law." (*Wainwright v. Witt* (1985) 469 U.S. 412, 424–426, fn. omitted.) "[W]hen there is ambiguity in the prospective juror's statements, 'the trial court, aided as it undoubtedly [is] by its assessment of [the prospective juror's] demeanor, [is] entitled to resolve it in favor of the State.' " (*Uttecht v. Brown*, at p. 7.) We review the trial court's ruling for substantial evidence.

Prospective Juror D.D. said she was against the death penalty and did not believe that she had the right to take part in a decision that would deprive a person of his life. She also believed her feelings about the death penalty would substantially interfere with her ability to function as a juror in this case and were so strong she "[p]ossibly" would never find a special circumstance to be true.

Although Prospective Juror D.D. acknowledged her feelings about the death penalty were not so strong that she would never impose the death penalty in any case, she described a death verdict as "really a serious leap of some sort — and I'm not sure I'd be able to make it — to impose the death penalty," and she said she "doubt[ed] seriously that [she] would impose a death penalty." She suggested she might be able to impose the death penalty on "someone like Jeffrey Dahmer, if the death penalty had been appropriate in his case. . . . Severe human crimes, mass murders of numbers, lots of different people, and other . . . heinous circumstances involved would lead me to impose the death penalty; but it would have to be something very extreme and very severe."

Beck and Cruz also assert Prospective Juror D.D. was qualified to serve because she offered examples of when she believed the death penalty was appropriate. "But the mere

theoretical possibility that a prospective juror might be able to reach a verdict of death in some case does not necessarily render the dismissal of the juror" erroneous. (*People v. Martinez* (2009) 47 Cal.4th 399, 432.) We concluded substantial evidence supported the excusal of the prospective juror in *Martinez* (*id.* at p. 433) who said she might be able to impose the death penalty for " 'particularly heinous' " crimes, to "recidivists" (*id.* at p. 428), and " 'it would have to be something that would push me beyond the way I normally feel about the death penalty' " but " 'that could happen' " (*id.* at p. 429). The same reasoning supports the excusal of D.D. The trial court, which heard D.D.'s responses, was left with the definite impression that she was substantially impaired, and that determination is supported by substantial evidence.

Beck asserts that the trial court's voir dire was inadequate because it denied counsel the opportunity to ask Prospective Juror D.D. follow-up questions or to rehabilitate her. Likewise, Cruz asserts that no deference is due a trial court's determination of a prospective juror's state of mind when the defense objects to excusal but is not permitted to ask follow-up questions and that the erroneous refusal to allow counsel to ask questions on voir dire was prejudicial.

The United States Constitution "does not dictate a catechism for voir dire, but only that the defendant be afforded an impartial jury." (*Morgan v. Illinois* (1992) 504 U.S. 719, 729, italics omitted.) At the time of the 1992 trial, the jury selection provisions of Proposition 115, codified in Code of Civil Procedure former section 223, applied to this case. (Code Civ. Proc., former § 223, added by Prop. 115, as approved by voters Primary Elec. (June 5, 1990); *Tapia v. Superior Court* (1991) 53 Cal.3d 282, 299−300 [jury voir dire provisions of Prop. 115

apply to all trials occurring after the proposition's effective date].) Former section 223 provided in relevant part: "In a criminal case, the court shall conduct the examination of prospective jurors. However, the court may permit the parties, upon a showing of good cause, to supplement the examination by such further inquiry as it deems proper, or shall itself submit to the prospective jurors upon such a showing, such additional questions by the parties as it deems proper." Accordingly, the trial court here properly assumed primary responsibility for questioning prospective jurors. (*People v. Box* (2000) 23 Cal.4th 1153, 1178−1179.) Moreover, as Cruz's counsel observed when discussing the voir dire of a different prospective juror, "[t]he Court has permitted us to submit questions in the course of jury selection."

In addition, a trial court "has wide discretion in deciding what questions should be asked on voir dire to determine potential jurors' biases. [Citation.] 'It abuses that discretion if its failure to ask questions renders the defendant's trial " 'fundamentally unfair' " or " ' "if the questioning is not reasonably sufficient to test the jury for bias or partiality." ' " ' " (*People v. Harris* (2013) 57 Cal.4th 804, 831 (*Harris*); *People v. Stitely* (2005) 35 Cal.4th 514, 540 (*Stitely*) ["the trial court has broad discretion over the number and nature of questions about the death penalty"].) Here, Beck and Cruz fail to identify how the trial court's voir dire was lacking or what questions trial counsel could have asked Prospective Juror D.D. that would have resolved the ambiguity in her responses. Hence they fail to demonstrate the trial court abused its discretion in not permitting the parties to further question D.D.

Beck and Cruz further contend that Prospective Juror D.D.'s missing juror questionnaire and proposed voir dire questions counsel submitted to the court render the record inadequate for appellate review and require reversal of the penalty judgment. Although we do not condone the loss of any prospective juror questionnaires in a capital case (Cal. Rules of Court, rule 8.610(a)(1)(R)), "[t]he record on appeal is inadequate . . . only if the complained-of deficiency is prejudicial to the defendant's ability to prosecute his appeal. [Citation.] It is the defendant's burden to show prejudice of this sort." (*People v. Alvarez* (1996) 14 Cal.4th 155, 196, fn. 8 (*Alvarez*); cf. *People v. Townsel* (2016) 63 Cal.4th 25, 69 [record lacking either specification of "the materials the trial court reviewed in ruling on the *Pitchess* motion or any particularized description of them, is inadequate to permit meaningful appellate review"].)

As can be seen from the discussion above, much of Prospective Juror D.D.'s now missing juror questionnaire was read into the record during the trial court's ruling on the challenge for cause. At no time did any of the four defendants or the prosecutor object that the trial court had misstated a question or answer in the questionnaire. "In the absence of any indication from defense counsel at the time of the trial court's ruling" that the court "was misrepresenting the contents of the questionnaire[] upon which" the court relied, we see no reason to question the court's recitation of that questionnaire. (*People v. Heard* (2003) 31 Cal.4th 946, 971 (*Heard*).) Nor is it apparent how D.D.'s responses to other questions not recounted by either the trial court or counsel could possibly remove the ambiguity present in her voir dire responses or alter the deference accorded to the trial court's

ruling. (See *People v. Haley* (2004) 34 Cal.4th 283, 305−306 ["Defendant fails to show prejudice because he does not explain *how* the missing juror questionnaires undermine" the circumstance that on voir dire "each of the challenged jurors gave equivocal or conflicting statements as to whether they could impose the death penalty"].)

As for counsels' proposed questions to Prospective Juror D.D., we have already observed that Beck and Cruz fail to identify how the trial court's voir dire was lacking or what questions trial counsel could have asked D.D. that would have resolved the ambiguity in her responses. Contrary to their assertion, they could provide this information on appeal without reference to the proposed questions actually given to the trial court that are apparently now no longer in the record. Hence the absence of what questions counsel previously proposed does not deprive them of meaningful appellate review. In sum, the record is adequate to address Beck and Cruz's claims that the trial court improperly excused Prospective Juror D.D.

### b. *Other Prospective Jurors*

Cruz further asserts that the trial court erred in sustaining challenges for cause to Prospective Jurors B.D. and C.F. based on their death penalty views. Beck also challenges the excusal of these two prospective jurors as well as the excusal of Prospective Jurors E.D., C.S., C.D., D.M., C.G., P.J., and E.M.

### 1. *Prospective Juror B.D.*

On Prospective Juror B.D.'s juror questionnaire, when asked, "What are your general feelings regarding the death penalty," B.D. replied, "Undeci[d]ed." When asked, "Do you

feel that a jury should determine the punishment in a criminal case," he replied "No." When asked, "Under what circumstances, if any, do you believe that the death penalty is appropriate," he answered, "None." When asked, "Under what circumstances, if any, do you believe that the death penalty is not appropriate," B.D. replied "All." In response to the question, "Could you set aside your own personal feelings regarding what you think the law should be regarding the death penalty, and follow the law as the Court instructs you," he replied, "No," explaining, "I can't change my opp[osition] of the [d]eath penalty."

Prospective Juror B.D. also responded, "No," when asked if either the death penalty or life imprisonment without the possibility of parole "should be automatic for any particular type of crime." He believed in the adage, "[a]n eye for an eye." He answered, "Not sure," when asked how he would vote if the issue of whether California should have a death penalty law were on the ballot. When asked if he believed "the state should impose the death penalty on everyone who, for whatever reason, murders another human being," B.D. responded "No," explaining, "not in self-[d]efen[s]e."

Prospective Juror B.D. did not provide answers to numerous other questions regarding the death penalty, such as whether his views about the death penalty had changed substantially in either intensity or nature in the last few years, his feelings about the punishment of life imprisonment without the possibility of parole, his level of support for imposition of the death penalty, what purpose he believed the death penalty served, what information he would like to make a penalty decision, and whether he believed the death penalty was imposed too often, too seldom, or randomly.

On voir dire, the court asked Prospective Juror B.D., "Have your views about the death penalty changed substantially in the last few years?" He answered, "No." The court asked, "What are your feelings about punishment of life in prison without the possibility of parole?" B.D. responded, "I agree with it." The court asked B.D. about a question that had asked B.D. to pick a response that most accurately described his view on the death penalty and for which he had not provided a written answer. B.D. replied, "Oppose," but also noted that in his view the death penalty served as a deterrent. The court asked, "Do you feel the death penalty . . . is imposed either too often, too seldom, or randomly?" B.D. replied, "Randomly." The court noted when B.D. was asked on the questionnaire, " 'Under what circumstances, if any, do you believe the death penalty [is] appropriate' you put down, 'None.' Could you go ahead and explain what you meant by that answer?" B.D. replied, "I don't believe in the death penalty. I don't believe it's my place to judge a man."

The court subsequently asked, "Do you have feelings about the death penalty which are so strong that you would never vote for first degree murder," or "find a special circumstance to be true?" Prospective Juror B.D. replied, "No." The court asked, "Do you have feelings about the death penalty which are so strong that you would never impose the death penalty in any case whatsoever?" B.D. replied, "Yes." The court asked, "Do you have feelings about the death penalty which you believe would substantially interfere with your ability to function as a juror in this case?" B.D. replied, "Yes."

The prosecutor challenged Prospective Juror B.D. for cause, and the trial court sustained the challenge, and denied defense counsels' requests for sequestered voir dire and

submission of written questions. The trial court stated: "[B]ased on [Prospective Juror B.D.'s] answers to questions in the questionnaire, . . . he believed the death penalty was appropriate in no circumstances . . . [and] was not appropriate in all cases. . . . [H]e cannot change his opinion regarding the death penalty. His failure to answer a number of death penalty related questions, the Court feels that those answers indicate a very strong opinion, feeling against the death penalty, which far outweighs his undecided answer in [response to a question asking for his general feelings regarding the death penalty]. His general feelings about the death penalty — his feelings I believe are confirmed by his answers orally in court, that he would never impose the death penalty under any circumstances whatsoever. Accordingly, the Court concludes that [B.D.] has feelings about the death penalty that are so strong that . . . his ability to serve as a juror in this case would be substantially impaired if he were to come to the point where he had to vote on which sentence was appropriate, death or life without the possibility of parole."

No error appears in excusing Prospective Juror B.D. for cause. Although on his questionnaire he stated that he believed in the adage "[a]n eye for an eye" and that he did not believe the death penalty should be imposed in cases of self-defense, his voir dire responses, which the trial court observed, were consistent with respect to his inability to consider the death penalty. Substantial evidence supports the court's ruling.

### 2. *Prospective Juror C.F.*

Prospective Juror C.F.'s juror questionnaire is not contained in the record. On voir dire, the trial court asked, "In

answering the questionnaire, you said that your feelings about the death penalty were very mixed. Will you tell us what those mixed feelings are?" C.F. replied, "I would have a hard time going for the death penalty," explaining, "I don't really think it's the ultimate answer." The court asked, "Do you have any religious or other reasons that you feel that you could not sit in judgment on the conduct of a fellow human being?" C.F. replied, "No." The court asked, "What are your feelings about [the] punishment of life in prison without the possibility of parole?" C.F. replied, "I could handle that." When asked, "What purpose do you believe the death penalty serves," she replied, "I don't think it serves any purpose." The court subsequently asked, "Can you tell us any circumstances where you think the death penalty is appropriate and not appropriate?" C.F. responded, "I don't think it's appropriate." The court again asked, "Is there any situation in which you believe the death penalty is appropriate?" C.F. replied, "No." When asked, "Do you have feelings about the death penalty which are so strong that you would never be able to vote for first degree murder," or "find a special circumstance to be true," C.F. replied, "Yes." The court asked, "Do you have feelings about the death penalty which are so strong that you would never impose the death penalty in any case whatsoever?" C.F. replied, "Yes." The court asked, "Do you have feelings about the death penalty which you believe would substantially interfere with your ability to function as a juror in this case?" C.F. replied, "Yes."

The prosecutor challenged Prospective Juror C.F. for cause. Both Beck and Cruz unsuccessfully sought sequestered voir dire and the "opportunity of giving follow-up questions." The court sustained the challenge, stating: "The Court feels

that the answers given here in open court clearly reflect [C.F.'s] state of mind and belief against the death penalty. She would never impose it. She feels it so strongly, she would never even vote for a first degree murder conviction. Her ability to perform her duties as a juror in this type of case would be substantially impaired. The Court finds in the written questionnaire, her answer to [No.] 108 she had mixed feelings, [No.] 110 she did not feel that the death penalty should be automatic for any particular type of crime . . . . All of those answers clearly reflect her feeling, and the Court finds that those feelings and beliefs are not diminished by the one answer to [No.] 115 that she would consider the death penalty."

No error appears in excusing Prospective Juror C.F. for cause. Although on her questionnaire she stated that her views on the death penalty were "mixed" and that she would consider the death penalty, her voir dire responses were consistent with respect to her inability to consider the death penalty, and substantial evidence supports the court's ruling.

Beck and Cruz further contend that Prospective Juror C.F.'s missing juror questionnaire and the missing proposed questions counsel submitted to the court render the record inadequate for appellate review, and require reversal of the penalty judgment. But the court recited in its ruling without objection several of Prospective Juror C.F.'s questionnaire responses, and any ambiguity in her questionnaire regarding her feelings on the death penalty was clarified in her consistent answers on voir dire that she would never impose the death penalty in any case. Thus, the absence of the questionnaire from the record does not prevent meaningful review of defendants' claim C.F. was wrongfully

excused for cause. (*Alvarez*, *supra*, 14 Cal.4th at p. 196, fn. 8.) As for counsel's proposed questions to C.F. that are now no longer in the record, Beck and Cruz fail to identify how the trial court's voir dire was lacking or what questions could have been asked of C.F. that would have mitigated her absolute refusal to impose the death penalty — information that Beck and Cruz could have provided in their briefing without reference to the proposed questions that counsel actually gave to the trial court. In sum, the record is adequate to address Beck and Cruz's claim regarding the excusal of C.F.

### 3. *Remaining challenged prospective jurors*

Beck also summarily challenges the excusal of Prospective Jurors E.D., C.S., C.D., D.M., C.G., P.J., and E.M. He broadly contends that "in almost every instance" for these seven prospective jurors, the trial court based the excusal on the prospective juror's questionnaire, made "little or no attempt to rehabilitate or inquire into these jurors' opinions," but merely asked the standard four "*Witherspoon-Witt*" questions, apparently refused to ask "additional written questions posed by defense counsel," and refused to allow defense counsel to rehabilitate the prospective jurors before they were excused. He claims this procedure is similar to the error by the trial court in *Heard*, *supra*, 31 Cal.4th 946, and speculates that had these prospective jurors been further questioned, they "may well have been passed for cause."

We conclude there was no error with respect to any of these jurors in light of the following substantial evidence in the record supporting the trial court's rulings:

### (a) Prospective Juror E.D.

On the juror questionnaire, Prospective Juror E.D. replied "Yes" when asked if her "religious views [would] in any way affect [her] service as a juror," explaining, "Here the death penalty is a possibility." When asked, "For religious or any other reason, do you feel you cannot sit in judgment on the conduct of a fellow human being," she said "No," explaining, "Only if it didn't involve the death penalty." When asked, "Do you have any beliefs about the guilt or innocence of the defendants or the penalty, if any, they should receive if found guilty," E.D. replied, "Yes," explaining, "I don't believe in the death penalty." When asked her "general feelings regarding the death penalty," E.D. answered, "I could never in good consci[ence] vote for the death penalty. I believe only God has that right." When asked, "Have your views about the death penalty changed substantially in either intensity or nature in the last few years," she answered, "I have always felt I couldn't vote for the death penalty." When asked which "entry . . . best describes your feeling about the death penalty," she chose, "Will never under any circumstances impose [the] death penalty." When asked, "If called upon to decide penalty, what information would you like to have to help you make that decision," she answered, "No info would help in view of my feelings." In response to the question, "Could you set aside your own personal feelings regarding what you think the law should be regarding the death penalty, and follow the law as the Court instructs you," she replied, "No," explaining, "I feel too strongly against the death penalty." When asked, "Do you have any reason whatsoever to think you might not be a completely fair and impartial juror in this case," she responded "Yes," explaining, "My feelings on the death penalty."

On voir dire, the court asked Prospective Juror E.D., "Do you have feelings about the death penalty which are so strong that you would never impose a death penalty in any case whatsoever?" She answered "Yes." When asked if her feelings were "so strong that you would never even convict somebody of first degree murder," she responded, "I could convict them, but I could never follow through on the second phase of the death penalty." The court asked, "Do you have feelings about the death penalty which you believe would substantially interfere with your ability to function as a juror in this case?" E.D. answered, "With a Phase Two. It would affect probably the other, although I think I could do the other probably up to that point." The court asked, "How about Phase Two," and she replied, "Phase Two I have problems with." The court asked, "How severe would those problems be?" She said, "I think I would have trouble living with myself." The court asked, "The feeling about having trouble living with yourself, would that be if you voted to impose the death penalty?" She replied, "I feel that I would have to oppose it; and if everyone else was for it, I feel that it's the law and that is the right they should have; but I couldn't do it and I wouldn't want to foul up the case by being the only one to not vote for it, because I feel so strongly."

The prosecutor challenged Prospective Juror E.D. for cause. Over defense objection, the court sustained the challenge, stating: "I will find, in view of [E.D.'s] answers orally given here in court, as well as those set forth in her questionnaire, that [E.D.] never under any circumstances in any case would impose a death penalty. I think all of her answers make that unmistakably clear. The manner in which she has given those answers leads the Court to believe that she is completely honest . . . . I find [E.D.] completely truthful and

her beliefs are very deep and long lived and that she cannot perform her function as a juror in this case in that there may be a time when the jurors have to decide whether the death penalty is the penalty to be imposed." The court also observed that "when a juror makes it absolutely and unmistak[ably] clear that he or she . . . [would] never impose a death penalty, there is no requirement that there be an attempt to . . . 'rehabilitate' . . . that juror."

### (b) Prospective Juror C.S.

On the juror questionnaire, Prospective Juror C.S. replied "Yes" when asked if his "religious views [would] in any way affect [his] service as a juror," explaining, "No capital punishment." When asked, "For religious or any other reason, do you feel you cannot sit in judgment on the conduct of a fellow human being," he said "No," explaining, "Unless my absolute opposition to the death penalty is involved in such judging." When asked, "If you were in the position of the defendants or the prosecutor, would you be satisfied to have your case tried with 12 jurors of your present frame of mind," C.S. replied, "Not if anyone is looking for the death penalty." When asked his "general feelings regarding the death penalty," C.S. answered: "Life is sacred. Life is a gift. Neither men nor the State have a moral right to take life." Although C.S.'s writing is difficult to decipher, he appears to also say: "Any[one] who does so has God's judgment upon him. Men and states punish by killing — only to perpetuate the cycle, which is a sin against love."

When asked which "entry . . . best describes your feeling about the death penalty," Prospective Juror C.S. chose, "Will never under any circumstances impose [the] death penalty."

He explained, "There is no other alternative possible for a religious consciousness where the ultimate issue of Life is Love or death." When asked, "Under what circumstances, if any, do you believe that the death penalty is appropriate," he answered, "Never." In response to the question, "Could you set aside your own personal feelings regarding what you think the law should be regarding the death penalty, and follow the law as the Court instructs you," he replied, "No," explaining, "Never." When asked, "Do you have any reason whatsoever to think you might not be a completely fair and impartial juror in this case," he responded "No," adding, "[e]xcept for the death penalty."

On voir dire, the trial court asked Prospective Juror C.S., "Do you have feelings about the death penalty which are so strong that you would never impose the death penalty in . . . any case whatsoever?" He answered, "Yes." The court asked, "Do you have feelings about the death penalty which you believe would substantially interfere with your ability to function as a juror in this case?" After discussion regarding whether a yes or no answer was sought, C.S. said, "If the case puts the defendants at risk for the death penalty, then I believe my feelings are such that they would not make me . . . an appropriate juror."

The prosecutor challenged Prospective Juror C.S. for cause. Over defense objection, the court sustained the challenge, stating: "I think his answers to the questionnaire and in open court make it absolutely clear that [C.S.] is completely opposed to the death penalty and would never impose it in any case whatsoever under any situation whatsoever."

### (c) Prospective Juror C.D.

On the juror questionnaire, when asked his "general feelings regarding the death penalty," Prospective Juror C.D. answered: "Because of the irrevers[i]bility of the penalty and because of the chance, no matter how remote, that an innocent person could be found guilty, I do not believe that it is an appropriate penalty. Mistakes do happen." When asked if he felt "life without [the] possibility of parole should be automatic for any particular type of crime," he answered, "Yes," explaining, "[m]urder." When asked which "entry . . . best describes your feeling about the death penalty," he chose, "Will never under any circumstances impose [the] death penalty." When asked, "Under what circumstances, if any, do you believe that the death penalty is appropriate," he answered, "None." In response to the question, "Could you set aside your own personal feelings regarding what you think the law should be regarding the death penalty, and follow the law as the Court instructs you," he replied, "Yes," but commented, "Could not support death penalty."

On voir dire, the trial court asked Prospective Juror C.D., "Do you have feelings about the death penalty which are so strong that you would never find a special circumstance to be true?" He answered, "Yes." The court asked, "Do you have feelings about the death penalty which are so strong that you would never impose the death penalty in any case whatsoever?" He answered, "Yes." The court asked, "Do you have feelings about the death penalty which you believe would substantially interfere with your ability to function as a juror in this case?" He answered, "Yes."

The prosecutor challenged Prospective Juror C.D. for cause. The court sustained the challenge.

### (d) Prospective Juror D.M.

No juror questionnaire for Prospective Juror D.M. appears in the record. On voir dire, the trial court asked D.M. if she felt the death penalty was "imposed too often, too seldom, or randomly?" D.M answered: "I know we have people on death row right now. I would assume that once is too often, for me too often." The court asked, "Do you have feelings about the death penalty which are so strong that you would never impose the death penalty in any case whatsoever?" She answered, "Yes." The court asked, "Do you have feelings about the death penalty which you believe would substantially interfere with your ability to function as a juror in this case?" She answered, "Yes."

The court described the alternative penalties and when a jury was permitted to choose the death penalty. After it finished this explanation, D.M. stated she was "for life without." The court asked, "Would you ever be able to vote for the death penalty?" D.M. said, "I've never been in this situation. . . . I believe in life imprisonment without parole." The court asked, "My question to you, though, is this: Under the law of the state of California, the death penalty is an alternative under circumstances that I've described to you. If you found those circumstances, would you be able to put your beliefs aside and vote for the death penalty?" D.M. replied, "I don't think so."

The prosecutor challenged Prospective Juror D.M. for cause. Over defense objection, the court sustained the challenge, stating: "The Court will find that the answers of

[D.M.], both orally and in writing, and the manner of giving those answers leads the Court to believe that [D.M.] has a belief against the death penalty which would substantially impair her ability to serve as a juror in this case should she get to the point where the death penalty was an option.  I cite specifically question No. 108, she does not believe in the death penalty.   [No.] 115, she opposes it.   [No.] 116, it serves no purpose.  [No.] 118, one imposition of the death penalty is too much.   [No.] 122, she would vote against it.   [No.] 127, the death penalty is never appropriate.  And [No.] 128, life without possibility of parole would always be appropriate."

Beck contends that Prospective Juror D.M.'s missing juror questionnaire renders the record inadequate for appellate review and requires reversal of the penalty judgment.  But the court recited in its ruling without objection several of D.M.'s questionnaire responses, and at voir dire, she consistently stated she would never impose the death penalty in any case.  Thus, the absence of the questionnaire from the record does not prevent meaningful review of Beck's claim D.M. was wrongfully excused for cause.

### (e)  Prospective Juror C.G.

No juror questionnaire for Prospective Juror C.G. appears in the record.  At voir dire, the trial court asked Prospective Juror C.G., "What are your feelings about the death penalty?"  She replied, "I'm against it."  The court asked, "Do you have feelings about the death penalty which are so strong that you would never impose the death penalty in any case whatsoever?"  She replied, "Right."  The court asked, "Do you have feelings about the death penalty which you believe would substantially interfere with your ability to function as a

juror in this case?" She replied, "I guess so." The court asked, "Would you be able to put your beliefs against the death penalty aside and vote to impose the death penalty after hearing the law and the evidence if you felt that the death penalty was the appropriate . . . disposition?" C.G. replied, "No, I wouldn't."

The prosecutor challenged Prospective Juror C.G. for cause. Over defense objection, the court sustained the challenge, stating: "Based on [C.G.'s] answers to Question No[s]. 108, . . . 115, 122, 127, and answers given here orally in court, I will find that [C.G.'s] personal beliefs and feelings about the death penalty are such that her ability to serve as a juror in this type of case would be substantially impaired." The absence of C.G.'s questionnaire from the record does not prevent meaningful review because any ambiguity in C.G.'s juror questionnaire regarding her feelings on the death penalty was clarified in her consistent answers on voir dire that she would never impose the death penalty in any case.

### (f) Prospective Juror P.J.

On the juror questionnaire, when asked her "general feelings regarding the death penalty," Prospective Juror P.J. answered: "I am opposed to it because I don't think [the] government should be in the position of taking human life." When asked which "entry . . . best describes your feeling about the death penalty," she chose, "Strongly oppose." When asked, "Under what circumstances, if any, do you believe that the death penalty is appropriate," she answered, "Can't think of appropriate case." When asked, "Under what circumstances, if any, do you believe that the death penalty is not appropriate," she responded, "All cases." In response to the question, "Could

you set aside your own personal feelings regarding what you think the law should be regarding the death penalty, and follow the law as the Court instructs you," she replied, "No," explaining, "I could not set aside my own feelings about what is right and impose [the] death penalty."

On voir dire, the trial court observed that Prospective Juror P.J. had stated in her questionnaire that she might not be able to follow the law for religious reasons, and the court asked if she had thought about that further. She replied, "What I was concerned about was I would not impose the death penalty, and that's the only reason why I marked that question, why I answered that question that way." The court asked, "Do you have feelings about the death penalty which are so strong that you would never impose the death penalty in any case whatsoever?" She answered, "Yes." The court asked, "Do you have feelings about the death penalty which you believe would substantially interfere with your ability [to] function as a juror in this case?" She answered, "Probably." The court asked, "Do you understand that if selected as a juror and the jury got to the penalty phase that one of the decisions you would have to make would be whether under the law and the evidence, the death penalty was the sentence which should be imposed?" P.J. replied, "Yes." The court asked, "If under the law and the evidence you felt that was the appropriate penalty, would you be able to vote to impose it?" P.J. answered, "No."

The prosecutor challenged Prospective Juror P.J. for cause. Over defense objection, the court sustained the challenge, stating: "Based on [P.J.'s] answers here in court that she would not be able to impose the death penalty under any circumstances, . . . and the Court finding nothing in [P.J.'s]

oral or written answers to suggest that there's anything to the contrary, I'll find that her beliefs against the death penalty would substantially impair her ability to be a juror in this case."

### (g) Prospective Juror E.M.

On the juror questionnaire, Prospective Juror E.M. answered "Yes" when asked if any of her "religious views [would] in any way affect your service as a juror" and whether "[f]or religious or any other reason, do you feel you cannot sit in judgment on the conduct of a fellow human being," explaining "I'm against killing" in response to the first question, and "I feel that killing another human being is wrong" in response to the second question. When asked if she had "any beliefs about . . . the penalty, if any, [Beck and Cruz] should receive if found guilty," she replied, "Yes," explaining, "I'm against the death penalty regardless of the crime." When asked her "general feelings regarding the death penalty," E.M. answered, "I'm against the death penalty." When asked which "entry . . . best describes your feeling about the death penalty," she chose, "Will never under any circumstances impose [the] death penalty." When asked, "Under what circumstances, if any, do you believe that the death penalty is appropriate," she answered, "None." In response to the question, "Could you set aside your own personal feelings regarding what you think the law should be regarding the death penalty, and follow the law as the Court instructs you," she replied, "No."

At voir dire, the trial court asked Prospective Juror E.M., "[A] function of the jury, in this case, if it gets to the point of determining penalty, is to determine whether the penalty should be death or life in prison without the possibility of

parole. Would you be able to . . . vote for one particular penalty or the other?" E.M. replied, "Yes." The trial court observed that on the jury questionnaire, E.M. had answered, "No" to the question, "If you were in the position of the defendants or the prosecutor, would you be satisfied to have your case tried with 12 jurors of your present frame of mind?" He asked E.M if that was "still [her] feeling," and she replied, "I think the reason that I answered that is because I'm against the . . . death penalty and I feel I would be biased." The court asked, "Do you have feelings about the death penalty which are so strong that you would never impose the death penalty in any case whatsoever?" E.M. answered, "Yes." The court asked, "Do you have feelings about the death penalty which you believe would substantially interfere with your ability to function as a juror in this case?" She again answered, "Yes."

The prosecutor challenged Prospective Juror E.M. for cause. Over defense objection, the court sustained the challenge, stating that based on E.M.'s answers on her juror questionnaire and "the answers given here orally in court, the Court finds that [E.M.'s] belief against the death penalty is such that her ability to serve in this type of case would be substantially impaired." As to Beck's contention that Prospective Juror E.M.'s missing juror questionnaire renders the record inadequate for appellate review, this court on January 23, 2008 accepted the parties' stipulation that E.M.'s questionnaire had been located, and we augmented the record to include it.

### 5. *Jury selection procedures*

Beck and Cruz challenge certain jury selection procedures. We conclude there was no error.

### a. *Sequestered voir dire*

Beck and Cruz contends the trial court erred in denying a defense motion for individual and sequestered death-qualification voir dire for all prospective jurors. As defendants acknowledge, we have repeatedly rejected similar claims, and defendants cite no persuasive reason to revisit our conclusion. (See, e.g., *People v. Capistrano* (2014) 59 Cal.4th 830, 862–864.) Moreover, in denying the motion, the trial court observed individual sequestered voir dire might be required in some circumstances and that counsel would have "full opportunity to submit" proposed follow-up voir dire questions.

### b. *Questionnaire*

Cruz, joined by Beck, contends that the trial court erred in denying his request to ask prospective jurors on the juror questionnaire their "perception of the meaning of the term 'life without the possibility of parole.'" He contends that "the overwhelming majority of California capital jurors erroneously believe that a life-without-parole sentence does not foreclose the possibility of parole." We reject the claim. The questionnaire asked prospective jurors "[w]hat are your feelings about the punishment of life imprisonment without the possibility of parole?" This inquiry was sufficient to elicit any concern by a prospective juror that the punishment would not in fact be imposed. Indeed, during voir dire, LaMarsh's counsel observed that "after reviewing these questionnaires, . . . there are a number of people [who] are skeptical of the meaning of life [imprisonment] without parole."

### c. *Partisan procedures*

Beck, joined by Cruz, contends that the trial court's jury selection procedures favored the prosecutor. We reject the claim.

Beck contends that "although the trial court informed both sides that it would allow counsel to submit written questions to be asked of the jurors . . . , the court, with rare exception, refused to ask defense counsel's proposed questions." As noted, the trial occurred at a time when voir dire was primarily performed by the trial court. (See Code Civ. Proc., former § 223; see *ante*, pt. II.A.4.a.2.) A trial court "has wide discretion in deciding what questions should be asked on voir dire to determine potential jurors' biases. [Citation.] 'It abuses that discretion if its failure to ask questions renders the defendant's trial " 'fundamentally unfair' " or " ' "if the questioning is not reasonably sufficient to test the jury for bias or partiality." ' " ' " (*Harris*, *supra*, 57 Cal.4th at p. 831; see *Stitely*, *supra*, 35 Cal.4th at p. 540.)

Although Beck notes at least one occasion where it appears the trial court did not ask certain follow-up questions suggested by the defense, he fails to demonstrate that the prosecutor received more favorable treatment. Beck contends that the trial court allowed the prosecutor to use voir dire in aid of peremptory challenges to improperly exclude Prospective Juror M.L. We have rejected Beck's claim that the trial court erred in finding there was good cause to reopen jury selection to allow the prosecutor to exercise a peremptory challenge against Prospective Juror M.L. (See *ante*, pt. II.A.3.) As pertinent here, the court solicited questions for M.L. from counsel. Beck, Cruz, and the prosecutor suggested questions.

But once the court began its first question to M.L., Beck and Cruz changed their minds and objected to any questions. The court overruled the objection and asked M.L. the very questions Beck and Cruz had proposed. Beck and Cruz then objected to any further questioning on the grounds that M.L. was qualified to serve and that further questioning would prejudice the defendants. These circumstances do not illustrate partisan jury selection procedures.

Beck further contends that the "trial court also gave the prosecution the exclusive benefit of expanded voir dire to rehabilitate" Prospective Juror M.N. In fact, during the voir dire of M.N., Cruz suggested a question that the court immediately asked. The prosecutor was subsequently permitted to ask a hypothetical question. As the prosecutor started to ask a second question, Beck's counsel objected and then successfully challenged M.N. for cause. Beck fails to demonstrate how this scenario "demonstrat[es] a clear bias in favor of the prosecution."

Finally, citing as an example Prospective Juror D.D., whose excusal for cause we have upheld (see *ante*, pt. II.A.4.a.), Beck contends that "in every instance where a prospective juror stated that he or she was opposed to the death penalty, the trial court not only denied the additional written questions posed by defense counsel, but refused to allow defense [counsel] any opportunity to question the juror or to pose hypothetical questions or otherwise rehabilitate these jurors." Beck does not claim the *prosecutor's* suggested questions for D.D. were asked or assert any other persuasive basis for concluding the jury selection procedure was unfair. To the extent Beck summarily contends the trial court "made no attempt to rehabilitate or inquire into" the opinions of Prospective

Jurors B.D and C.F., we have exhaustively reviewed the record regarding these prospective jurors and concluded that the trial court did not err in sustaining these challenges for cause. Nor is any partisan procedure evident. We have also exhaustively reviewed the record regarding the remaining seven prospective jurors Beck claims were improperly excused but for whom he offers no specific argument, and these portions of the record also reveal no partisan procedure. (See *ante*, pt. II.A.4.b.3.a–g.)

### 6. *Security measures*

Beck, joined by Cruz, contends that courtroom security measures violated his right to due process. We reject the claim.

### a. *Factual background*

Before trial, LaMarsh objected to having three bailiffs sit behind the four defendants. The trial court stated it did not "see any prejudice to counsel or their clients by the seating configuration. Your clients and counsel are approximately two feet apart, one right behind the other. The Court does not see any undue prejudice by having three deputy sheriffs seated against the back rail."

On the morning jury selection began, Beck arrived wearing a short-sleeved shirt and no jacket, making a jail armband visible. Outside the presence of the prospective jurors, Beck asserted that the armband was an indicia of incarceration and asked that it be placed around his ankle or removed. The trial court offered to explain to the prospective jurors that Beck and his codefendants were in custody. Beck noted that the other defendants were wearing jackets that "might cover these armbands, and so just at first glance, it

might appear that [he is] the only one in custody." The court clarified it was offering to instruct the prospective jurors that in a "capital case the defendants have no right to bail, they're in custody . . . , and that the jury should not hold that against the defendants in any manner." Beck asked the court to so instruct the prospective jurors, which it did.

At the end of the guilt phase, the court instructed the jury: "The fact that there was increased courtroom security during the trial is not to be discussed or considered by you. Such security measures should have no bearing on your determination of the defendant's guilt or innocence."

The trial court's order settling the record states as to security measures during trial: "There was increased security, including additional uniformed bailiffs in the courtroom, perhaps one per defendant, one in an adjoining room not visible to jurors. The courtroom was referred to as a 'high security courtroom.' Entrance to the courtroom was through more than one security entrance and could be locked preventing both entrance and exit. During jury selection, the lights went out for a minute or two, leaving the courtroom in total darkness. One or more defense counsel loudly told their clients not to move. [¶] On one occasion when the lights were turned off during the presentation of slides, bailiffs shined flashlights on the defendants. The record speaks for itself as to any hearings and findings on security issues and defense objections. Judge Lacy did discuss security with the bailiffs and perhaps the courtroom clerk and court reporter. These discussion[s] may not have been reported. No findings about the content of these discussions are possible." The court also found that "[d]efense counsel sat at the table to the right; the [defendants] sat behind their attorneys. The bailiffs sat behind

the [defendants]. The district attorney and his investigator sat at the table to the left. There was no change at the penalty trial for Cruz except that there were fewer bailiffs in the courtroom. After the first day of Beck's penalty trial, the matter was moved to another courtroom."

### b. Analysis

Beck contends the trial court prejudicially erred by "ordering heightened security measures without conducting an evidentiary hearing and without making a proper showing on the record of a manifest need for such measures." Beck appears to contend that the trial court was required to hold an evidentiary hearing and find a "manifest need" for his visible arm band and for several security measures mentioned in the trial court's order settling the record. Assuming this claim is preserved, it is meritless.

"Central to the right to a fair trial, guaranteed by the Sixth and Fourteenth Amendments, is the principle that 'one accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial.'" (*Holbrook v. Flynn* (1986) 475 U.S. 560, 567.) "[E]xtraordinary security practices carry an inordinate risk of infringing upon a criminal defendant's right to a fair trial" and "must be justified by a particularized showing of manifest need sufficient to overcome the substantial risk of prejudice they pose." (*People v. Stevens* (2009) 47 Cal.4th 625, 632 (*Stevens*).) For example, requiring a defendant to wear a visible physical restraint or prison clothing when appearing before the jury "may erode the presumption of innocence because [it]

suggest[s] to the jury that the defendant is a dangerous person who must be separated from the rest of the community." (*Id.* at pp. 632−633; *People v. Taylor* (1982) 31 Cal.3d 488, 494 [prison clothing]; *People v. Duran* (1976) 16 Cal.3d 282, 290−291 [physical restraint].)

"This does not mean, however, that every practice tending to single out the accused from everyone else in the courtroom must be struck down." (*Holbrook v. Flynn*, *supra*, 475 U.S. at p. 567.) Rather, a " 'trial court has broad power to maintain courtroom security and orderly proceedings,' " and "decisions regarding security measures in the courtroom are generally reviewed for abuse of discretion." (*Stevens*, *supra*, 47 Cal.4th at p. 632.) Only "when the court imposes a measure that is inherently prejudicial to the defendant's right to assist in his defense, competently present his own testimony, or enjoy the presumption of innocence," must the court "find a manifest need sufficient to justify the risk of prejudice." (*Id.* at p. 643.)

We consider first Beck's claim regarding his armband. Beck's appearance at the first day of jury selection without a jacket made visible an armband that, although the record is not clear, apparently identified him as a jail inmate. Although a defendant has a right not to stand trial wearing clothing or other items that identify him or her as incarcerated, any possible prejudice from the prospective jurors' awareness that Beck was in custody was ameliorated by the trial court's concomitant instruction to the prospective jurors that capital defendants have no right to bail and are in custody, and that the jury should not hold that against the defendants in any manner. Moreover, at the end of the guilt phase, the court instructed the jury that the "fact that there was increased courtroom security during the trial is not to be discussed or

considered by you" and "should have no bearing on your determination of the defendant's guilt or innocence." We presume the jury understood and followed these instructions. (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1178 (*Hajek and Vo*).)

Beck also challenges the presence of deputies in the courtroom. He asserts that "[w]ithout an evidentiary hearing on the issues of courtroom security, including the courtroom configuration and previously existing security measures, it is impossible to conclude that the presence of four deputies, with three sitting directly behind the defendants, was 'reasonable.'" In *Duran*, "we specifically distinguished shackling from the use of armed guards in the courtroom. [Citation.] We explained that unless the guards 'are present in unreasonable numbers, such presence need not be justified by the court or the prosecutor'.... California courts have long maintained this distinction between the presence of security officers and the imposition of physical restraints." (*Stevens*, *supra*, 47 Cal.4th at p. 634, citation omitted.) Here, the court reasonably assigned three bailiffs to sit behind the four defendants. (See *Holbrook v. Flynn*, *supra*, 475 U.S. at p. 571 ["Four troopers are unlikely to have been taken as a sign of anything other than a normal official concern for the safety and order of the proceedings," and "any juror who for some other reason believed defendants particularly dangerous might well have wondered why there were only four armed troopers for the six defendants"].) Likewise, no inherent prejudice is shown by guards shining flashlights on the backs of the defendants when the lights were turned off so that slides could be shown. Nor was there inherent prejudice when defense counsel told defendants not to move when power was lost once during the

trial, assuming that counsel's action could be imputed to the court.

Beck also asserts that requiring spectators and witnesses to pass through more than one security entrance to enter the courtroom was inherently prejudicial, but he cites no evidence the jury was aware of this security measure. Nor is such a measure inherently prejudicial. (See *People v. Jenkins* (2000) 22 Cal.4th 900, 996 [use of a metal detector outside of a courtroom is not inherently prejudicial].)

Beck also notes the courtroom was referred to as a "high security courtroom," although again he does not assert the jury was aware of that characterization. Likewise, he notes the circumstance that the "entrance to the courtroom could be locked preventing both entrance and exit," but does not state the courtroom was ever locked when the jury was inside the courtroom; nor does he explain how this circumstance was prejudicial.

Beck contends that "the heightened security measures reinforced the prosecutor's theory at the penalty phase that Beck was deserving of death because of his future dangerousness." As noted, Beck's penalty trial took place in a different courtroom, about which he created no record below. Nor have we found any inherent prejudice in the security measures employed during the guilt phase.

In sum, the trial court did not abuse its discretion as to the challenged security measures.

## B. Guilt Phase Issues

### 1. *Substantial evidence*

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence — that is, evidence that is reasonable, credible, and of solid value — from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.) We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' (*Jackson v. Virginia* (1979) 443 U.S. 307, 319.) In so doing, a reviewing court 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*People v. Edwards* (2013) 57 Cal.4th 658, 715.) " 'We review the sufficiency of the evidence to support an enhancement using the same standard we apply to a conviction.' " (*People v. Wilson* (2008) 44 Cal.4th 758, 806.)

### a. *Conspiracy to commit murder*

Beck, joined by Cruz, contends that no substantial evidence supports his conspiracy conviction. We disagree.

" 'Conspiracy requires two or more persons agreeing to commit a crime, along with the commission of an overt act, by at least one of these parties, in furtherance of the conspiracy.' " (*People v. Homick* (2012) 55 Cal.4th 816, 870 (*Homick*).) " 'Evidence is sufficient to prove a conspiracy to commit a crime "if it supports an inference that the parties positively or tacitly came to a mutual understanding to commit a

crime. [Citation.] The existence of a conspiracy may be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy." ' " (*People v. Maciel* (2013) 57 Cal.4th 482, 515–516 (*Maciel*); *Homick*, at p. 870 [the element of agreeing to commit a crime "must often be proved circumstantially"].)

Beck first contends Evans's testimony was "so contradictory and inherently unreliable as to violate due process." He asserts that she had participated in the murders and was motivated to "save her own life," "threatened with losing her child[]," had "sold drugs and committed theft," and had lied to the police when interviewed.

" ' "Although an appellate court will not uphold a judgment or verdict based upon evidence inherently improbable, testimony which merely discloses unusual circumstances does not come within that category. [Citation.] To warrant the rejection of the statements given by a witness who has been believed by a trial court, there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions. [Citations.] Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." ' " (*Maciel, supra*, 57 Cal.4th at p. 519.) Here, Evans's testimony was properly impeached by the factors Beck cites, but nothing about her testimony was inherently unbelievable or implausible.

Beck further asserts that Evans's testimony was the "evidentiary foundation" of a conspiracy and was not sufficiently corroborated.  The court instructed the jury, "If the crime of murder or the crime of conspiracy to commit murder was committed by anyone, the witness Michelle Evans was an accomplice as a matter of law and her testimony is subject to the rule requiring corroboration."

The "existence of a conspiracy may be proved by uncorroborated accomplice testimony," but corroboration of accomplice testimony is required "to connect the defendant to the conspiracy."  (*People v. Price* (1991) 1 Cal.4th 324, 444 (*Price*).)  Here, Evans's testimony regarding her meeting on the night of the murders with Beck, Cruz, LaMarsh, Willey, and Vieira is sufficient to establish the existence of a conspiracy to murder.

Moreover, Evans's testimony connecting Beck and Cruz to the conspiracy was corroborated.  We have explained that under section 1111, "an accomplice's testimony is not corroborated by the circumstance that the testimony is consistent with the victim's description of the crime or physical evidence from the crime scene.  Such consistency and knowledge of the details of the crime simply proves the accomplice was at the crime scene, something the accomplice by definition *admits*.  Rather, under section 1111, the corroboration must connect the defendant to the crime *independently* of the accomplice's testimony."  (*People v. Romero and Self* (2015) 62 Cal.4th 1, 36 (*Romero and Self*).)  " 'The entire conduct of the parties, their relationship, acts, and conduct may be taken into consideration by the trier of fact in determining the sufficiency of the corroboration.' [Citations.]  The evidence 'need not independently establish

the identity of the victim's assailant' [citation], nor corroborate every fact to which the accomplice testifies [citation], and ' "may be circumstantial or slight and entitled to little consideration when standing alone." ' " (*Id.* at p. 32.)

Here, both Beck and Cruz testified in their defense cases that they were at the scene of and therefore were connected to the murders. Cruz was identified by a witness as one of the assailants in the street attacking Ritchey. Shortly after the murders, Beck told acquaintance Wallace that "we" or "I" "slit some throats." The jury could reasonably infer Beck was referring to the murder of the four victims in this case, whose throats were slit or stabbed. Shortly before the murder, Beck and Cruz purchased the police baton the parties stipulated was found near the crime scene, and Cruz purchased masks similar to those found at the crime scene, including a mask found between the legs of one victim. Evans's testimony was also corroborated by witnesses who testified regarding the close relationship between Beck and Cruz. This evidence was collectively sufficient to corroborate Evans's testimony and to demonstrate that Beck and Cruz were part of a conspiracy to kill the victims.

Moreover, even aside from Evans's testimony, there was substantial evidence of a conspiracy to murder in the nonaccomplice testimony. The murders occurred in a short time period late at night. The throats of all four victims were slit or stabbed, a similarity in the manner of killing that indicates planning and an intent to kill. Four men all dressed alike in dark clothing were observed leaving the crime scene together in single file. A dark knit cap and camouflage mask were found on the victims' front lawn and a second camouflage mask was found between Ritchey's legs, evidence that

demonstrates planning and an effort to avoid detection. (*Thompson, supra,* 1 Cal.5th at p. 1111 [agreement may be shown by the " ' "conduct of the defendants in mutually carrying out an activity which constitutes a crime" ' "]; *Rodrigues, supra,* 8 Cal.4th at p. 1135 [evidence that when the surviving victim opened the door for an expected female guest (the defendant's accomplice), two male assailants immediately rushed into the apartment and started attacking the victims and coordinated their actions with one another, demonstrated "that the two male assailants agreed and coordinated with each other and with [the female accomplice] to forcibly gain access to the apartment for the purpose of robbing or stealing from the brothers," and "sufficiently established" the existence of a conspiracy].) Nothing of value was taken from the house, indicating the motivation was revenge, not theft. (*Price, supra,* 1 Cal.4th at p. 444 [defendant's connection to conspiracy demonstrated in part because "[n]othing of significant value was taken from the home, suggesting that revenge, and not gain, was the motive"].) In addition, the jury could reasonably infer that Beck, Cruz, LaMarsh, and Willey visited 5223 Elm Street two nights before the murders to learn the layout of the home and that LaMarsh, who, according to Smith, had visited the house next door to the victims on the afternoon before the murders, did so to see who was in the victims' house and to make sure Raper and perhaps Colwell were still staying there. Finally, Rosemary's testimony that Beck, Cruz, and Vieira lived together and pooled financial resources supported the prosecutor's theory of conspiracy. Because the object of the conspiracy was to kill everyone present at 5223 Elm Street and leave no witnesses, the murders of Raper, Ritchey, Colwell, and Paris "satisfied the element of an overt act committed in

furtherance of the conspiracy." (*Maciel*, *supra*, 57 Cal.4th at p. 518; *People v. Jurado* (2006) 38 Cal.4th 72, 121 ["Commission of the target offense in furtherance of the conspiracy satisfies the overt act requirement."].)

In sum, there was substantial evidence of conspiracy.

### b. *Personal use of a deadly or dangerous weapon*

The jury found that Beck and Cruz had each personally used a deadly or dangerous weapon in the murders of all four victims. (Former § 12022, subd. (b) (section 12022(b)).) The trial court imposed one additional year for Ritchey's murder (Count I) as to both Beck and Cruz and stayed imposition of the use enhancement for the remaining counts. Beck, joined by Cruz, contends that no substantial evidence supports the jury's true finding of the allegations that he personally used a deadly or dangerous weapon in the murders of Raper (Count II) and Paris (Count IV). We reject the claim.

At the time of the murders, former section 12022(b) provided in relevant part: "Any person who personally uses a deadly or dangerous weapon in the commission or attempted commission of a felony shall, upon conviction of such felony or attempted felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished by an additional term of one year . . . ." (Stats. 1989, ch. 1284, § 2, p. 5058.) " 'In order to find "true" a section 12022(b) allegation, a fact finder must conclude that, during the crime or attempted crime, the defendant himself or herself intentionally displayed in a menacing manner or struck someone with an instrument capable of inflicting great bodily injury or death.' " (*Hajek and Vo, supra*, 58 Cal.4th at p. 1197.) In determining whether

there was substantial evidence of deadly and dangerous weapon use, "we may properly consult cases construing the term 'uses' in other enhancement statutes under ' "The Dangerous Weapons' " Control Law." ' " (*Id.* at p. 1198.) In that context, " '[u]se' means, among other things, 'to carry out a purpose or action by means of,' to 'make instrumental to an end or process,' and to 'apply to advantage.' " (*People v. Chambers* (1972) 7 Cal.3d 666, 672.) "The obvious legislative intent to deter the use" of deadly and dangerous weapons in the commission or attempted commission of a felony "requires that 'uses' be broadly construed." (*Ibid.*)

Here, Beck does not dispute there was substantial evidence that he stabbed Colwell in the stomach and slit Ritchey's throat. Moreover, substantial evidence supports the jury's finding that he and his coperpetrators had conspired to kill everyone present at 5223 Elm Street, and Beck and Cruz each arrived at the house armed with a deadly or dangerous weapon. Colwell, Paris, and Raper were killed inside a small portion of the home in a short period of time. Evans testified that she heard Paris screaming and pleading for her life about 30 seconds after Beck and Vieira went toward the living room from a bedroom, and two to three minutes after she saw Cruz running toward the house. LaMarsh testified that after Cruz struck Raper in the head several times with a baton, LaMarsh turned around and saw Vieira trying to pull Paris, who was crying, out from under a kitchen table. At the same time, LaMarsh saw Beck grab Colwell and stab him in the stomach. Our review of a crime scene videotape indicates the bodies of Colwell and Paris appear to be just several feet apart, and Raper's body just several more feet away from both of them. Given these circumstances, the jury could reasonably infer that

Beck's knife use on Colwell and Cruz's baton attack on Raper facilitated the perpetrators' plan to murder everyone present in the house.

In *People v. Cole* (1982) 31 Cal.3d 568, 570, 572, on which Beck relies, we construed former section 12022.7, which as relevant here imposes an enhancement for a defendant who " 'personally inflicts great bodily injury on any person,' " to apply "only to a person who himself inflicts the injury." Contrary to Beck's assertion, however, here the prosecutor was not required to prove that Beck personally inflicted physical harm on Raper or Paris for the former section 12022(b) personal use enhancement to apply. Unlike former section 12022.7, former section 12022(b) imposes an enhancement for a defendant who "personally uses a deadly or dangerous weapon in the commission or attempted commission of a felony," not for his or her conduct in personally inflicting injury on a victim. As explained above, "use[]" is broadly construed to include acts other than the physical infliction of injury. Nor is such personal use of a deadly or dangerous weapon obviated when a coperpetrator also uses a deadly or dangerous weapon to personally inflict physical harm on a victim.

In sum, substantial evidence supports the jury's true finding of the allegations that Beck and Cruz personally used a deadly or dangerous weapon in the murders of Raper and Paris. We also reject Beck's further claim that the trial court erred in failing to instruct the jury that "vicarious liability is not a basis for a 'true' finding under Penal Code section 12022(b)." This claim is likewise predicated on the erroneous assertion that the use enhancement applies only

when the defendant personally inflicts physical harm on the victim.

## 2. *Firearms and relationship evidence*

Cruz, joined by Beck, contends that the trial court erred in admitting evidence regarding Cruz's firearms, his relationships with Beck and Vieira, his mistreatment of Vieira, and his cult activity, which he collectively describes as irrelevant and prejudicial character evidence. We conclude there was no error.

Evidence Code section 1101, subdivision (a), provides that generally "evidence of a person's character or a trait of his or her character . . . is inadmissible when offered to prove his or her conduct on a specified occasion." At the same time, evidence is admissible to show "that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, . . .) other than his or her disposition to commit such an act." (*Id.*, subd. (b).)

Cruz contends that there "was no legitimate inference from the firearm evidence [that] could be drawn under Evidence Code section 1101, subdivision (b)." We disagree. Cruz conceded that some evidence regarding the firearms was admissible. Nor did he consistently object each time the subject of firearms was raised. Moreover, all four defendants denied that there was a conspiracy to commit murder. In support of this denial, Willey and LaMarsh contended that the firearms evidence demonstrated a *lack* of planning, reasoning that if there was a conspiracy to kill the victims, the defendants would have taken advantage of the weapons

stockpile available to them rather than relying on knives and bats. As the Attorney General notes, "[i]t is natural to assume that if a group planned to [kill] a house full of people . . . they would take along the most effective weapons they had." In addition, evidence that Cruz and Beck had militaristic aspects to their lifestyles, such as possessing numerous firearms, visiting gun stores, frequently wearing camouflage clothing, and at times patrolling their residential area at night, supported eyewitness Duval's testimony that he observed four men leave the Elm Street house in a single file, dog-trotting, and with their hands in a port arms position. Finally, the evidence was not unduly prejudicial; there was no evidence any of the weapons were illegal, and the trial court curtailed extraneous inquiry, such as sustaining objections to Willey asking Cruz if he was a "gun nut" and to LaMarsh's counsel asking LaMarsh if he ever saw a certain rocket in Cruz's home. The trial court acted within its discretion in admitting the evidence under Evidence Code section 1101(b).

The court also properly admitted evidence of Cruz's relationship with Beck and Vieira and Cruz's mistreatment of Vieira. As noted, the " 'existence of a conspiracy may be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy.' " (*Rodrigues*, *supra*, 8 Cal.4th at p. 1135.) Evidence that Beck, Cruz, and Vieira had formed a tight-knit, hierarchical group who lived together and pooled financial resources supported the prosecutor's theory of conspiracy. (*People v. Manson* (1976) 61 Cal.App.3d 102, 126 ["The very nature of this case and the theory of the prosecution compel reference to circumstantial evidence of the conduct and relationship of the parties."].) Likewise, evidence that LaMarsh

and Willey had each separately performed a ritual (cutting a hand and leaving a bloody fingerprint) to join that group was relevant to the relative culpability of each defendant and his willingness to participate in the conspiracy.

Contrary to Cruz's assertion, the court refused to admit evidence regarding "anything like Nazism," "White Aryan supremacy, [or] the occult." The fact that questions were asked regarding the purpose of the group, Satanism, or Cruz's title as head of the household, to which objections were sustained, does not give rise to prejudice. The court instructed the jury that "when an objection is sustained you are to disregard either the question that was asked or if an answer was given, also the answer." We presume the jury understood and followed this instruction. (*Hajek and Vo, supra*, 58 Cal.4th at p. 1178.)

Finally, even if the trial court erred in admitting the evidence of firearms or of Cruz's controlling behavior, there is no reasonable probability the verdict would have been different. Cruz admitted to being at the murder scene, a nonaccomplice witness observed Cruz cutting Ritchey's throat, and Cruz stipulated his bloody baton was found near the murder scene.

### 3. *Mistrial motion*

Beck, joined by Cruz, contends the trial court erroneously denied his mistrial motion. We disagree.

Cruz testified in his own defense. On cross-examination by Willey, Willey's counsel, William Miller, began to ask Cruz, "You've been incarcerated on this matter since —" Cruz's counsel, Amster, objected. Miller observed that "the jury was informed that all defendants are incarcerated on this matter without bail." The trial court agreed and allowed the question.

Miller asked, "You've been incarcerated on this matter since May 23 of 1990 . . . is that correct?" Cruz replied, "I don't believe so." Miller asked, "Have you been out any time since th[en]?" Amster objected, "[I]t's a trick question" that "assum[ed] facts." Amster added that if counsel wanted to "ask the question if [Cruz has] been in custody with the police shortly after . . . they found [him] at the Camp, that's fine and we can go on with this. But the way the question's being posed, I object strongly and . . . I'd like a sidebar on this." Miller explained the question was foundational, and he was asking "has he been in custody continuously since his arrest on this matter." Amster said, "Fine. That's different," and the court instructed Cruz to answer the question. Amster then objected on relevance grounds, saying, "I don't want this to be used as foundational aspect of opening up another door. I think this is going into [a] collateral purpose." Miller said, "If Mr. Amster didn't want his client questioned, he shouldn't have put him on the stand." Amster replied, "Well, let's knock it off," and unsuccessfully moved for a mistrial. The court instructed Cruz, "[Y]ou may answer the question as to whether or not you've been in custody continuously since the time of your arrest in this matter." A short time later, out of the presence of the jury, Beck's counsel, Kent Faulkner, joined by Amster, moved for a mistrial on the ground that Miller's comment, "If Mr. Amster didn't want his client questioned, he shouldn't have put him on the stand," had so tainted the jury that if Beck did not testify, the jury would assume Faulkner did not want his "client questioned and he has something to hide." Amster explained that he had objected to Miller's line of questioning because Cruz had initially been arrested in "the

bomb case," and Amster was concerned Cruz's response would open the door to exploring this charge.

The trial court denied Beck's mistrial motion. Neither Beck nor Cruz moved for the jury to be contemporaneously admonished.

" 'A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions. [Citation.]' [Citation.] A motion for a mistrial should be granted when ' " 'a [defendant's] chances of receiving a fair trial have been irreparably damaged.' " ' " (*People v. Collins* (2010) 49 Cal.4th 175, 198.) We conclude here that Miller's statement was not "so incurably prejudicial that a new trial was required." (*People v. Ledesma* (2006) 39 Cal.4th 641, 683.)

Miller's statement was brief and isolated. Moreover, at the beginning and the end of the guilt phase, the court instructed the jury that statements of the attorneys are not evidence. We presume it followed this instruction. (*People v. Avila, supra*, 38 Cal.4th at p. 574.) Beck claims the trial court erred in not contemporaneously admonishing the jury to disregard Miller's comment and instructing the jury a defendant had the absolute right not to testify, but Beck did not request such an admonition. In sum, the trial court acted within its wide discretion in denying the mistrial motion.

### 4. *Presence of defendant*

Cruz, joined by Beck, citing federal and state constitutional and statutory provisions, contends he was

denied his right to be present at critical stages of his trial. (U.S. Const., 6th & 14th Amends; Cal. Const., art. I, §§ 7 & 15; §§ 977, 1043.)  We disagree.

" 'Under the Sixth Amendment, a defendant has the right to be personally present at any proceeding in which his appearance is necessary to prevent "interference with [his] opportunity for effective cross-examination." ' (*People v. Butler* (2009) 46 Cal.4th 847, 861 (*Butler*), quoting *Kentucky v. Stincer* (1987) 482 U.S. 730, 744–745, fn. 17.)  In addition, a defendant has a due process right 'to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure.' (*Kentucky v. Stincer*, at p. 745.)"  (*People v. Lynch* (2010) 50 Cal.4th 693, 745–746 (*Lynch*).)

A defendant also has a state statutory right to be present.  Former section 977, subdivision (b) (section 977(b)) states in relevant part that in all felony cases, "the accused must be present . . . during those portions of the trial when evidence is taken before the trier of fact, and at the time of the imposition of sentence" and in general at "all other proceedings."  And section 1043, subdivision (a) generally provides that a felony defendant "shall be personally present at the trial."

We have held that "[n]either the state nor the federal Constitution, nor the statutory requirements of sections 977 and 1043, require the defendant's personal appearance at proceedings where his presence bears no reasonable, substantial relation to his opportunity to defend the charges against him."  (*Butler*, *supra*, 46 Cal.4th at p. 861.)  In *People v. Safety National Casualty Corp.* (2016) 62 Cal.4th 703,

711, fn. 2, 712 (*Safety National*), for purposes of applying the bail forfeiture statutes, we declined to apply this limitation to former section 977(b), reasoning that the phrase "at all other proceedings" in that section "does not distinguish between critical and noncritical proceedings" and "suggests the provision's reach is inclusive, i.e., subsuming those court proceedings not specifically listed in section 977." We did not reach "the precise scope of section 977 as it relates to the constitutional right to be present"; we simply held that "a defendant's presence at an 'other proceeding[]' under section 977(b)(1) constitutes a 'lawfully required' appearance for which his or her unexcused absence may justify the forfeiture of bail." (*Safety National*, at p. 716.)

Here, Cruz challenges his lack of presence at numerous sidebar conferences. In *Safety National*, we observed there is no indication in former section 977, subdivision (b)(1), which addresses "all other proceedings," that "sidebars at the bench or conferences in chambers, i.e., those proceedings that do not occur in open court and that are often impromptu and unscheduled, are within the scope" of that subdivision. (*Safety National, supra,* 62 Cal.4th at p. 716.)

Moreover, Cruz fails to demonstrate that his "personal presence was necessary for an opportunity for effective cross-examination, would have contributed to the trial's fairness, or bore a reasonably substantial relation to the fullness of his opportunity to defend the charges against him." (*Lynch, supra,* 50 Cal.4th at p. 746.) Rather, the "proceedings at issue were all similar to those involved in prior cases in which we rejected a claim that a defendant's right to presence was infringed." (*People v. Carrasco* (2014) 59 Cal.4th 924, 959 (*Carrasco*); see, e.g., *Lynch, supra,* 50 Cal.4th at pp. 745−746 [the defendant

need not be present at hearings regarding discussion of an allegation that a juror smelled of alcohol and the questioning of the juror]; *People v. Perry* (2006) 38 Cal.4th 302, 312 ["a defendant may ordinarily be excluded from conferences on questions of law, even if those questions are critical to the outcome of the case, because the defendant's presence would not contribute to the fairness of the proceeding"]; *People v. Riel* (2000) 22 Cal.4th 1153, 1195–1196 [the defendant's presence at discussions of television coverage, jury instructions, or which exhibits to send to the jury "would neither have contributed to the fairness of the procedure nor have affected the fullness of his opportunity to defend against the charges"].) Indeed, one of the challenged hearings occurred after the guilt verdicts against Beck and Cruz had been read, and after defendants had been remanded to custody until the penalty phase; it involved the court addressing the jury on its inability to reach verdicts on the charges against LaMarsh and Willey. It is inconceivable Cruz's presence at this hearing would have had any bearing on the already adjudicated charges against him.

### 5. *Reopening*

Beck contends that the trial court erred in allowing Willey to reopen his defense to allow him to enter into evidence an autopsy photograph. We conclude there was no abuse of discretion.

#### a. *Factual background*

During the prosecutor's case-in-chief, the pathologist who performed Colwell's autopsy testified that the cause of death was "stab wounds to the neck and to the abdomen." On May 12, 1992, during the defense case, the court excused the jury until 1:30 p.m. the following day. Outside the presence of the

jury, Willey successfully moved for admission of exhibits 183 and 184, and subsequently rested. The following day, during a hearing between the court and counsel, and before the jury returned, Willey informed the court he had just realized he had neglected to seek admission of exhibit 185, an autopsy photograph. He sought leave to reopen to have the photograph admitted, and he invited a stipulation by the parties that it was a photograph taken at Colwell's autopsy. The prosecutor agreed to stipulate, but Beck and Cruz refused to do so. The prosecutor stated in the absence of a stipulation he would ask the pathologist, who was already scheduled to be recalled to testify on rebuttal, whether the photograph was of "the stomach area of Mr. Colwell as [the pathologist] saw it at the time of the autopsy." Beck objected on the grounds that the photograph was improper rebuttal and unduly prejudicial.

Willey explained he had not offered the photograph sooner "because [he] had mistakenly thought that it . . . was in evidence since it was a photograph of a major wound." Beck objected that the photograph of Colwell's wound held no evidentiary value as to Willey because Willey asserted he was never in the house (where Colwell had been stabbed), and Willey's motion for admission of the photograph was untimely. Willey asserted the photograph was probative because when it was compared to exhibit 115, a photograph already in evidence of victim Ritchey, it demonstrated Colwell and Ritchey had suffered nearly identical wounds. Willey's defense was that Ritchey had been stabbed in the house before he ran outside to the street and encountered Willey.

The court granted Willey leave to reopen. When the jury returned to the courtroom, the court explained it was permitting Willey to reopen and call the pathologist "to go over

one brief area," but because the pathologist had not yet arrived, the prosecutor would first present two rebuttal witnesses. Later that afternoon, Willey called the pathologist, who identified exhibit 185 as a photograph taken during Colwell's autopsy, and the photograph was admitted into evidence. The jury was shown both exhibit 115, the photograph of Ritchey's wound, and exhibit 185. Willey again rested, and the prosecutor resumed his rebuttal case.

### b. *Analysis*

"A 'motion to reopen [is] one addressed to the [trial] court's sound discretion.' (*People v. McNeal* (2009) 46 Cal.4th 1183, 1202.) In determining whether an abuse of discretion occurred, the reviewing court considers four factors: ' "(1) the stage the proceedings had reached when the motion was made; (2) the defendant's diligence (or lack thereof) in presenting the new evidence; (3) the prospect that the jury would accord the new evidence undue emphasis; and (4) the significance of the evidence." ' " (*Homick*, *supra*, 55 Cal.4th at p. 881.)

Here, after the jury had been excused and before it returned, Willey rested and then moved the following day to reopen and admit a single autopsy photograph. The pathologist was already scheduled to testify that same afternoon in the prosecutor's rebuttal case. Under these circumstances, whatever lack of diligence existed on Willey's part in not noticing exhibit 185 had not been admitted earlier, the stage of the proceeding at which his motion was made caused no prejudice to Beck. Nor on this record is it reasonably likely the jury accorded exhibit 185 undue weight. Willey's questioning of the pathologist and the admission of the photograph consume merely two pages of the reporter's

transcript. Moreover, the probative value of exhibit 185 was that it arguably demonstrated Colwell's wound was nearly identical to Ritchey's wound. This similarity was equally probative regardless of when it was presented to the jury. Although Beck asserts the photograph was cumulative, he does not explain what already admitted evidence demonstrated the similarities in the wounds. Likewise, although Beck asserts on appeal that the photograph had been previously excluded in response to a motion in limine, he offers no citation to the record or the basis on which it was purportedly excluded. In sum, the trial court acted well within its discretion in allowing Willey to reopen his defense for the limited purpose of seeking admission of the photograph.

### 6. Rebuttal argument

Beck and Cruz contend that the trial court erred in denying their request for rebuttal argument to the closing arguments of their codefendants regarding the conspiracy charge. We reject the claim.

The trial court set the order of closing argument as follows: Cruz, Beck, LaMarsh, and Willey. At the end of trial, and before closing arguments, Cruz expressed concern that his codefendants would argue that Cruz, Beck, and Vieira had formed a conspiracy to kill the victims. Cruz, joined by Beck, requested the court allow Cruz the opportunity to present a "short argument" about conspiracy or "anything else that would be detrimental to my client . . . on those grounds" after the codefendants' closing arguments but before the prosecutor's rebuttal argument. Cruz did not object to "anybody having rebuttal after me, as long as the rebuttal stays within what I might argue at that point." The trial court solicited comment

from LaMarsh, Willey, and the prosecutor, all of whom objected. They noted that Cruz could anticipate codefendants' arguments and address them in his summation, and the prosecutor added that allowing such rebuttal would result in "being here all month doing rebuttal arguments." The trial court denied the motion.

Section 1093, subdivision (e), provides: "When the evidence is concluded, unless the case is submitted on either side, or on both sides, without argument, the district attorney, or other counsel for the people, and counsel for the defendant, may argue the case to the court and jury; the district attorney, or other counsel for the people, opening the argument and having the right to close." The trial court has discretion to depart from this order "for good reason[]" or when required by the "state of the pleadings." (§ 1094.)

Beck contends that counsel simply "requested the opportunity to rebut the arguments of the other 'prosecutors' after counsel had an opportunity to hear the claims of the other attorneys" and that the "request was narrowly drawn in an unusual situation in a capital case." Cruz contends that the trial court "denied [the] request for rebuttal argument . . . without any acknowledgement of its discretion to grant the request." The trial court clearly understood it had discretion to grant the request when it solicited comment from the codefendants and the prosecutor. It was not required to explain its reasons for not deviating from section 1093, nor do Beck and Cruz demonstrate it abused its discretion in following the statute's general provisions.

### 7. Instructional error

#### a. Conspiracy

##### 1. Intent to kill

Beck and Cruz contend the trial court erroneously failed to instruct the jury that conspiracy to commit murder requires express malice. The Attorney General concedes there was instructional error. We conclude the error was harmless beyond a reasonable doubt.

### (a) Factual background

The court instructed the jury that murder is the unlawful killing of "a human being with malice aforethought." It explained: " 'Malice' may be either express or implied. Malice is express when there is manifested an intention unlawfully to kill a human being. Malice is implied when: One, the killing resulted from an intentional act. Two, the natural consequences of the act are dangerous to human life. And, [t]hree, the act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life. When it is shown that a killing resulted from the intentional doing of an act with express or implied malice, no other mental state need be shown to establish [the] mental state of malice aforethought."

The court then instructed the jury on premeditated first degree murder and second degree murder: "All murder which is perpetrated by any kind of willful, deliberate, and premeditated killing with express malice aforethought is murder of the first degree. . . . If you find that the killing was preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill, which was the result of deliberation and premeditation, so that it must have been

formed upon preexisting reflection and not under a sudden heat of passion or other condition precluding the idea of deliberation, it is murder of the first degree." As to second degree murder, the court stated: "Murder of the second degree is the unlawful killing of a human being with malice aforethought when there is manifested an intention unlawfully to kill a human being but the evidence is insufficient to establish deliberation and premeditation." Subsequently, the court instructed the jury that "conspiracy is an agreement entered into between two or more persons with the specific intent to agree to commit the public offense of murder."

Later in the instructions, the court stated: "In each of the crimes charged in the information, namely, murder and conspiracy to commit murder, there must exist a certain mental state in the mind of the perpetrator. Unless such mental state exists, the crime to which it relates is not committed. In the crimes of first degree murder and conspiracy to commit first degree murder, the necessary mental states are malice aforethought, premeditation, and deliberation. In the crime of second degree murder and conspiracy to commit second degree murder, the necessary mental state is malice aforethought."

During the prosecutor's closing argument, he addressed the elements of murder: "Express[] malice, which is what you have to have for first degree murder, is a manifestation of an intention unlawfully to kill a human being. Now, you have that in this case." The prosecutor then cited evidence he asserted supported this view. After briefly describing implied malice, the prosecutor stated: "In this case the [p]rosecution is alleging it's a first degree murder because it's premeditated and it's deliberate, and I think that that's obvious in this case

when you look at the evidence that the intention to kill these people was planned well ahead of time."

The prosecutor then turned to the conspiracy to commit murder count, stating that there must be "a meeting of the minds, an agreement, specific intent to agree and specific intent to commit the murders." The prosecutor argued that an agreement to commit murder was demonstrated by the meeting in the trailer in which the "plan was made to go over and do the people and leave no witnesses"; everyone was given assignments based on the house diagram; by the "damning evidence" of possession of masks to conceal their identity; and by the testimony of Donna Alvarez, whom the prosecutor characterized as a disinterested witness, that LaMarsh, while pointing a gun, had ordered everyone to go to the living room where the murders were to be committed. When discussing the elements of the multiple-murder special-circumstance allegation, the prosecutor noted at least one murder must be first degree, and argued, "I would submit to you that all four of them are first degree murders in this particular case." He asserted that when the jury looked at all of the evidence, it would "conclude that each and every one of these defendants conspired to go over there on Elm Street and kill whoever was there." He asked the jury to "return verdicts of guilty of first degree murder with the special circumstance and guilty of conspiracy to commit murder . . . as to each and every one of these defendants."

On Friday May 29, 1992, the jury completed and signed all of the guilt phase verdict forms for Beck and Cruz. Also on this day, the jury sent the court a note asking, "If we find a defendant guilty of conspiracy to commit murder and proceed to completing the individual murder counts, does the finding of

first/second degree murder need or have to be the same for all four counts?" That afternoon, after consulting with counsel, the court responded, "No." Later that same day, the jury asked, "Should we turn in completed jury forms 1) when we complete an individual defendant[,] 2) when we complete all defendants?"

On Monday June 1, 1992, the court instructed the jury as to when it should turn in the completed verdict forms: "[L]adies and gentlemen, that's up to you. You can do it either way you wish." The court cautioned the jury that if it returned verdicts as to one or more defendants and then it had second thoughts while deliberating regarding a different defendant, the verdicts that had been returned could not be changed.

On the morning of Wednesday, June 3, the jury asked, "If we cannot reach an agreement on a conspiracy charge and begin to consider the individual charges of murder, should an individual . . . who feels that a defendant is guilty of conspiracy put that feeling aside and only consider the direct evidence linking the defendant and a specific victim or hold their feeling that if the defendant is guilty of conspiracy, the defendant is guilty of the crimes against all the defendants?" The court instructed the jury: "If the jury does not find a particular defendant guilty of conspiracy, neither the jury, nor any individual juror, can find a defendant guilty of a crime based on the theory that it was an act done in the furtherance of the alleged conspiracy. However, the failure to find a defendant guilty of conspiracy does not preclude the juror, any individual juror, from determining whether the defendant is guilty of any crime on any individual victim as an aider and abettor. I refer you back to CALJIC 3.00 and 3.01, which you have with you in the jury room, which define[] aiding and abetting. Any juror

who believes an individual defendant did not aid and abet a particular crime can only consider that defendant's guilt as to that crime based on that defendant's own commission of that crime which can be based on direct or circumstantial evidence."

During the afternoon of June 4, 1992, the jury informed the court it had reached unanimous verdicts on all charges against two defendants and were unable to reach unanimous verdicts against the other two defendants. The court observed that the verdicts against Beck and Cruz were dated May 29, 1992, and asked, "Can I assume that you arrived at these verdicts on May the 29th and have been deliberating on the other two defendants since then?" The foreperson replied, "Yes."

### (b) Analysis

Contrary to the court's instruction, there is no crime of "conspiracy to commit second degree murder. . . ." Rather, "all conspiracy to commit murder is necessarily conspiracy to commit premeditated and deliberated first degree murder." (*People v. Cortez* (1998) 18 Cal.4th 1223, 1237 (*Cortez*).)

In contrast to the trial court's instructions here, CALCRIM No. 563 currently provides in relevant part, "The defendant intended to agree and did agree with [one or more of] (the other defendant[s] . . .) to intentionally and unlawfully kill," and the bench notes to this instruction state: "Do not cross-reference the murder instructions unless they have been modified to delete references to implied malice. Otherwise, a reference to implied malice could confuse jurors, because conspiracy to commit murder may not be based on a theory of implied malice." (Judicial Council of Cal. Crim. Jury Instns. (2019), Bench Notes to CALCRIM No. 563, p. 312.) Both

CALCRIM No. 563 and the corresponding CALJIC No. 6.10 would avoid any possibility of confusion if they told the jury that when it refers to the instructions that define murder, it should not consider any instructions regarding implied malice because conspiracy to commit murder may not be based on a theory of implied malice. Conspiracy to commit murder may be based only on express malice, i.e., an intent to kill. (See *People v. Gonzalez* (2012) 54 Cal.4th 643, 653 ["Express malice is an intent to kill"].) Alternatively, because "all conspiracy to commit murder is necessarily conspiracy to commit premeditated and deliberated first degree murder" (*Cortez*, *supra*, 18 Cal.4th at p. 1237), references to "conspiracy to commit murder" and "intent to commit murder" in the standard conspiracy instructions could be changed along the following lines. The instructions should make clear that what is required is a conspiracy to commit first degree murder and an intent to commit first degree murder, respectively. That would also avoid any confusion about the nature of the intent required for this type of conspiracy.

The error here in instructing on conspiracy to commit second degree murder was nonetheless harmless beyond a reasonable doubt. Based on the remaining instructions, the prosecutor's argument, and the jury verdicts, we conclude that the "jury necessarily found the defendants guilty of conspiracy to commit murder on a proper theory, i.e., based on express malice or intent to kill." (*People v. Swain* (1996) 12 Cal.4th 593, 607 (*Swain*).)

It is true that there is possible ambiguity in the instructions insofar as the court defined malice aforethought to include both express and implied malice, and later stated that the mental state for second degree murder was simply "malice

aforethought." Critically, though, when specifically instructing the jury on second degree murder, the court — at the request of both Cruz and the prosecutor — instructed on what we have termed "unpremeditated murder with express malice." (*Swain*, *supra*, 12 Cal.4th at p. 601.) The court stated, "Murder of the second degree is the unlawful killing of a human being with malice aforethought when there is manifested *an intention unlawfully to kill a human being* but the evidence is insufficient to establish deliberation and premeditation." Thus, in specifically instructing the jury on premeditated first degree murder and second degree murder, the court defined both as requiring express malice or an intent to kill. In light of that instruction, the jury had no occasion to consider the instructions defining implied malice.

Indeed, the prosecutor had also requested an instruction on implied malice murder, but the court denied the request, stating: "I don't think this is applicable." The prosecutor responded, "That would only be applicable if they were alleging that they went over to beat them up." The court said, "Right. So this is not going to be given." Neither Beck nor Cruz objected. Nor do they contend here that the trial court should have instructed on implied malice murder.

Beck and Cruz rely on *Swain*, where the trial court instructed the jury on "the elements of murder, including principles of implied malice second degree murder." (*Swain*, *supra*, 12 Cal.4th at p. 602, italics omitted.) The jury returned general verdicts, which did not state "on what theory they found the requisite element of malice necessary to convict on the charges of conspiracy to commit murder. Under the implied malice instructions, the jury could have found malice without finding intent to kill." (*Id*. at p. 607.) The "prosecutor

repeatedly referred to implied malice in the closing arguments, stating at one point that ' . . . this could very easily be an implied malice case.' " (*Ibid*.) "Swain was found not guilty of murder and its lesser offenses," and his codefendant "was convicted of second degree murder, which conviction itself could have been based on a theory of implied malice." (*Ibid*.) On this record, this court concluded that the conspiracy to commit murder convictions must be reversed. (*Ibid*.)

Here, by contrast, the court did not instruct on implied malice murder when it specifically instructed on premeditated first degree murder and second degree murder. Nor did the prosecutor invite the jury to convict Beck or Cruz of either murder or conspiracy to commit murder on a theory of implied malice, but rather urged the jury to find them guilty of first degree premeditated murder. Moreover, Beck and Cruz, unlike the defendants in *Swain*, were found guilty of the first degree premeditated murders of all four victims. Under the court's instructions, this entailed a finding that each of the killings "was preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill, which was the result of deliberation and premeditation . . . formed upon preexisting reflection." Although *Swain* did not delineate what overt facts were found true by the jury in that case, here the jury expressly found that Beck and Cruz had committed five overt acts for the purpose of carrying out the conspiracy: Beck and Cruz "obtained and armed themselves with weapons to be used to commit the murders," "drove and rode in a vehicle to the area of the scene of the murders," "put on military type face masks in an attempt to conceal their identities," "entered the residence located at 5223 Elm Street," and "killed Franklin Raper, Richard Ritchey, Emmie Darlene Paris and Dennis

Colwell in the furtherance of the conspiracy." These findings of participation in acts of preparing to murder and then in the killing of the victims support a conclusion that the jury found Beck and Cruz conspired to kill the victims.

Further, as Beck's briefing acknowledges, "a conspiracy to commit an implied malice murder is a logical impossibility under the law." Implied malice murder is established "in part through hindsight" once the defendant commits "some act dangerous to human life" that results in a killing. (*Swain, supra,* 12 Cal.4th at p. 603.) Conspiracy, by contrast, is an inchoate crime that establishes criminal liability before the target crime is committed. (*Ibid.*) Conspiracy to commit implied malice murder "would be at odds with the very nature of the crime of conspiracy . . . precisely because commission of the crime could never be established, or be deemed complete, unless and until a killing actually occurred." (*Ibid.*) In light of the court's instructions and the way the prosecution argued this case to the jury, we find no reasonable possibility that the jury embraced the "logical impossibility" of a conspiracy to commit implied malice murder as opposed to convicting Beck and Cruz of conspiracy to commit murder upon a finding of intent to kill.

Finally, Beck asserts that "the jurors obviously were confused about the relationship between the conspiracy instruction and the substantive murder charges" because it asked the two questions noted above. The second question was asked after the jury had already reached verdicts for Beck and Cruz and were only deliberating on the charges against LaMarsh and Willey. The first question, "If we find a defendant guilty of conspiracy to commit murder and proceed to completing the individual murder counts, does the finding of

first/second degree murder need or have to be the same for all four counts," to which the court simply answered, "No," does not suggest that the jury failed to find an intent to kill for either the conspiracy to commit murder or the murder counts. That question, which focused on whether the degree of murder found (first or second) must be the same for all four counts, contains no hint that the jury found or considered finding any defendant guilty of conspiracy to commit murder based on implied malice.

### 2. *Natural and probable consequences*

Cruz, joined by Beck, contends that the trial court's conspiracy instructions improperly allowed him to be convicted of first degree premeditated murder as an aider and abettor under the natural and probable consequences doctrine. (*People v. Chiu* (2014) 59 Cal.4th 155, 158−159 [a natural and probable consequences theory of liability cannot serve as a basis for a first degree premeditated murder conviction].) The Attorney General concedes the error. We conclude there is no reasonable probability Beck and Cruz were prejudiced by any error.

The trial court instructed the jury: "A member of a conspiracy is not only guilty of the particular crime that to his knowledge his confederates agreed to and did commit, but is also liable for the natural and probable consequences of any crime or act of a coconspirator to further the object of the conspiracy, even though such crime or act was not intended as a part of the agreed upon objective and even though he was not present at the time of the commission of such crime or act. You must determine whether the defendant is guilty as a member of a conspiracy to commit the originally agreed upon crime or

crimes and, if so, whether the crime alleged in Count I, II, III, and IV was perpetrated by coconspirators in the furtherance of such conspiracy and was a natural and probable consequence of the agreed upon criminal objective of such conspiracy."

Beck and Cruz were charged with conspiracy *to murder*, not conspiracy to commit a lesser crime that resulted in murder. There is thus no possibility they were found guilty of murder on a natural and probable consequences theory. Indeed, the prosecutor proceeded on a theory that Beck and Cruz were direct perpetrators of the murders, directly aided and abetted the murders, or were coconspirators to commit murder. The prosecutor did not proceed on a theory that Beck and Cruz were guilty of murder under the natural and probable consequences doctrine; the "prosecutor never argued that one defendant intended only to commit one particular crime, but that the other defendant committed a different crime, which was the natural and probable consequence of the commission of the first, thereby making both defendants guilty of the second offense." (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 184 (*Letner and Tobin*).) Nor, despite mentioning the natural and probable consequences doctrine in the conspiracy instruction, did the trial court instruct the jury on this theory of murder.

### b. *Multiple murder*

Cruz, joined by Beck, contends that the trial court failed to instruct the jury that the multiple-murder special-circumstance allegation required intent to kill. We conclude any ambiguity in the multiple-murder special-circumstance instruction was harmless beyond a reasonable doubt.

"When there is evidence from which a jury could base its convictions for multiple counts of murder on the theory that the defendant was guilty as an aider and abettor, and not as the actual perpetrator, the trial court must instruct the jury that to find true a multiple-murder special-circumstance allegation as to that defendant, it must find that the defendant intended to kill the murder victims. (§ 190.2, subds. (b)-(c); *People v. Hardy* (1992) 2 Cal.4th 86, 192.)" (*People v. Nunez and Satele* (2013) 57 Cal.4th 1, 45.) Contrary to both the Attorney General's and Cruz's erroneous assertions, these principles remain true even after the passage of Proposition 115 in 1990. (*Nunez and Satele*, at p. 45.) We conclude these principles were satisfied here.

The trial court instructed the jury: "If you find beyond a reasonable doubt that a defendant was either the actual killer, a co-conspirator, or an aider and abettor, but you are unable to decide which, then you must also find beyond a reasonable doubt that the defendant, with intent to kill, participated as a co-conspirator with or aided and abetted an actor in the commission of at least one murder in the first degree and in at least one additional murder of the first or second degree in order to find the special circumstances to be true. On the other hand, if you find beyond a reasonable doubt that defendant was the actual killer of at least one person in the first degree and at least one additional person in the first or second degree, you need not find that the defendant intended to kill a human being in order to find the special circumstance to be true."

Cruz contends that under the court's instruction, "the jury was required to find an intent to kill only if they could not decide whether [a defendant] was the actual killer, an aider and abettor, or a coconspirator," and that if the "jury did

143

determine that [a defendant] was guilty as an aider and abettor, or as a coconspirator, this instruction required no finding of intent to kill." But we have previously described a substantially similar instruction as merely "ambiguous." (*Letner and Tobin, supra,* 50 Cal.4th at pp. 180−181.) Moreover, we concluded there was "no reasonable likelihood the jury misunderstood or misapplied this instruction." (*Id.* at p. 182.) We reasoned: "Although we conclude the instruction's meaning concerning the intent of an aider and abettor was not 'unmistakable,' certainly the jury *could* draw from the instruction as a whole the inference that an aider and abettor was required to have an intent to kill. In addition, the prosecutor presented a correct and complete statement of the law in h[is] arguments following the trial court's instructions." (*Ibid.*) Nor did the prosecutor "identify one defendant as having killed [the victim], but instead argued exclusively that the evidence demonstrated that *both* defendants had the intent to kill [the victim]," and also did not argue "that the jury, pursuant to that part of the instruction addressing an actual killer, need not find intent to kill as to one of the two defendants. . . . Accordingly, despite the ambiguity in the instruction, there is no reasonable likelihood that the jury found one defendant was the actual killer, and then based its special circumstance findings as to the other defendant upon an erroneous notion that an aider and abettor need not possess the intent to kill." (*Letner and Tobin*, at pp. 182−183.)

Similarly here, "the jury *could* draw from the instruction as a whole the inference that an aider and abettor" or coconspirator "was required to have an intent to kill," and the prosecutor did not argue that the jury need not find intent to kill as to either Beck or Cruz. (*Letner and Tobin, supra,*

50 Cal.4th at p. 182.) Moreover, we have already concluded in connection with the erroneous conspiracy to commit murder instruction that the jury necessarily found Beck and Cruz acted with an intent to kill. (See *ante*, pt. II.B.7.a.1.) Hence any ambiguity in the multiple-murder special-circumstance instruction was harmless beyond a reasonable doubt.

### c. *Self-defense and imperfect self-defense*

The trial court instructed the jury on self-defense only as to the charge that LaMarsh had murdered Raper. Beck, joined by Cruz, contends that the court erred in failing to instruct the jury on self-defense as to each of them. Beck and Cruz further contend the trial court erred in refusing to instruct the jury on imperfect self-defense. No substantial evidence supported such instructions.

As noted, Beck testified that between April 10, 1990, when Raper's trailer was removed from the Camp, and May 20, 1990, the night of the murders, Beck received no threats from Raper. On May 20, 1990, Evans told Beck and Cruz that she had gone to her sister's house earlier to retrieve some items. Raper refused to let her take the items and said he and his friends were at some unspecified time going to go to the Camp and kill Evans and those with whom she associated at the Camp. Evans said it was urgent she retrieve a wedding gown and other clothes from 5223 Elm Street, and asked that someone accompany her so that Raper would not again interfere. The entire group went to the Elm Street house "in case something happened, so they wouldn't be caught so then they couldn't get out." Beck was unarmed. Evans and LaMarsh apparently entered the home first, and after hearing a woman scream, Beck followed Vieira into the house and

observed LaMarsh holding a baseball bat and standing in front of Raper. Raper was sitting down, and Beck watched his body "slump[] down." Beck was "shock[ed]," stood there briefly, and then moved toward noises in the house. He saw Vieira and Colwell struggling. Vieira's back was on the floor, and Colwell was on top of Vieira. Beck punched Colwell several times on his back and then threw him several feet into the cupboards. Beck denied killing Colwell, Ritchey, or Paris, or doing anything wrong that night.

Cruz testified that on the evening on May 20, Evans told Cruz she needed to retrieve some clothes, including a bridal gown that was an heirloom, from 5223 Elm Street, and wanted Cruz and others to accompany her for protection. Also sometime that evening, Evans told Cruz that Raper had threatened to kill Cruz and her, "Raper was sharpening knives," and Raper was going to call his biker friends "to come and kill everyone in the camp that night." Cruz told Evans that Raper had also previously threatened him. Cruz denied hitting, stabbing, or killing anyone on the night of May 20, 1990 or directing Vieira to cut Paris's throat. He testified he was not physically capable of fighting another person on the night of the murders.

"Self-defense, when based on a *reasonable* belief that killing is necessary to avert an imminent threat of death or great bodily injury, is a complete justification, and such a killing is not a crime." (*People v. Elmore* (2014) 59 Cal.4th 121, 133−134.) Here there was no evidence of such imminent threat. Indeed, neither Beck nor Cruz described being attacked by anyone, and both denied killing anyone.

Beck contends that although he denied any participation in the victims' deaths, the jury could have found he committed such acts based on LaMarsh's testimony that Beck stabbed Colwell in the stomach and Willey's testimony that Beck knocked Willey off Ritchey, fell on Ritchey, and slit his throat. He further asserts that such acts "might have been in self-defense" because Raper was a "violent, dangerous individual" who had a "history of hostilities toward and violent confrontations with Beck and his friends." "Thus, Beck and the others could reasonably fear for their safety in any confrontation with Raper and his buddies." Such speculation is not substantial evidence warranting a self-defense instruction.

Beck and Cruz further contend the trial court erred in failing to instruct the jury on imperfect self-defense. Assuming this claim is preserved as to Beck, no substantial evidence supported such an instruction for either defendant.

" ' "Under the doctrine of imperfect self-defense, when the trier of fact finds that a defendant killed another person because the defendant *actually*, but unreasonably, believed he was in imminent danger of death or great bodily injury, the defendant is deemed to have acted without malice and thus can be convicted of no crime greater than voluntary manslaughter." ' " (*People v. Manriquez* (2005) 37 Cal.4th 547, 581.) Imperfect self-defense "obviates malice because that most culpable of mental states 'cannot coexist' with an actual belief that the lethal act was necessary to avoid one's own death or serious injury at the victim's hand." (*People v. Rios* (2000) 23 Cal.4th 450, 461.) "This doctrine is a ' "narrow" ' one and 'will apply only when the defendant has an actual belief in the need for self-defense and only when the defendant fears

immediate harm that " ' "*must be instantly dealt with.*" ' " ' " (*People v. Landry* (2016) 2 Cal.5th 52, 97–98.)

There is no substantial evidence that Beck or Cruz possessed an actual but unreasonable belief of imminent danger of death or great bodily injury. Again, neither Beck nor Cruz described being attacked by anyone, and both denied killing anyone. The prosecutor's evidence and the testimony of LaMarsh and Willey showed that Beck and Cruz executed a surprise attack on the victims and brutally murdered them, and thus also provides no substantial basis for an instruction on imperfect self-defense. (*In re Christian S.* (1994) 7 Cal.4th 768, 773, fn. 1 [the imperfect self-defense doctrine may not be invoked "by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified"].)

In sum, the trial court did not err in refusing to instruct the jury on self-defense or imperfect self-defense.

### d. Sudden quarrel and heat of passion

The trial court instructed the jury on voluntary manslaughter based on heat of passion. Beck, joined by Cruz, contends that the court improperly defined sudden quarrel and heat of passion when instructing the jury on voluntary manslaughter and erred in refusing to give four proposed instructions. We disagree.

" 'Manslaughter, an unlawful killing without malice, is a lesser included offense of murder.' [Citations.] 'Although section 192, subdivision (a), refers to "sudden quarrel or heat of passion," the factor which distinguishes the "heat of passion" form of voluntary manslaughter from murder is provocation.' "

(*People v. Avila* (2009) 46 Cal.4th 680, 705 (*Avila*).) "To be adequate, the provocation must be one that would cause an emotion so intense that an ordinary person would simply *react*, without reflection. . . . [T]he anger or other passion must be so strong that the defendant's reaction bypassed his thought process to such an extent that judgment could not and did not intervene." (*People v. Beltran* (2013) 56 Cal.4th 935, 949 (*Beltran*).) " ' "[I]f sufficient time has elapsed for the passions of an ordinarily reasonable person to cool, the killing is murder, not manslaughter." ' " (*Avila*, at p. 705.) " 'The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim.' " (*Ibid.*)

Beck requested four supplemental instructions: (1) "The right of self-defense is available to a person engaged in a sudden quarrel. The mere fact that the parties are engaged in a sudden quarrel, which may be a mere altercation of words, cannot deprive one of the right to defend himself against real or apparent danger"; (2) "The passion necessary to constitute heat of passion need not mean rage or anger but may be any violent, intense, overwrought or enthusiastic emotion which causes a person to act rashly and without deliberation and reflection"; (3) "Any type of provocation is sufficient if it is of such character and degree as naturally would excite and arouse such heat of passion, and verbal provocation may be sufficient"; (4) "A defendant may act in the heat of passion at the time of the killing as a result of a series of events which occur over a considerable period of time. Where the provocation extends for a long period of time, you must take such period of time into account in determining whether there

was a sufficient cooling period for the passion to subside. The burden is on the prosecution to establish beyond a reasonable doubt that the defendant did not act in the hea[t] of passion."

Beck contends that unlike his proposed instructions, the court's instructions failed to "inform[] the jury that the period of provocation might occur over 'a considerable period of time.'" As he concedes in his reply, the court instructed the jury: "Legally adequate provocation may occur in a short, or over a considerable, period of time. The question to be answered is whether or not at the time of the killing the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment."

Beck further contends that the court failed to instruct the jury that intense emotions other than anger and rage could operate to "reduce the murder charge." As noted, the focus of the jury in evaluating whether a defendant has committed voluntary manslaughter is properly on the asserted *provocation*. (*Avila, supra,* 46 Cal.4th at p. 705.) "To be adequate, the provocation must be one that would cause an emotion so intense that an ordinary person would simply *react*, without reflection. . . . [T]he anger or other passion must be so strong that the defendant's reaction bypassed his thought process to such an extent that judgment could not and did not intervene." (*Beltran, supra,* 56 Cal.4th at p. 949.) "[P]rovocation is sufficient not because it affects the quality of one's thought processes but because it eclipses reflection." (*Id.* at p. 950.) These concepts were adequately conveyed in the court's instruction.

Finally, Beck contends that the trial court erred in refusing his proposed instruction that verbal provocation may be sufficient to reduce the alleged crime from murder to manslaughter. This concept was adequately addressed by the court's lengthy instructions to the jury of what constitutes adequate provocation. These instructions do not, as Beck contends, "limit[] provocation to physical provocation by the victim."

### e. *Order of charges*

Beck, joined by Cruz, contends the trial court erroneously instructed the jury to consider the charges in a particular order. There is no reasonable likelihood the jury understood the instructions in this manner.

At the close of the guilt phase, the court instructed the jury: "[Y]ou are to determine whether the defendants are guilty or not guilty of the crime charged and any degree thereof or of any lesser crime as specified in this instruction. In doing so, you have discretion to choose the order in which you evaluate each crime or consider the evidence pertaining to it. You may find it productive to consider and reach a tentative conclusion on all charges and lesser crimes before reaching any final verdicts. However, the Court cannot accept a guilty verdict on a lesser crime unless you have unanimously found the defendant not guilty of the crime charged."

During deliberations, the jury sent the following question to the court: "CALJIC 17.10. Please clarify must be found unanimously not guilty of each applicable count before considering lesser charge." (*Sic*.) The court told counsel it had prepared a response, it had shared that proposed response with the prosecutor and Beck's counsel, and both had agreed

that the proposed response could be read to the jury in their absence. At the hearing, counsel for Cruz also agreed to the proposed instruction.

The court then instructed the jury: "In response to your question, 'please clarify must be found unanimously not guilty of each applicable count before considering lesser charge,' let me tell you there is a very lengthy CALJIC instruction dealing with lesser included offenses which has not been read to you. If you want that instruction read to you, I will read it to you tomorrow morning. However, in the meantime, I will attempt to respond to your specific question with the following instruction: For example, before you can find a defendant guilty of second degree murder as to a particular count, all 12 of you must find him not guilty of first degree murder as to that count. Before you can find him guilty of voluntary manslaughter as to that count, all 12 of you must find him not guilty of both first and second degree murder as to that count. Before you can find him guilty of one of the lesser nonhomicide crimes, as to that count, all 12 of you must find him not guilty of first and second degree murder and voluntary manslaughter as to that count. Okay?" The court then sent the jury back to continue deliberations.

Here, Beck acknowledges that his counsel agreed to the second instruction given during deliberations but contends the instruction was erroneous. Assuming this claim has not been waived, we reject it.

Contrary to Beck's assertion, the instruction is not reasonably understood to mandate that the jury consider the charges in a particular order. Reading the two instructions together, the jury would have reasonably understood it could

consider the crimes in any order but could not return a guilty verdict on a lesser included crime unless it had unanimously found the defendant not guilty of the crime charged.

### f. Consciousness of guilt

Cruz, joined by Beck, contends that the trial court erroneously instructed the jury on consciousness of guilt evidenced by willfully false statements, suppression of evidence, and flight. We reject the claim.

The court instructed the jury with the language of CALJIC No. 2.03: "If you find that before this trial a defendant made a willfully false and deliberately misleading statement concerning the crimes for which he is now being tried, you may consider such statement as a circumstance tending to prove a consciousness of guilt on the part of such defendant. However, such conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are matters for your determination." Cruz contends the court erred in denying his requested addition to this instruction, which provided in part: "The defendant's consciousness of guilt, if any, is relevant upon the questions o[f] whether the defendant was afraid of being apprehended and whether the defendant thought he had committed a crime. Consciousness of guilt may not be considered [in determining the degree of defendant's guilt] [or] [in determining which of the charged offenses the defendant committed]."

The court also instructed the jury with the language of CALJIC No. 2.06: "If you find that a defendant attempted to suppress evidence against himself in any manner, such as by attempting to induce a person to alibi for him or by destroying or concealing evidence, such attempt may be considered by you

as a circumstance tending to show a consciousness of guilt. However, such conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are matters for your consideration."

In addition, the court instructed the jury with the language of section 1127c and CALJIC No. 2.52: "The flight of a person immediately after the commission of a crime or after he is accused of a crime is not sufficient in itself to establish his guilt. It is a fact which, if proved, may be considered by you in the light of all other proved facts in deciding the question of his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine." Cruz contends the trial court erred in refusing to add the following language: "The defendant's consciousness of guilt, if any, is relevant upon the questions o[f] whether the defendant was afraid of being apprehended and whether the defendant thought [he] [she] had committed a crime. Consciousness of guilt may not be considered [in determining the degree of defendant's guilt] [or in determining which of the charge[d] offenses the defendant committed]."

Cruz contends that the challenged consciousness of guilt instructions improperly duplicated more general circumstantial evidence instructions, were unfairly partisan and argumentative, and permitted the jury to draw irrational permissive inferences about Cruz's guilt. We have rejected substantially similar challenges, and he offers no persuasive reason for us to reconsider these conclusions. (See, e.g., *Bryant, Smith and Wheeler, supra,* 60 Cal.4th at p. 438 [CALJIC Nos. 2.03, 2.06, and 2.52]; *Lynch, supra,* 50 Cal.4th at p. 761 [CALJIC Nos. 2.03, 2.06, and 2.52]; *People v. Hartsch*

(2010) 49 Cal.4th 472, 505 [CALJIC Nos. 2.03 and 2.06]; *People v. Rundle* (2008) 43 Cal.4th 76, 152–154 [CALJIC No. 2.52].)

Cruz also asserts the instructions were unfairly partisan and argumentative because they allowed for an inference of consciousness of guilt only as to Cruz and his codefendants when Evans also made false statements, attempted to suppress evidence, and fled. We disagree. The instructions merely informed the jury that if it found Cruz had made false statements, attempted to suppress evidence, or fled, such activities "could indicate consciousness of guilt, while also clarifying that such activity was not of itself sufficient to prove a defendant's guilt, and allowing the jury to determine the weight and significance assigned to such behavior." (*People v. Jackson* (1996) 13 Cal.4th 1164, 1224 (*Jackson*).) The jury did not need to know how to consider such evidence against Evans because she was not on trial. Defense counsel was nonetheless free to argue that the activities of Evans following the murders demonstrated her consciousness of guilt. (See *People v. Dement* (2011) 53 Cal.4th 1, 53 (*Dement*) [rejecting a substantially similar claim].)

Cruz further contends that the trial court erred in refusing his requested modification of CALJIC No. 2.03. We have previously rejected claims challenging the denial of similar proposed modifications, and Cruz offers no persuasive reason to reconsider our conclusion. (*People v. Thornton* (2007) 41 Cal.4th 391, 439; *Jackson*, *supra*, 13 Cal.4th at p. 1224.)

### g. *Reasonable doubt*

Cruz, joined by Beck, contends the trial court's instructions in the language of CALJIC Nos. 1.00, 1.02, 2.01, 2.02, 2.21.2, 2.22, 2.27, 2.50, 2.51, 2.52, 2.90, 8.20, 8.83, and

8.83.1 undermined and diluted the requirement of proof beyond a reasonable doubt. He advances no persuasive reason to reconsider our prior rejection of substantially similar challenges to these instructions, and we decline to do so. (*Romero and Self*, *supra*, 62 Cal.4th at p. 43; see *People v. Delgado* (2017) 2 Cal.5th 544, 572−575; *People v. Grimes* (2016) 1 Cal.5th 698, 723–725 [rejecting challenge to CALJIC No. 8.83]; *People v. Nelson* (2016) 1 Cal.5th 513, 553–554 [rejecting challenge to CALJIC Nos. 2.01, 2.02, 2.52, 8.83 and 8.83.1]; *People v. Casares* (2016) 62 Cal.4th 808, 831 [CALJIC No. 2.01 did not "create an impermissible mandatory presumption by requiring the jury to draw an incriminatory inference whenever such an inference appeared 'reasonable' unless the defense rebutted it by producing a reasonable exculpatory interpretation"]; *Bryant, Smith and Wheeler*, *supra*, 60 Cal.4th at p. 437 [rejecting challenge to CALJIC Nos. 1.00, 2.01, 2.02, 2.21.2, 2.21.2, 2.22, 2.27, 2.51, 2.90, and 8.20]; *People v. Carey* (2007) 41 Cal.4th 109, 129 [CALJIC Nos. 2.02, 8.83 and 8.83.1 did not inform jury it could find the defendant guilty if he " 'reasonably appeared' " to be guilty]; *People v. McCurdy* (2014) 59 Cal.4th 1063, 1106 [CALJIC No. 2.50]; *Dement*, *supra*, 53 Cal.4th at p. 54 [modified CALJIC No. 1.02].)

### h. *Firearms and relationship evidence*

Cruz asserts the trial court erroneously instructed the jury on the proper use of the firearms and relationship evidence. (See *ante*, pt. II.B.2.) There was no error.

The court instructed the jury in a modified form of CALJIC No. 2.50 (5th ed. 1988): "Evidence has been introduced for the purpose of showing that one or more of the

defendants committed acts similar to those constituting crimes other than that for which he is on trial. Such evidence, if believed, was not received and may not be considered by you to prove that the defendant is a person of bad character or that he has a disposition to commit crimes. Such evidence is received and may be considered by you only for the limited purpose of determining if it tends to show: The existence of the intent which is a necessary element of the crime charged. The identity of the person who committed the crime, if any, for which the defendant is accused. A motive for the commission of the crime charged. The defendant had knowledge or possessed the means that might have been useful or necessary for the commission of the crime charged. The crime charged is a part of a larger continuing plan, scheme, or conspiracy. The existence of a conspiracy. For the limited purpose for which you may consider such evidence, you must weigh it in the same manner as you do all other evidence in the case. You are not permitted to consider such evidence for any other purpose." The court further instructed the jury that if evidence was admitted against one or more defendants "it could not be considered . . . against the other defendants."

Cruz contends that the instruction was erroneous because it did not identify or describe what acts were "similar to those constituting crimes." There is no reasonable likelihood that the jury understood the instruction to refer to Cruz's ownership of firearms because there was no evidence any of these firearms were illegal. The jury would have reasonably understood the instruction to refer to evidence of violence before the murders, such as Cruz directing Beck to hit Vieira and LaMarsh and Willey beating Colwell. The instruction informed the jury of the proper use of this evidence, providing,

"[s]uch evidence, if believed, was not received and may not be considered by you to prove that the defendant is a person of bad character or that he has a disposition to commit crimes." Again, we presume the jury understood and followed this instruction. (*Hajek and Vo, supra*, 58 Cal.4th at p. 1178.) As the United States Supreme Court has said in upholding a similar modification of CALJIC No. 2.50 against a due process challenge, the "use of the evidence of prior offenses permitted by this instruction was . . . parallel to the familiar use of evidence of prior acts for the purpose of showing intent, identity, motive, or plan. [Citation.] Furthermore, the trial court guarded against possible misuse of the instruction by specifically advising the jury that the ' . . . evidence, if believed, was not received, and may not be considered by you[,] to prove that [the defendant] is a person of bad character or that he has a disposition to commit crimes.' " (*Estelle v. McGuire* (1991) 502 U.S. 62, 75; see *id.* at p. 67, fn. 1.)

## C. Penalty Phase Issues

### 1. Rebuttal evidence

Beck contends that the trial court erroneously admitted rebuttal evidence. We disagree.

As noted, on rebuttal, Jennifer testified that in 1988, when her daughter A. was no more than six months old, Beck, Cruz, and Vieira placed a tape recorder next to A. in her crib. As she was falling asleep, they snuck up on her and screamed at her. A. woke up and started to scream and cry. The tape recording of this incident was played for the jury.

"Rebuttal evidence is relevant and thus admissible if it 'tend[s] to disprove a fact of consequence on which the defendant has introduced evidence.' [Citation.] The trial court

is vested with broad discretion in determining the admissibility of evidence in rebuttal." (*People v. Clark* (2011) 52 Cal.4th 856, 936; see *People v. Mills* (2010) 48 Cal.4th 158, 195 [the trial court has "broad power to control the presentation of proposed impeachment evidence"].) Here, as the trial court observed, evidence that Beck had screamed at a sleeping infant so that he could be amused by her resulting terror and crying tended to undermine Beck's penalty defense evidence that he was caring to young children. The trial court therefore did not abuse its discretion in admitting the testimony and tape.

Nor did admission of the evidence contravene Evidence Code section 352. " 'Evidence is substantially more prejudicial than probative [citation] if, broadly stated, it poses an intolerable "risk to the fairness of the proceedings or the reliability of the outcome." ' " (*People v. Riggs* (2008) 44 Cal.4th 248, 290.) No such intolerable risk was present here. Nor, contrary to Beck's contention, is a trial court required to " 'expressly weigh prejudice against probative value or even expressly state that it has done so, if the record as a whole shows,' " as here, that " 'the court was aware of and performed its balancing function under Evidence Code section 352.' " (*People v. Lewis* (2009) 46 Cal.4th 1255, 1285.)

Beck further contends the tape was not newly discovered evidence and should have been admitted in the prosecutor's case-in-chief. He does not articulate on what basis the tape, which was not relevant to the circumstances of the crime or Beck's prior criminal conduct, would have been admissible in the prosecutor's case-in-chief. Rather, the tape only became relevant after Beck's penalty defense witnesses testified to his care of and positive interactions with young children.

### 2. Tape exclusion

Beck contends that the trial court erred in excluding during the prosecutor's rebuttal case a tape of a threatening telephone call from Perkins to Jennifer. We disagree.

Jennifer testified on rebuttal that she had received numerous threatening telephone calls from Cruz while he was in jail after the murders. They stopped just before Cruz's death penalty phase when he learned Jennifer would be a witness. Jennifer also received threatening telephone calls from Perkins. A tape of one threatening call from Cruz was played for the jury. Jennifer testified she had been afraid of Beck because "he would do what [Cruz] told him to do."

Beck contends that evidence of Perkins's "threat was a critical component of trial counsel's argument to the penalty phase jury that [Beck] was under the control of Cruz," and the "fact that Perkins was making threats on behalf of Cruz when [Beck] was not even present would have given significant support to that claim." Jennifer testified that Beck did whatever Cruz told him to, and the jury was informed that Perkins had made threatening telephone calls to Jennifer. The trial court acted within its discretion in excluding the tape itself, which was remote evidence of Cruz's control over Beck and, as the trial court observed, might have necessitated Perkins's further testimony at this late stage of trial.

### 3. Prosecutorial Misconduct

Beck and Cruz contend that the prosecutor committed misconduct during closing argument in their respective penalty phases. There was no prejudicial misconduct.

" 'A prosecutor commits misconduct when his or her conduct either infects the trial with such unfairness as to

160

render the subsequent conviction a denial of due process, or involves deceptive or reprehensible methods employed to persuade the trier of fact.' [Citation.] 'As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.' [Citation.] 'When attacking the prosecutor's remarks to the jury, the defendant must show' that in the context of the whole argument and the instructions there was ' "a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner." ' " (*People v. Rangel* (2016) 62 Cal.4th 1192, 1219 (*Rangel*).)

### a. Biblical references

Beck and Cruz challenge the prosecutor's reliance on the Bible in closing argument.

### 1. Factual background

At Cruz's penalty phase, the prosecutor argued: "I want to briefly talk about a subject that is, I want to make clear to you, is not aggravating in any sense of the word. The only reason I mention it is because maybe some of you that had a little problem with the subject of religion. Again this is not aggravating in any way. You know, when you hear the opponents of the death penalty talking, they invariably bring up passages from the Bible, as do the proponents. And the opponents always say, 'Well, the Bible says " ' "Thou shalt not kill" ' " and it says " ' "Vengeance is mine saith the Lord." ' " But right after the passage about vengeance is . . . Paul, who is speaking, says, 'The ruler bears not the sword in vain for he is

the minister of God, a revenger to execute wrath upon him that do it evil.' Now, when he's talking about the ruler he's talking about the government there. The first five books of the Old Testament I believe are called the Torah in the Judeo-Christian ethic, and they start off . . . . with the book of Genesis where it says 'Adam, human being, whoever sheds the blood of man by man shall his blood be shed, for in his image did God make man.' Now, the opponents of the death penalty say that's all well and good but God didn't punish Adam for killing Cain and — or Abel. And, in any event, the most important concepts in that are that capital punishment for murder is necessary in order to preserve the sanctity of human life, and only the severest penalty of death can underscore the severity of taking a life. There are several other passages in the Bible that speak of death or killing, so forth. The most interesting, I think, is Exodus, [c]hapter 21, [v]erse 12 through 14. It says, 'Whoever strikes another man and kills him shall be put to death. But if he did not act with intent but they met by act of God, the slayer may flee to a place which I will appoint for you.' This is the Lord speaking. In other words, if it's an accidental type killing, it wasn't done with intent, there's a sanctuary, there's a haven. It's kind of like life in prison without possibility of parole. But the Lord goes on to say, 'If you didn't do this intentionally, then there's a sanctuary' — well, I'm sorry, that was my words. It goes on to say, 'If a man has the presumption to kill another by treachery, you shall take him even from my altar to be put to death.' The Lord says if you kill by treachery, there's no sanctuary. 'Take him from my altar and put him to death.' Now, again that's not aggravation. It's just in the event any of you have any

162

concerns about where religion fits in, hopefully that will be of some assistance to you."

At Beck's penalty phase, the prosecutor similarly argued: "Very briefly, I want to touch on a subject that you've heard a lot of evidence on in this phase of the trial. It's not aggravating in any sense. The subject of religion. Mr. Beck had a very strong religious upbringing. It's very obvious. Mr. Beck preached the Bible to others, carried it with him all the time, knew it front to back. If any of you have any problem with the role that the death penalty plays in religion, I'd like to indicate to you that there are a number of passages in the Bible that deal with the subject. I'm sure that Mr. Beck is aware of it. One especially fitting is in Exodus where it indicates that — the Lord of the Christian religion speaking, 'Whoever strikes another man and kills him shall be put to death, but if he did not act with intent, but they met by act of God, the slayer may flee to a place which I will appoint for you.' This is an accidental, unintentional killing. The Lord says there's a sanctuary, 'I will keep you safe.' I suggest to you that it's like life without parole. But the Lord goes on to say, 'If a man has a presumption to kill another by treachery, you shall take him even from [m]y altar to be put to death.' 'Taken from [m]y altar.' There is no haven, there is no sanctuary, for an intentional, treacherous killer. That's exactly what you have here. Again, it's not aggravation. It's just in case any of you have any problems with religion in the case. I'm going to conclude shortly.

"I would like to read a statement that was made many, many years ago by a Justice in a country other than ours, a Justice in England, that in spite of the fact that they didn't have a death penalty, made a very fitting statement. And it

goes: 'Punishment is the way in which society expresses [its] denunciation of wrongdoing; and in order to maintain respect for law, it is essential that the punishment inflicted for grave crime should adequately reflect the revulsion felt by the great majority of citizens for them. It is a mistake to consider the object of punishment as being a deterrent or reformative or preventive and nothing else. The truth is that some crimes are so outrageous that society insists on adequate punishment because the wrongdoer deserves it.' "

Beck responded in his closing argument: "[The prosecutor] talked about the Bible. One thing you have to remember, there was a passage in the Bible I think is so important in this particular context. And as I recall it very vaguely, the circumstances, someone was going to punish somebody else I think by killing them, and God said 'Vengeance is mine.' 'Vengeance is mine,' saith the Lord. It doesn't belong to you. And he was talking to people, to human beings. He said 'I take vengeance. I punish.' "

### 2. *Analysis*

Beck and Cruz did not object to the challenged argument or seek an admonition, and no exception to the general rule requiring an objection and request for admonition applies. The claim is therefore forfeited. (*People v. Samayoa* (1997) 15 Cal.4th 795, 841 (*Samayoa*).)

On the merits, we have previously held that reliance on the same British justice's quote was not misconduct, and Beck cites no persuasive reason to revisit our conclusion. (*People v. Vieira* (2005) 35 Cal.4th 264, 298 (*Vieira*).) Here, as in *Vieira*, the prosecutor "merely asked the jury to make the individualized determination that this defendant deserved

death for these crimes because they were particularly outrageous, regardless of whether or not his execution would deter other crimes." (*Ibid.*)

As to the remaining portions of the prosecutor's arguments, we have previously concluded that a substantially similar argument in Vieira's penalty trial was misconduct. (*Vieira, supra,* 35 Cal.4th at pp. 296–298.) The " ' "primary vice in referring to the Bible and other religious authority is that such argument may 'diminish the jury's sense of responsibility for its verdict and . . . imply that another, higher law should be applied in capital cases, displacing the law in the court's instructions.' " ' " (*People v. Powell* (2018) 6 Cal.5th 136, 184 (*Powell*).)

But here, as in *Vieira*, the misconduct was harmless beyond a reasonable doubt because "the biblical argument quoted above was only a small part of a prosecutorial argument that primarily focused on explaining to the jury why it should conclude that the statutory aggravating factors outweighed the mitigating factors." (*Vieira, supra,* 35 Cal.4th at p. 298.) In both Beck's case and Cruz's case, the biblical references were only a small part of the prosecutor's closing argument, which spanned 28 pages of transcript in Beck's case and 26 pages in Cruz's case, and the prosecutor largely focused on "explaining to the jury why it should conclude that the statutory aggravating factors outweighed the mitigating factors." (*Vieira*, at p. 298.) Moreover, on both occasions the prosecutor reminded the jury that the biblical passages were not aggravating evidence and "did not urge the jury to apply a source of law other than the court's instructions." (*Powell, supra,* 6 Cal.5th at p. 185.) There was no prejudice.

In *Vieira*, we observed that the prosecutor's 1991 argument had occurred before our "our statements clearly condemning prosecutorial reliance on biblical authority in penalty phase closing argument were made in a series of cases filed in late 1992 and 1993." (*Vieira, supra*, 35 Cal.4th at p. 298, fn. 11, citing *People v. Wash* (1993) 6 Cal.4th 215, 260−261, *People v. Sandoval* (1992) 4 Cal.4th 155, 193-194, *People v. Wrest* (1992) 3 Cal.4th 1088, 1107 [filed Nov. 1992].) We reserved the question of "whether prosecutorial biblical argument that postdates and deliberately contravenes the holdings in those decisions constitutes a more serious form of prosecutorial misconduct warranting reversal of the penalty phase judgment." (*Vieira, supra*, 35 Cal.4th at p. 298, fn. 11.) Here, the prosecutor's challenged comments were made in July 1992, and so this case does not present an opportunity to consider this issue.

### b.  *Role of jury*

Beck contends that the prosecutor attempted to "shame the jury into imposing a sentence of death."  The prosecutor argued:  "[A]ll the People ask you on this case is to consider everything that you've heard and to arrive at an appropriate decision.  The severest punishment in our society is death. . . . It's punishment for what you did.  That's justice.  Justice is what you get for what you did.  If it's anything less than you deserve, it's not justice.   It's unjust enrichment.   This defendant does not deserve to be unjustly enriched by you, the jury.  He deserves just punishment for what he did. . . . We use the criminal justice system to punish, and it protects society from physical danger and strengthens society by administering fitting punishments that express and nourish the vigor of our values.  We should be ashamed, and indeed alarmed, to live in

a society that does not intelligently express through you, members of our jury, the public's proper sense of proportionate punishment for the likes of people like James David Beck."

There was no misconduct. The prosecutor simply expressed the view that juries reflect the general public's sense of proportionate punishment and that, in the prosecutor's view, the death penalty would be a just sentence for Beck's crimes. There is no reasonable likelihood the jury understood the prosecutor's comments to mean, as Beck argues, "they individually should be ashamed of themselves if they don't impose death, [and] that they would not act 'intelligently' if they did not reach a death verdict."

### c. *Comparisons*

Beck contends the prosecutor improperly described situations that would or would not "call" for the death penalty. The prosecutor argued: "Now, there are only a few crimes in our society that call for the death penalty. I'm not going to say call for the death penalty. That subject one to the death penalty. Because death is never a mandatory sentence. . . . This is one of them. This is one of the most horrible crimes that one man could commit against others. You take the very life, the very life from four people, senselessly, in a brutal fashion, that, ladies and gentlemen, calls, in my opinion, for the death penalty. When I say calls, again, it's not mandatory. It's a death penalty type crime. And my opinion doesn't count, by the way. There are murders that we can — we can understand, not condone but understand. A person comes home and catches his wife unfaithful, we can understand if he pulls a gun, shoots his wife and his neighbor, his best friend. We can say it's not right, but we understand it. And the death

penalty is probably not appropriate in that particular case, depending on the individual, of course. And we can understand it if a guy is under so much pressure at work that he flips out, as we've seen time and again, flips out, kills the boss, kills a co-worker. We don't condone that at all. It's not right. . . . . [B]ut at least there's some underlying circumstances that help us appreciate what's happened and help us determine what's the appropriate punishment. In this particular case, the only thing that makes any sense is that these people — Gerald Cruz, Dave Beck, Ricky Vieira, those people, that group — were mad at Frank Raper, maybe Dennis Colwell. So they decided to do something about it, and they did. They went over there and in cold blood slaughtered four people, two of whom . . . they didn't have any animosity towards. . . . That just transcends the imagination. Brutal, senseless murders. And this person right here is responsible."

There was no misconduct. The prosecutor simply argued that premeditated murder was deserving of greater punishment than impulsive murder and that based on the evidence the murders here were deserving of the death penalty.

### d. *Willey testimony*

Beck contends that the prosecutor improperly made inconsistent arguments about Willey's testimony at the guilt phase and the penalty phase. The arguments were not inconsistent.

As noted, Willey testified that after he and the other perpetrators arrived at the victims' home, Willey had a fistfight with Ritchey outside. Beck suddenly knocked Willey off Ritchey, fell on Ritchey, and slit Ritchey's throat. During

his guilt phase argument, the prosecutor said: "Now we have the person that can really tell us who it was. We have Ron Willey. Ron Willey can tell us who cut Ritchey's throat, because Ron Willey was . . . out there with Mr. Ritchey. Of course, he didn't stab him either. But he was out there fighting with him. And he tells you that it was Dave Beck that came out and cut the throat. Now, why would he tell you that? . . . We're back to the tag team now. He's got to back up Mr. LaMarsh. If he puts Mr. Cruz out there cutting his throat, then Mr. Cruz couldn't be in there playing hardball with Mr. Raper's head. So Mr. Beck is taking the fall for cutting Mr. Ritchey's throat when, in fact, I would submit to you that it was Gerald Cruz [who] cut Mr. Ritchey's throat after Mr. Willey had stabbed him a bunch of times."

At Beck's penalty phase, when discussing section 190.3, factor (j), which asks the jury to consider whether the defendant's participation in the crime was relatively minor, the prosecutor argued: "We know that it was not relatively minor. [Beck] played a major part in the commission of those murders. Regardless of which witness that you want to believe or all the witnesses you want to believe, his part in those murders was major. In fact the testimony of . . . Michelle Evans, . . . he came through the back window like Rambo . . . with his big knife charging down the hallway. The testimony of Jason LaMarsh that this is the man right here that he saw thrust that big knife all the way up to the hilt in the belly of Dennis Colwell. The testimony of Ron Willey that this is the man right here that came out and knocked him off of Richard Ritchey and cut his throat while he lay in the street pleading for his life. Now, I don't know what part of those testimonies that you believe: Any, all, or none. That's entirely up to you.

But there was ample evidence presented at the penalty [*sic*] phase of this trial that Mr. Beck took a major part in the commission of these crimes."

There was no inconsistency or misconduct. At the guilt phase, the prosecutor argued that Willey's testimony that Beck slit Ritchey's throat should not be credited. At the penalty phase, the prosecutor said he did not know which testimony the jury had found credible in convicting Beck, but none of the testimony on which it could have relied demonstrated Beck's participation in the crime was relatively minor. No misconduct is demonstrated.

### 4. *Instructional error*

Beck and Cruz contend the trial court's modification of CALJIC No. 8.87 was erroneous because it did not identify the unadjudicated criminal activity and allowed the jury to consider evidence in aggravation under section 190.3, factor (b) that did not meet the requirements of the statute. We reject these claims.

The court instructed the jury at Cruz's penalty phase in the modified language of CALJIC No. 8.87: "Evidence has been introduced for the purpose of showing that the defendant has committed criminal activity which involved the express[] or implied use of force or violence or the threat of force or violence. Before a juror may consider any of such criminal activity as an aggravating circumstance in this case, a juror must first be satisfied beyond a reasonable doubt that the defendant did, in fact, commit such criminal activity. A juror may not consider any evidence of any other criminal activity as an aggravating circumstance. It is not necessary for all jurors to agree. If any juror is convinced beyond a reasonable doubt

that such criminal activity occurred, that juror may consider that activity as a fact[or] in aggravation. If a juror is not so convinced, that juror must not consider that evidence for any purpose." The court then defined reasonable doubt. Substantially similar instructions were given at Beck's penalty trial.

Cruz submitted a proposed instruction in the language of CALJIC No. 8.87 that the trial court modified. During the Cruz instruction hearing, the court asked the prosecutor if he had any objection to CALJIC No. 8.87. The prosecutor replied, "No, other than we have to specify the —" The court interjected, "I'm going to read it as follows," and then read the language in which the jury was instructed noted above. The prosecutor said, "All right," and Cruz did not object or request that the court identify the criminal acts that involved force or violence.

During the prosecutor's closing argument at Cruz's penalty phase, he argued without objection that the jury could consider the following unadjudicated criminal activity under section 190.3, factor (b): placing a rifle in the mouths of Jennifer, Rosemary, and Vieira and threatening to kill them; repeatedly beating Vieira and Perkins, clapping his infant daughter on the side of the head (which left bruises on the inside of her ears); hanging water bottles from her legs while she was suspended in a harness and making her cry so her lungs would be strong; and kicking Jennifer while she was pregnant between the legs so hard she bled. During the prosecutor's closing argument at Beck's penalty phase, he asserted without objection that the unadjudicated criminal activity under factor (b) included beating Perkins and Vieira, and electrocuting Perkins's toes so that they fused together.

The prosecutor stated that the tape of A. crying that was introduced on rebuttal was not aggravating evidence because it was not an act of violence, but had been introduced in response to Beck's defense mitigating evidence to show that Beck was "not always real good . . . with children."

Cruz contends that the incidents relied on by the prosecutor under section 190.3, factor (b), did "not constitute the use or threat of use of force or violence." He did not object on this ground below, and the claim is therefore forfeited. (*Carrasco*, *supra*, 59 Cal.4th at pp. 966–967.) Moreover, all the incidents relied on involved force or violence.

Beck and Cruz contend that the trial court erred in not identifying what behavior fell within section 190.3, factor (b), and what crime had been committed by that behavior. Here, the prosecutor "during closing argument explicitly identified the evidence to be considered as other crimes under factor (b), and the jury instructions . . . explicitly required that such evidence be considered only if it involved" force or violence or the threat of force or violence. (*People v. Mitcham* (1992) 1 Cal.4th 1027, 1075.) "Therefore, the trial court's failure to list the other crimes relating to factor (b) could not have affected the verdict." (*Ibid.*)

Citing dicta in *People v. Robertson* (1982) 33 Cal.3d 21, 55, footnote 19, Beck and Cruz contend that "this [c]ourt has held that the jury should be instructed as to the specific crimes being alleged by the prosecution in order to make certain that the jury will not improperly consider other acts." In *People v. Pensinger* (1991) 52 Cal.3d 1210, 1267, we observed in response to the defendant's reliance on the same language in *Robertson*: "We have not imposed any sua sponte duty to

instruct in this area. [Citations.] There may even be tactical reasons why the defendant would not wish such an instruction." Likewise, in *People v. Taylor* (2010) 48 Cal.4th 574, 656, we stated: "[W]e have held that absent a request, the trial court has no duty to specify the names or elements of the unadjudicated crimes when instructing the jury on factor (b) evidence. [Citations.] The premise of this rule is that, for tactical reasons, most defendants prefer not to risk having the jury place undue emphasis on the prior violent crimes."

Cruz further contends that the prejudice from evidence at the guilt phase that he possessed assault weapons, knives, and grenades was likely compounded at the penalty phase by the trial court's challenged instruction. He points to a single fleeting reference to his possession of grenades at the guilt phase and no evidence that any of the weapons he possessed were illegal. Nor did the prosecutor rely on evidence Cruz possessed assault weapons, knives, and grenades as aggravating evidence under factor (b). Nothing supports Cruz's speculative claim that the evidence might have been considered by a juror "as criminal activity involving a threat of violence." For similar reasons, we reject Cruz's claim that a juror might have considered his juvenile misconduct of spray painting a car as aggravation under factor (b). Indeed, this evidence was not presented by the prosecutor, but elicited by Cruz's defense counsel in his penalty defense case.

Beck contends that "the jury was not properly guided in their consideration" of the tape of A. crying because the court's instruction did not limit the type of evidence the jury could consider under the factor (b). The instruction stated the jury could only consider "criminal activity which involved the express or implied use of force or violence or the threat of force

or violence," and the prosecutor told the jury this did not include the tape of A. crying. Beck fails to demonstrate how the jury lacked guidance.

### 5. *Death sentence for conspiracy*

Beck and Cruz assert that even if their conspiracy convictions are supported by substantial evidence, the trial court erred in imposing a death sentence based upon this conviction because conspiracy to "commit murder alone cannot make a defendant death eligible." That, as the Attorney General concedes, is correct. (*Vieira, supra,* 35 Cal.4th 264, 294; *People v. Hernandez* (2003) 30 Cal.4th 835, 864–870; *People v. Lawley* (2002) 27 Cal.4th 102, 171–172.) Therefore, as to both Beck and Cruz, we vacate as unauthorized the multiple-murder special-circumstance true findings as to Count V (conspiracy to commit murder), as well as the death sentences imposed for that count. Under our statutory power to modify an unauthorized sentence (§ 1260), "we shall direct the trial court to issue . . . amended abstract[s] of judgment reflecting the appropriate sentence for conspiracy to commit murder, which the Attorney General in this case agrees is imprisonment for 25 years to life." (*Lawley,* at pp. 171–172; see § 182; *Cortez, supra,* 18 Cal.4th at p. 1226.)

Here Cruz instructed the perpetrators to "go and do them all and leave no witnesses." For that reason, contrary to Cruz's contention, we do not direct the trial court to stay these convictions under section 654 because the object of the conspiracy to commit murder was not limited to the actual victims killed, but rather included anyone found at 5223 Elm Street and any witnesses. (Cf. *Lewis, supra,* 43 Cal.4th at p. 539 ["under section 654, defendant may not be punished for

both the underlying crimes and the conspiracy, because there was no showing that the object of the conspiracy was any broader than commission of the underlying crimes"].)

### 6. *New trial motion*

Following the penalty verdict, Beck and Cruz filed substantially similar new trial motions asserting there was newly discovered evidence and *Brady* error. (§ 1181, subd. 8; *Brady v. Maryland* (1963) 373 U.S. 83.) Beck, joined by Cruz, contends that the trial court erred in denying his new trial motion. We conclude there was no abuse of discretion.

### a. *Newly discovered evidence*

Cruz attached to his new trial motion a September 23, 1992 letter from inmate Alfred "Kip" McDonnell (that Cruz asserted was intended for Cruz) that said: "When I was on X's Jason LaMarsh told me that he and Michelle Evans had tricked [Beck] and [Cruz] into going over to her sister's house. Where Jason and Michelle had some drugs hidden. Which they could not get out because Raper and some people were staying there. [¶] Jason said that he and Missy had plan[n]ed for a fight to break out over at her sister[']s between [Beck] and [Cruz] and the people staying at her sister[']s house, while Jason and Missy got the drugs out. [¶] Jason started laughing and said that [Beck] and [Cruz] had no idea of what was going to happen when they showed up at her sister[']s house. [¶] I heard Jason telling Ron that if he 'Ron' went along with his story that they would walk, because his story will be close to Missy's story and Missy won't say anything bad about Ron and Jason. That she[']ll only dump on [Beck] and [Cruz] which they must also do to convince the jury."

At the hearing on the new trial motion, Cruz's counsel said his investigator had contacted McDonnell and asked him to sign an affidavit containing "the same thing as what's in the letter." McDonnell refused to sign the affidavit and said that if he "was brought to court he would take the Fifth." The trial court ruled that "even if the Court were to treat this handwritten letter as a declaration and as signed by Mr. Alfred McDonnell, the Court still feels that in view of the evidence presented at the trial that no different result would have occurred had Mr. McDonnell testified in accord with his letter. His letter deals only with the testimony of co-defendants Mr. LaMarsh and Mr. Willey. There's substantial other evidence which the jury is certainly entitled to rely on in reaching their verdict of guilty for Mr. Cruz and Mr. Beck."

" 'To grant a new trial on the basis of newly discovered evidence, the evidence must make a different result probable on retrial.' [Citation.] '[T]he trial court has broad discretion in ruling on a new trial motion . . .,' and its 'ruling will be disturbed only for clear abuse of that discretion.' " (*People v. Verdugo* (2010) 50 Cal.4th 263, 308 (*Verdugo*).)

Beck asserts that "Evans was the state's key witness and the only witness to supply evidence of a conspiracy to commit murder. It was on the basis of her testimony that Beck and Cruz were convicted of capital murder. Had the McDonnell evidence been given to the jury, there is a reasonable likelihood that the jury would have doubted Evans and would have been more inclined to return convictions of lesser included second degree murder, voluntary manslaughter, or assault with a deadly weapon." Beck contends McDonnell's testimony would have provided "strong independent corroborative evidence in support of Beck's defense."

Even assuming the letter purportedly from McDonnell could be properly considered, we have concluded that there was substantial evidence of a conspiracy to murder even aside from Evans's testimony. (See *ante*, pt. II.B.1.a.) Moreover, Beck was connected to that conspiracy by his own statement to Wallace that he alone or with others had slit some throats, his statements to Rosemary that "they had to do them" and that he had purchased new shoes because his were covered in blood and he could not get them clean, and his presence with Cruz when he purchased the baton later found at the crime scene. Cruz was connected to the conspiracy by Creekmore's identification of him as the person who slit Ritchey's throat, and his purchase of the baton. In addition, the letter was cumulative in part to trial evidence that LaMarsh and Evans had been romantically involved and that several days after the murders the house at 5223 Elm Street had been broken into and a garbage disposal taken that Cruz's counsel argued had contained drugs. Finally, the letter lacked any probative detail as to how LaMarsh and Evans had tricked Beck and Cruz to go to Evans's sister's house, or how they orchestrated a fight that resulted in four deaths. We conclude the trial court did not abuse its discretion in denying Beck's new trial motion based on McDonnell's letter.

### b. *Asserted* Brady *and discovery violation*

On May 8, 1992, during the guilt defense case, Detective Deckard interviewed Jennifer. Beck and Cruz learned of and were provided tape recordings and transcripts of the interview after the guilt phase had concluded. Jennifer did not testify at the guilt phase.

In their new trial motions, Beck and Cruz challenged the failure of the prosecutor to disclose evidence of Jennifer's interview earlier to the defense. The trial court ruled that Jennifer's statements during the interview would not have been admissible because they were made during plea negotiations, and therefore they were also not discoverable. The court further concluded that even if the prosecutor erred in not disclosing the evidence, that the failure was harmless beyond a reasonable doubt.

On appeal, Beck notes Jennifer told investigators that when she met Cruz at a hotel on the night of the murders, Cruz told her that they had gone to "the place where Franklin lived," that "there was a big fight, and it just like took on a life of its own," and "there was blood everywhere." She also recalled Cruz said that "something had gone wrong." Jennifer stated that Raper had "made threats towards us and stuff" and had told Cruz, "Hey man if you don't leave me alone I'm going to kill you." Beck asserts Jennifer also stated that LaMarsh blamed Cruz for the incident and for ruining LaMarsh's life. Our review of the interview tape and transcript indicates Jennifer was actually referring to Willey and said she had seen LaMarsh in court but had not spoken to him on the telephone or visited him.

Pursuant to *Brady v. Maryland*, *supra*, 373 U.S. 83, " 'the prosecution must disclose material exculpatory evidence whether the defendant makes a specific request (*id*. at p. 87), a general request, or none at all. . . .' [Citation.] 'For *Brady* purposes, evidence is favorable if it helps the defense or hurts the prosecution, as by impeaching a prosecution witness. [Citations.] Evidence is material if there is a reasonable probability its disclosure would have altered the trial result.' "

(*Verdugo*, *supra*, 50 Cal.4th at p. 279.) "A 'reasonable probability' of a different result" does not mean "the defendant would more likely than not have received a different verdict with the evidence," but "is . . . shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" (*Kyles v. Whitley* (1995) 514 U.S. 419, 434.) "'Materiality includes consideration of the effect of the nondisclosure on defense investigations and trial strategies. [Citations.] Because a constitutional violation occurs only if the suppressed evidence was material by these standards, a finding that *Brady* was not satisfied is reversible without need for further harmless-error review.'" (*Verdugo*, at p. 279.)

Section 1054.1, the reciprocal discovery statute, "independently requires the prosecution to disclose to the defense, . . . certain categories of evidence 'in the possession of the prosecuting attorney or [known by] the prosecuting attorney . . . to be in the possession of the investigating agencies.'" (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1133.) Evidence subject to disclosure includes any "[r]elevant written or recorded statements of witnesses or reports of the statements of witnesses whom the prosecutor intends to call at the trial" (§ 1054.1, subd. (f)), and "[a]ny exculpatory evidence" (*id.*, subd. (e)). "Absent good cause, such evidence must be disclosed at least 30 days before trial, or immediately if discovered or obtained within 30 days of trial. (§ 1054.7.)" (*Zambrano*, at p. 1133.)

We conclude that Jennifer's statements were not material, hence there was no *Brady* violation. (*People v. Dickey* (2005) 35 Cal.4th 884, 908 [evidence was not material under *Brady* when "it would have added little to the cumulative impact of . . . other . . . evidence"].) We further

conclude any violation of the prosecutor's state law reciprocal discovery obligations was harmless beyond a reasonable doubt. Jennifer's statement that Cruz told her they had gone to "the place where Franklin lived," that "there was a big fight, and it just like took on a life of its own," "there was blood everywhere," and "something had gone wrong," was consistent with Beck's and Cruz's trial testimony, and hence was not material. Evidence that Willey blamed Cruz for the incident and for ruining Willey's life was cumulative to Willey's testimony that he did not kill anyone and did not know anyone was going to be killed that night, and to his closing argument that on the night of the murders he was in Ceres, a town different from where Beck and Cruz lived, when "Cruz had already decided something was going to happen." Finally, Jennifer's statements that she had heard Raper threaten to kill Cruz were cumulative to Cruz's testimony that before the murders Raper had threatened to kill him and that on the night of the murders Evans told him Raper was going to call his biker friends "to come and kill everyone in the camp that night." They were also cumulative to Beck's testimony that Evans told him on the night of the murders that Raper wanted to kill Evans and those with whom she associated at the Camp.

In sum, the trial court acted within its discretion in denying Beck's new trial motion.

### 7. *Constitutionality of the death penalty statute*

Beck and Cruz contends California's death penalty statute and implementing instructions are constitutionally invalid in numerous respects. We have repeatedly rejected similar claims, and Beck and Cruz provide no persuasive reason to revisit our decisions.

"[T]he California death penalty statute is not impermissibly broad, whether considered on its face or as interpreted by this court." (*People v. Dykes* (2009) 46 Cal.4th 731, 813.) We further "reject the claim that section 190.3, factor (a), on its face or as interpreted and applied, permits arbitrary and capricious imposition of a sentence of death." (*Ibid.*; see *Tuilaepa v. California* (1994) 512 U.S. 967, 975−976, 978.)

"The death penalty statute does not lack safeguards to avoid arbitrary and capricious sentencing, deprive defendant of the right to a jury trial, or constitute cruel and unusual punishment on the ground that it does not require either unanimity as to the truth of aggravating circumstances or findings beyond a reasonable doubt that an aggravating circumstance (other than Penal Code section 190.3, factor (b) or (c) evidence) has been proved, that the aggravating factors outweighed the mitigating factors, or that death is the appropriate sentence." (*Rangel, supra,* 62 Cal.4th at p. 1235.) Nothing in *Hurst v. Florida* (2016) 577 U.S. __ [136 S.Ct. 616], *Cunningham v. California* (2007) 549 U.S. 270, *Blakely v. Washington* (2004) 542 U.S. 296, *Ring v. Arizona* (2002) 536 U.S. 584, or *Apprendi v. New Jersey* (2000) 530 U.S. 466, affects our conclusions in this regard. (*Rangel,* at p. 1235, fn. 16.)

"No burden of proof is constitutionally required, nor is the trial court required to instruct the jury that there is no burden of proof." (*Dement, supra,* 53 Cal.4th at p. 55.) The trial court is not required to instruct the jury that "if it determines the mitigating factors outweigh the aggravating factors, it is required to return a sentence of life imprisonment without the possibility of parole." (*Id.* at p. 56.)

Nor is the trial court required to instruct the jury that if the aggravating circumstances are so substantial in comparison to the mitigating circumstances, it may still return a sentence of life imprisonment without the possibility of parole. Choice of penalty is a normative decision, and CALJIC No. 8.88 properly explains to the jury that it may return a death verdict *only if* the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death, not that it *must* do so. (*People v. Bivert* (2011) 52 Cal.4th 96, 124.) We disapprove of *People v. Smith* (2005) 35 Cal.4th 334, 370 to the extent it is inconsistent with this principle. In *Smith* we said, "[T]he jury is not free to return a life verdict regardless of the evidence," but rather "[i]f [the] aggravating circumstances are so substantial in comparison with mitigating circumstances as to warrant the death penalty, then death is the appropriate penalty."

The trial court need not instruct that there is a presumption of life, or that a jury need not be unanimous in finding the existence of a mitigating factor. (*People v. Adams* (2014) 60 Cal.4th 541, 581; *People v. Moore* (2011) 51 Cal.4th 1104, 1139–1140.) Nor is the trial court required to instruct the jury that mitigating circumstances need not be proved beyond a reasonable doubt. (*Kansas v. Carr, supra,* 577 U.S. at p. __ [136 S.Ct. at p. 642] ["our case law does not require capital sentencing courts 'to affirmatively inform the jury that mitigating circumstances need not be proved beyond a reasonable doubt' "]; accord, *Samayoa, supra,* 15 Cal.4th at p. 862.)

The trial court was not required to delete inapplicable factors from CALJIC No. 8.85 (*People v. Watson* (2008) 43 Cal.4th 652, 701), or "instruct that the jury can consider

certain statutory factors only in mitigation." (*People v. Valencia* (2008) 43 Cal.4th 268, 311.) " ' "[T]he statutory instruction to the jury to consider 'whether or not' certain mitigating factors were present did not impermissibly invite the jury to aggravate the sentence upon the basis of nonexistent or irrational aggravating factors." ' " (*People v. Parson* (2008) 44 Cal.4th 332, 369.) "Written findings by the jury during the penalty phase are not constitutionally required, and their absence does not deprive defendant of meaningful appellate review." (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1097.) "The jury may properly consider evidence of unadjudicated criminal activity under section 190.3, factor (b). . . ." (*People v. Lee* (2011) 51 Cal.4th 620, 653.) The language "so substantial" and "warrants" in CALJIC No. 8.88 is not impermissibly vague. (*Romero and Self, supra,* 62 Cal.4th at p. 56.) "Use of the adjectives 'extreme' and 'substantial' in section 190.3, factors (d) and (g) is constitutional." (*Dement, supra,* 53 Cal.4th at p. 57.)

"The federal constitutional guarantees of due process and equal protection, and against cruel and unusual punishment [citations], do not require intercase proportionality review on appeal." (*People v. Mai* (2013) 57 Cal.4th 986, 1057.) Moreover, " 'capital and noncapital defendants are not similarly situated and therefore may be treated differently without violating' a defendant's right to equal protection of the laws, due process of law, or freedom from cruel and unusual punishment." (*Carrasco, supra,* 59 Cal.4th at p. 971.) " 'The death penalty as applied in this state is not rendered unconstitutional through operation of international law and treaties.' " (*People v. Jackson* (2016) 1 Cal.5th 269, 373.)

### 8. *Cumulative prejudice*

Beck and Cruz contend the cumulative effect of guilt and penalty phase errors requires us to reverse the judgment. We have found error but no prejudice in the trial court's instruction on conspiracy to commit murder, the prosecutor's reliance on biblical argument at the penalty phase, and the imposition of the death penalty for convictions of conspiracy to commit murder. (See *ante*, pts. II.B.7.a.1., II.C.3.a., II.C.5.) Likewise, we have assumed error but found no prejudice in testimony regarding a Ka-Bar knife box found in Beck's trailer, the reference to natural and probable consequences in the conspiracy instruction, and ambiguity in the multiple-murder instruction. (See *ante*, pts. II.A.2., II.B.7.a.2., II.B.7.b.) We further conclude that these errors and assumed errors are not prejudicial when considered cumulatively.

## CONCLUSION

For the reasons above, we vacate as unauthorized the multiple-murder special-circumstance true findings as to Count V (conspiracy to commit murder) for Beck and Cruz, as well as the death sentences imposed for that count. We remand to the trial court to state on amended abstracts of judgment sentences of imprisonment for 25 years to life on the conspiracy count (Count V) and to strike the multiple-murder special-circumstance true findings for that count. We affirm the judgments, as modified, in all other respects.

**LIU, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**GROBAN, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Beck and Cruz

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S029843
**Date Filed:** December 2, 2019

_____

**Court:** Superior
**County:** Alameda
**Judge**: Edward M. Lacey, Jr.

_____

**Counsel:**

Andrew Parnes, under appointment by the Supreme Court, for Defendant and Appellant James David Beck.

William T. Lowe; Michael J. Hersek, State Public Defender, under appointments by the Supreme Court, for Defendant and Appellant Gerald Dean Cruz.

Edmund G. Brown, Jr., Kamala D. Harris and Xavier Becerra, Attorneys General, Dane R. Gillette and Gerald A. Engler, Chief Assistant Attorneys General, Jeffrey M. Laurence, Assistant Attorney General, Glenn R. Pruden and David M. Baskind, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Andrew Parnes
Attorney at Law
P.O. Box 5988
Ketchum, ID 83340
(208) 726-1010

William T. Lowe
Attorney at Law
P. O. Box 871
El Cerrito, CA 94530
(510) 230-4285

David M. Baskind
Deputy Attorney General
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102-7004
(415) 510-3759